## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NEWSGUARD TECHNOLOGIES,
INC., 25 W. 52nd Street, 15th Floor
New York, NY 10019

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION and
ANDREW FERGUSON, in his official
capacity as Chairman of the Federal
Trade Commission, 600 Pennsylvania
Avenue NW, Washington, DC 20580

*Defendants.*

Civil Action No.:

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

JURY TRIAL DEMANDED

(Rule 57 Speedy Hearing Request)

## INTRODUCTION

1.    The most basic rule of the First Amendment is that the Free Speech Clause "constrains governmental actors and protects private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019). And "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741–4-2 (2024).

2.    Yet the Federal Trade Commission ("FTC" or the "Commission") under Chairman Andrew Ferguson has set out to do exactly that. In a multi-faceted campaign extending almost a year, the Chairman and the FTC have used the Commission's considerable regulatory powers to attack and punish a private news organization—NewsGuard Technologies, Inc. ("NewsGuard")—to impose their view of speech nirvana.

3.    Under the guise of a supposed antitrust investigation, the FTC has demanded all documents (memos, emails, texts, reporters' notes, subscriber lists, analyses, financial reports, and more) that NewsGuard has created or received since its founding in 2018. Then, in the context of a merger review (approving creation of the world's largest advertising agency holding company, Omnicom), the Commission entered an order requiring that NewsGuard be put on an unprecedented speech-based blacklist—*i.e.*, the merged company had to agree not to subscribe to or rely on

NewsGuard's ratings and journalism because such ratings reflect "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[1]

4.    While the FTC has jurisdiction over unfair competition in commerce and agreements that unreasonably restrain trade, 15 U.S.C. §§ 1, 45, here it is brazenly using its power not for any issue concerning trade or commerce, but rather to censor speech. And it has done so simply out of disagreement with NewsGuard's First Amendment-protected journalistic judgments about the reliability of news sources.

5.    The FTC has pursued its campaign because Chairman Ferguson does not like NewsGuard's news ratings, which he views as biased against conservative publications. That is wrong—NewsGuard's ratings and journalism about news sources are non-partisan and based on fully disclosed journalistic criteria. But the FTC's actions are plainly unconstitutional even if that were not the case. The First Amendment does not allow the government to pick and choose speech based on what it likes or dislikes. In our constitutional scheme the government's legitimate role is not to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks [is] biased." *Moody*, 603 U.S. at 719.

6.    Chairman Ferguson's public statements that the Commission would use its "tremendous array of investigative tools [and] coercive power" to force online publishers to "Do what we say"[2] presaged the extraordinarily broad Civil

---

[1] *In re Omnicom Group Inc.*, ¶¶ 1.D, 2.A, No. C-4823 (Sept. 26, 2025).

[2] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, ProMarket (Apr. 21, 2025), https://www.promarket.org/2025/04/21/transcript-ftc-chairman-andrew-ferguson-keynote-part-ii/.

Investigative Demand ("CID") designed to burden and bleed NewsGuard, as well as the blacklist imposed in the Omnicom Consent Order. This later proscription came at the urging of Newsmax, a conservative media company that has long chafed that it receives lower NewsGuard ratings (for what NewsGuard identified as its failures to follow basic journalistic practices) than other conservative news outlets.

7.    "No government agency should be in the business of policing speech" then-commissioner Ferguson said in late 2024, shortly before he was appointed chair of the FTC.[3] That statement was correct, but, as it turns out, policing private parties' speech is exactly what the FTC and Chairman Ferguson have done in their campaign against NewsGuard. Their view apparently is that using FTC powers to suppress speech is inappropriate *except* when it is speech the government doesn't like. That is wrong. The FTC's actions against NewsGuard are unconstitutional and should be enjoined by this Court.

## JURISDICTION AND VENUE

8.    This action arises under the First and Fourth Amendments to the U.S. Constitution and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

9.    This Court has jurisdiction under 28 U.S.C. § 1331 and the First and Fourth Amendments to the U.S. Constitution.

---

[3] Andrew Ferguson (@AFergusonFTC), X (Nov. 11, 2024, at 8:51 PM), https://x.com/AFergusonFTC/status/1856152760850243905?s=20.

10.    The Court has authority to issue the requested relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

11.    Subject matter jurisdiction exists under Article III because Plaintiff has suffered and will continue to suffer injuries-in-fact; there is a sufficient causal connection between Plaintiff's injuries and Defendants' actions, and a favorable decision from this Court granting Plaintiff relief will redress those injuries.

12.    This dispute is ripe because Plaintiff's rights are being violated, and Plaintiff will suffer further imminent invasions of those rights in the absence of relief from this Court.

13.    Venue is proper under 28 U.S.C. § 1391(e)(1) because the Commission has its principal place of business and Chairman Ferguson performs his official duties in the District of Columbia. Venue is also proper because a substantial part of the events giving rise to Plaintiff's claims occurred in the District.

## <u>PARTIES</u>

### *Plaintiff*

14.    Plaintiff NewsGuard is a nonpartisan media organization that uses fully disclosed journalistic criteria to rate the reliability of online news sources.

### *Defendants*

15.    Defendant Federal Trade Commission is a U.S. government agency tasked with protecting consumers and promoting fair competition; preventing unfair,

deceptive, and anticompetitive business practices; and enforcing federal consumer protection and antitrust laws.

16.    Defendant Andrew Ferguson is Chairman of the Federal Trade Commission. He was appointed to the position by President Donald Trump on January 20, 2025.

## FACTUAL ALLEGATIONS

**I.    NewsGuard's Ratings and Reporting About Online News Sources.**

17.    NewsGuard was founded in 2018 with the mission of providing internet users the context they need to make informed decisions about whether to rely (and the degree to which they can rely) on online sources of news.[4]

18.    NewsGuard was founded by two veteran journalists, Steven Brill and Gordon Crovitz. Mr. Brill previously established *The American Lawyer*, Court TV, The Yale Journalism Initiative, and the Clear Registered Traveler program. Mr. Crovitz spent more than 35 years at *The Wall Street Journal* as publisher, and as an editorial writer and opinion columnist.

19.    Messrs. Brill and Crovitz created NewsGuard because they believed online users would benefit from transparent and fully disclosed reports about the accuracy and reliability of news and information websites. From its launch, NewsGuard has been nonpartisan, and it has based its reviews and analyses on fully disclosed criteria focusing on long-standing journalistic standards.

---

[4] *Brill and Crovitz Announce Launch of NewsGuard to Fight Fake News*, NewsGuard (Mar. 5, 2018), https://www.newsguardtech.com/press/announcing-newsguard/.

20.    NewsGuard's guiding principle has been that no government entity should be in the business of deciding what news people consume, but neither should those decisions be left to unknown and unaccountable algorithms or partisan advocacy groups. Rather, NewsGuard believes people should have nonpartisan, journalistically sound information available to make their own decisions.

21.    NewsGuard is comprised of a team of journalists who review online news websites to create ratings based on disclosed criteria concerning the reliability of news reporting by sites and their transparency. NewsGuard has rated 38,742 news sources, including 12,765 websites.

22.    NewsGuard publishes reliability ratings of online news websites based on nine criteria, which it fully discloses.[5] These criteria assess adherence to basic, long-established practices of journalistic credibility and transparency. They include, for example, whether a publication repeatedly publishes provably false information, references multiple sources and differing viewpoints, effectively corrects errors, and fully discloses ownership and financing of the news site.

23.    Each of the nine criteria is assigned a weighted number of points, which can total to a maximum of 100 points. Based on analysts' judgments of a news provider's performance on the criteria, each site is assigned an overall score of 0 to 100 and a rating indicating the extent to which it adheres to the weighted criteria in NewsGuard's judgment.

---

[5] https://www.newsguardtech.com/ratings/rating-process-criteria/.

24.     NewsGuard also provides a "Nutrition Label" accompanying each website's listed score, which sets forth in detail NewsGuard's findings and ultimate determination. Nutrition Labels include a grid showing NewsGuard's judgment of the site's performance on each of the nine criteria and an explanation of the content on the site, who's behind it, and why it received the score it did. The Nutrition Labels also provide evidence and examples to explain NewsGuard's judgments and indicate the history of the site's ratings.

25.     Every score and Nutrition Label is reviewed and fact-checked by senior NewsGuard personnel before publication to ensure they are as fair and accurate as possible.

26.     The NewsGuard ratings are also informed by discussions with news publishers that are being rated. Online news sites are given the opportunity to provide feedback on NewsGuard's findings before publication. NewsGuard includes relevant comments from website publishers as part of the Nutrition Labels it publishes.

27.     NewsGuard periodically updates its ratings for websites. If a site changes practices, its performance on one or more of the nine criteria may change. More than 2,000 websites have improved their transparency or credibility practices as a result of engaging with NewsGuard through the rating process.

**II.    NewsGuard's Subscribers and Customers.**

    **A.    Consumer Subscribers.**

28.    Consumers access NewsGuard's reliability ratings through an online subscription. The monthly subscription also gives subscribers access to public reports the company produces about false claims spreading in the news.

29.    Subscribers get access to NewsGuard's reliability ratings and Nutrition Labels through browser extensions on their computers and through mobile apps for Apple or Android devices.

30.    As individuals browse the internet, NewsGuard displays trust score icons next to links in their search results and social media feeds. Hovering over each icon brings up a short description of the site and a link to "See the Full Nutrition Label" for a detailed description of the site and why it received its score.

31.    Beyond its ratings of news outlets, NewsGuard has also become a leading source of journalism about foreign disinformation such as Russian,[6] Chinese,[7] and Iranian[8] influence campaigns targeting Americans, and has exposed how violent

---

   [6]  Eva Maitland & Madeline Roache, *Russia's War on Ukraine: Three Years, Three Hundred and Two False Claims | NewsGuard*, NEWSWEEK (Feb. 21, 2025), https://www.newsweek.com/russia-ukraine-disinformation-newsguard-2034104.

   [7] Steven Lee Myers, *DeepSeek's Answers Include Chinese Propaganda, Researchers Say*, N.Y. TIMES (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/technology/deepseek-chinese-propaganda.html.

   [8]  Gordon Crovitz, *For Iran, Disinformation Comes Just Behind Assassination*, The Hill (Nov. 21, 2024), https://thehill.com/opinion/international/5000222-iran-disinformation-trump-threat.

Hamas propaganda videos were promoted to teens on platforms such as TikTok, Facebook, and X during the war in Gaza.[9]

**B. Business Customers.**

32.    NewsGuard's reliability ratings are also used by business subscribers, including by advertisers to make informed decisions about the websites on which to place their ads.

33.    The internet's growth and continually increasing share of advertising dollars has also spawned a multi-billion-dollar industry focusing on brand safety.

34.    An online advertiser does not place ads on websites one-by-one. Online ads are predominantly placed through programmatic advertising campaigns, *i.e.*, automated software-based buying and selling of digital ad placements. An average programmatic ad campaign runs on 44,000 websites.[10] These campaigns are ordinarily managed and directed by ad agencies.

35.    Given the automated processes and the large scale of programmatic campaigns, advertisers and ad agencies cannot know of all the tens of thousands of websites where their ads might appear. This is why they value information about the suitability of websites for their ads and brands. A key service that agencies now

---

[9] McKenzie Sadeghi, *Violent, Celebratory Hamas Videos Garner Millions of Views, Despite Bans by Tech Platforms*, NewsGuard (Oct. 26, 2023), https://www.newsguardtech.com/special-reports/violent-celebratory-hamas-videos-garner-millions-of-views-despite-bans-by-tech-platforms.

[10] *See ANA Provides "First Look" at In-Depth Programmatic Transparency Study*, ANA (June 19, 2023), https://www.ana.net/content/show/id/pr-2023-06-programmaticstudy.

provide to their advertising clients is avoiding ad placements that may be harmful to their brands (referred to in industry parlance as "brand unsafe").

36.    Major international brands have had their advertisements unintentionally placed through programmatic ad campaigns on websites that NewsGuard identifies as advancing dangerous health treatments,[11] promoting election misinformation,[12] or making false claims about the Israel-Hamas conflict.[13]

37.    In the advertising industry, ad placements such as these are considered among the most problematic sorts of brand unsafe placements, yet research shows that 67% of top brands inadvertently advertise on websites with such content.[14]

38.    Advertisers are especially sensitive to unintentionally funding foreign influence operations through their advertising. NewsGuard has identified hundreds of websites that spread Russian propaganda, with many unintentionally funded by Western brand advertising.

---

[11] Matt Skibinski, *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard, https://www.newsguardtech.com/special-report-advertising-on-covid-19-misinformation/.

[12] Matt Skibinski, *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021), https://www.newsguardtech.com/special-reports/special-report-advertising-on-election-misinformation/.

[13] *Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023), https://www.newsguardtech.com/press/brand-danger-newsguard-finds-349-top-global-brands-funding-misinformation-about-the-hamas-israel-conflict-with-programmatic-ads/.

[14] Wajeeha Ahmad, et al., *Companies Inadvertently Fund Online Misinformation Despite Consumer Backlash*, 630 NATURE 123, 124 (2024).

39. For example, NewsGuard reported that in 2019 Berkshire Hathaway's subsidiary GEICO was unintentionally the largest advertiser on Sputnik News, a Kremlin-controlled website.[15] NewsGuard has also reported that many other brands unintentionally placed ads on the pro-Russian site Pravda (*e.g.*, Hertz, Google, Sotheby's, Petco, LendingTree, Cars.com, AAA, Norton, and Toshiba).[16]

40. NewsGuard and Comscore estimated that in 2021, overall, some $2.6 billion of advertising per year appears unintentionally on websites they deem untrustworthy, including ones that publish false content.[17]

## II. NewsGuard Has Been Targeted by Administration Officials, Lawmakers, and Others.

### A. Attacks on NewsGuard by Publishers Unhappy with Ratings.

41. For several years, NewsGuard has faced criticisms from news websites across the political spectrum that NewsGuard's ratings are biased in one direction or another.

---

[15] L. Gordon Crovitz, *How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020), https://www.nytimes.com/2020/01/21/opinion/fake-news-russia-ads.html.

[16] *One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023), https://www.newsguardtech.com/press/one-year-100-myths-newsguard-has-identified-more-than-100-false-narratives-about-the-war-in-ukraine/.

[17] Matt Skibinski, *Special Report: Top Brands Are Spending $2.6 Billion to Misinformation Websites Each Year*, NewsGuard https://www.newsguardtech.com/special-reports/brands-send-billions-to-misinformation-websites-newsguard-comscore-report/.

42. In one year, for example (actually within a period of a few months), one advocacy group produced a report claiming NewsGuard's ratings are biased *against* conservatives while another published a separate report claiming NewsGuard's ratings are biased *toward* conservatives.

43. In 2023, *Consortium News*, a left-leaning website that had received low reliability ratings, sued NewsGuard for defamation and supposed claims under the First Amendment. *Consortium for Indep. Journalism, Inc. v. United States*, 2025 WL 919504, at *1 (S.D.N.Y. Mar. 26, 2025). The U.S. District Court for the Southern District of New York dismissed the suit , holding that NewsGuard's ratings of *Consortium News* were protected editorial opinion. *See id.* at *17–18.

**B.    Newsmax Campaign Against NewsGuard.**

44. At the same time, Newsmax—a conservative cable news network and digital media company which also received low reliability ratings under NewsGuard's journalistic criteria—mounted a campaign to urge Republican lawmakers and members of the administration including FTC Commissioner (and later Chairman) Ferguson to use state powers to silence NewsGuard. While Newsmax has a constitutional right to criticize NewsGuard and lobby government officials, the First Amendment bars those officials from acting on Newsmax's behalf in an attempt to snuff out NewsGuard's speech.

45. Beginning in 2022 and for several years, Newsmax asserted repeatedly in its programs and publications that NewsGuard was biased against conservative media and websites.

46.    Newsmax's attacks ignored the facts that NewsGuard ratings are based on nonpartisan journalistic criteria and are agnostic to the political or editorial viewpoints of online sources. Many left-leaning outlets receive lower scores than comparable right-leaning sources (*e.g.*, Fox News scores higher than MSNBC, the conservative *Washington Examiner* outscores the liberal *Daily Beast,* and the conservative *Daily Caller* outscores the liberal *Daily Kos*).[18] As reflected in a summary reported by the *Washington Post*:



NewsGuard ratings for selected publishers, with 100 being a perfect score

Source: NewsGuard          WILL OREMUS / THE WASHINGTON POST

---

[18]    Statement from Gordon Crovitz, NewsGuard, on Brendan Carr Letter (Nov. 15, 2024), https://www.newsguardtech.com/wp-content/uploads/2024/11/NewsGuard-Statement-on-Brendan-Carr-Letter.pdf.

Source: *Washington Post*.[19]

47.    Newsmax's offensive against NewsGuard appears to be motivated by the fact that it has received lower reliability ratings than other conservative news sources such as Fox News, the *National Review*, and the *Washington Times*. Newsmax competes with these sites for advertisers.

### C.    Putative Congressional Investigations Targeting NewsGuard.

48.    Newsmax lobbied for a congressional investigation of NewsGuard, and when Republicans took control of the House in 2023, several committees opened investigations, including the Oversight and Small Business Committees.

49.    Oversight Committee Chairman James Comer appeared on Newsmax, agreeing with comments of the show's host that "their [NewsGuard's] goal is obviously to bully conservative media out of existence."[20]

50.    After NewsGuard presented evidence to the committee that its ratings are apolitical and nonpartisan, the investigation did not proceed.

51.    In September 2024, the House Small Business Committee released an interim staff report entitled "Small Business: Instruments and Casualties of the

---

[19]    Will Oremus & Naomi Nix, *This Company Rates News Sites' Credibility. The Right Wants It Stopped*, WASH. POST (Dec. 24, 2024), https://www.washingtonpost.com/technology/2024/12/24/newsguard-disinformation-censorship-free-speech/.

[20] Ted Johnson, *Attacking the Watchdog: How Media Rating Site NewsGuard Ended Up As a Target for GOP Lawmakers and Regulators*, Deadline (Dec. 19, 2024), https://deadline.com/2024/12/newsguard-newsmax-trump-fcc-1236202249.

Censorship-Industrial Complex," which took aim at NewsGuard with unsubstantiated claims of bias.[21]

52.    Around the same time, the Senate Judiciary Committee launched an investigation into alleged coordination between the Biden Administration, tech companies, and third parties like NewsGuard, to allegedly propagate and amplify anti-conservative media bias.

53.    In early 2025, the Judiciary Committee held a hearing on what it termed the "Censorship Industrial Complex." NewsGuard cooperated, addressed the Committee's questions, and provided evidence that NewsGuard's ratings are apolitical and do not reflect any anti-conservative bias. The Committee found no evidence to the contrary, and the investigation has not proceeded.

54.    Meanwhile, Senator Ted Cruz, Chairman of the Senate Commerce Committee, publicized a letter he sent to Microsoft pressuring the company to renounce support of NewsGuard and its educational Media Literacy Initiative.[22]

---

[21] H. Comm. on Small Bus., 118th Cong., *Small Business: Instruments and Casualties of the Censorship-Industrial Complex* 42–59 (Interim Staff Rep. 2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

[22] Press Release, U.S. Senate Committee on Commerce, Science, and Transportation, *Sen. Cruz's Investigation Leads Microsoft to Disavow Support for Biased Indoctrination Tool* (Feb. 6, 2025), https://www.commerce.senate.gov/2025/2/sen-cruz-s-investigation-leads-microsoft-to-disavow-support-for-newsguard-s-biased-indoctrination-tool.

### D.    Public Assertions of FTC Chairman Ferguson and Other Administration Officials Targeting NewsGuard.

55.    Defendant Andrew Ferguson has been a long-time critic of NewsGuard. Even before he was appointed by President Trump to be FTC chairman, Ferguson promoted an ideologically motivated effort to pursue and censor NewsGuard.

56.    In November 2024, then-Commissioner Ferguson responded to a post on X about the closure of the U.S. Department of State's Global Engagement Center by referring to NewsGuard specifically and asserting it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[23]

57.    Brendan Carr, the Chairman of the Federal Communications Commission appointed by President Trump, has echoed Ferguson's attacks on NewsGuard.

58.    In a November 2024 letter to the CEOs of Alphabet, Microsoft, Meta, and Apple, then-Commissioner Carr alleged NewsGuard was part of a "censorship cartel" with technology companies and that the company "leverag[es] its partnerships with advertising agencies to effectively censor[] targeted outlets."[24]

59.    Carr said the incoming Trump Administration would investigate and take action against NewsGuard and companies that used its services for protecting

---

[23] Andrew Ferguson (@AFergusonFTC), *supra* note 3.

[24] Letter from Brendan Carr, FCC Comm'r to CEOs (Nov. 13, 2024), https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.

brand safety, declaring that the so-called "cartel" must be "completely dismantled."
*Id.* NewsGuard responded that the claims in Carr's letter were false.[25]

60.    Echoing Carr's threats, in December 2024 then-Commissioner Ferguson
asserted the FTC "ought to conduct … an investigation," incorrectly claiming that
NewsGuard "seems to give a free pass to … major left-leaning outlets."[26]

61.    Following the public (and publicized) statements of Carr and Ferguson,
in January 2025, President Trump named these two individuals to chair the FCC and
the FTC respectively.

62.    The next month, the FTC issued a Request for Information ("RFI")
seeking public comment on "Technology Platform Censorship," asserting that social
media providers and other "tech platforms" are engaged in "censorship" that is
"potentially illegal."[27] The Commission's RFI did not mention that the Supreme Court
has made clear that editorial decisions by publications, websites, and platforms are
firmly protected by the First Amendment. *Moody*, 603 U.S. at 734, 741–42.

63.    In an April 2025 interview, Chairman Ferguson explained how the FTC
could use its "tremendous array of investigative tools" and "coercive power—formal

---

[25]  Statement from Gordon Crovitz, *supra* note 18.

[26]  Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

[27]  Press Release, Fed. Trade Comm'n, *Federal Trade Commission Launches Inquiry Into Tech Censorship* (Feb. 20, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship; *see* Request for Public Comment Regarding Technology Platform Censorship, https://www.ftc.gov/system/files/ftc_gov/pdf/P251203CensorshipRFI.pdf.

and informal" to demand compliance to its views about supposed online "censorship." Ferguson laid out a roadmap of the tactics his FTC would ultimately use against NewsGuard: "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say'."[28]

64.     Ferguson's message was clear that the FTC would use its powers and the burdens and expenses it can impose not to determine if there was any legitimate basis for regulation, but rather to intimidate and coerce NewsGuard to do what the FTC demands. He noted that the FTC's investigative powers and tools "are expensive when applied to you even if we don't win at the end of the day, so knuckle under."[29]

65.     Ferguson's comments are similar to not-so-veiled threats by FCC Chairman Carr about Jimmy Kimmel's late-night comedy monologue mentioning Charlie Kirk, which the administration found objectionable. Carr stated that ABC and its affiliates had to "find ways to change conduct and take action … on Kimmel or there's going to be additional work for the FCC ahead," and "we can do this the easy way or the hard way."[30]

---

[28]  *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, *supra* note 2.

[29]  *Id.*

[30]  Brian Stelter, *How Brendan Carr, the Attack-Dog FCC Chair, Helped Take Down Jimmy Kimmel with Words, Not Actions*, CNN (Sept. 18, 2025), https://www.cnn.com/2025/09/18/media/brendan-carr-jimmy-kimmel-fcc-first-amendment; *see* Mike Wendling, *What does the FCC do – and can it revoke a TV network's license?* BBC (Sept. 19, 2025), https://www.bbc.com/news/articles/c87yel3wgqgo

E.    **The FTC's Tactics Toward NewsGuard Mirror Actions Taken to Suppress Other Platforms, Journalists, and News Ratings Organizations**

66.    The FTC's tactics toward NewsGuard are part of a broader retaliatory campaign against tech and media companies (including other review and rating services) for exercising their First Amendment rights.

67.    In May 2025, the FTC launched an extraordinarily broad, intrusive investigation of Media Matters for America, a nonprofit journalistic and media watchdog organization.

68.    Media Matters published several articles about the rise of "extremist and racist rhetoric" on X (renamed from Twitter) after Elon Musk's acquisition of the platform, reporting that X began placing major companies' ads "next to pro-Nazi content." *Media Matters for Am. v. Fed. Trade Comm'n*, 2025 WL 2378009, at *2–3 (D.D.C. Aug. 15, 2025).

69.    Musk responded in November 2023 by promising to file a "thermonuclear lawsuit against Media Matters." *Id.* at *3.

70.    Musk's vendetta was picked up by administration officials, state attorneys general, and the FCC and FTC.

71.    At the time, Ferguson was a candidate for FTC chairman, and in public statements to promote his candidacy, he touted that he had a "track record of standing up to … the radical left" and would "[i]nvestigate advertiser boycotts" and "'progressives who are targeting disinformation.'"[31]

---

[31] Press Release, PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-

72.     On November 19, 2023, Stephen Miller (the current White House deputy chief of staff) accused Media Matters of "fraud" for its reporting, urging the "2 dozen+ conservative state Attorneys General" to go after the organization. *Media Matters*, 2025 WL 2378009, at *3.

73.     The attorneys general of Texas and Missouri took up the cudgel and issued overbroad, oppressive CIDs to Media Matters. Media Matters sued and won preliminary injunctions precluding both investigations in this Court.

74.     In the case concerning the Texas CID, this Court entered a preliminary injunction blocking the investigation, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), which the D.C. Circuit affirmed. 138 F.4th 563, 569 (D.C. Cir. 2025). The Circuit Court opined that Media Matters was the "target of a government campaign of retaliation" and an "arguably bad faith investigation" infringing "exercise of their First Amendment rights and imposing special burdens on their newsgathering activities and operation of their media company." *Id.* at 581.

75.     In the case concerning the Missouri investigation, this Court found: "A reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities." *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *15 (D.D.C. Aug. 23, 2024).

---

Andrew-N-Ferguson-Overview.pdf; *see* Kari Donovan, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, War Room (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am/.

76.     But the FTC was undeterred by the failed cases of the Texas and Missouri AGs or the rulings of this Court and the D.C. Circuit that the states' actions and coercion against Media Matters were pretextual pursuits in likely violation of the First Amendment.

77.     On May 20, 2025, the FTC issued an extensive CID to Media Matters with 20 detailed specifications demanding all documents and information about methodologies for addressing online speech or misinformation; communications with tech companies or platforms; everything related to Media Matters' newsgathering, reporting, and editorial decisions; all programs, policies, and analyses; and all financial reports and information of the company, among many other demands. *See Media Matters for America v. FTC*, — F. Supp. 3d —, 2025 WL 2378009, at *5 (D.D.C. Aug. 15, 2025).

78.     Media Matters filed suit in June 2025, alleging the FTC violated First Amendment rights by launching an onerous investigation in retaliation for Media Matters' speech, and violated the First and Fourth Amendments by unreasonably requiring production of sensitive and privileged materials impinging on associational rights. *Id*. at *6. Media Matters moved for a preliminary injunction to bar the FTC's investigation from going forward.

79.     This Court granted the preliminary injunction, noting: "This case presents a straightforward First Amendment violation." *Id*. at *1. The Court rejected the government's argument that the FTC Act foreclosed any suit in the district court, observing *inter alia* that reading the statute to preclude Media Matters' First

Amendment claims would "foreclose all meaningful judicial review." *Id*. at *11 (internal quotation omitted).

80.    Given the FTC's comments characterizing Media Matters and the investigation in ideological terms, the timing of the CID (coming on the heels of other failed attempts at retribution), the extraordinary scope of the CID, and the FTC's pretextual explanations for why it targeted Media Matters, the Court held Media Matters was likely to prevail on the merits. *Id*. at *19–21.

81.    The FTC moved in the D.C. Circuit for a stay of the District Court's preliminary injunction order pending appeal. The Circuit Court denied the emergency request. 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025).[32]

82.    True to Chairman Ferguson's threats and telegraphed strategy that companies in the FTC's sights should simply "knuckle under" (because FTC investigations "are expensive even if we don't win"), the FTC turned to NewsGuard and targeted it with burdensome and groundless regulatory action in retaliation for the company's First Amendment activities.

## III.    The FTC Targeted NewsGuard With a Sweeping CID and Threatened Regulatory Action.

83.    On May 20, 2025, the FTC issued a sweeping CID to NewsGuard, 21 pages long, containing 31 Specifications (with dozens of subparts) demanding vast numbers of confidential and sensitive documents.

---

[32] The FTC has appealed the Media Matters preliminary injunction order, and that appeal remains pending. *Media Matters for America v. FTC*, No. 25-5302 (D.C. Cir.).

84.    The CID requires production of "all documents relating to NewsGuard's News Reliability Ratings and any other rating[s];" identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. *See* FTC Civil Investigative Demand, FTC File No. 251-0061 (May 20, 2025), attached hereto as Exhibit A (the "NewsGuard CID"); *see, e.g.,* NewsGuard CID Specifications 5, 8, 26.

85.    The Specifications go further, demanding all materials about NewsGuard's work product and methodology, including data sets; all documents about websites and news sources rated; all ratings and reviews issued; all communications regarding ratings; any and all analyses of the effects of NewsGuard's ratings on advertisers and publishers; and any studies relating to social media or digital advertising. NewsGuard CID Specifications 5, 11, 12, 14–16.

86.    Among its all-inclusive document demands, the CID also requires production of information, materials, and communications relating to NewsGuard's journalism and reporting, including reporters' notes and sources. *See* NewsGuard CID Specification 5.

87.    The CID Specifications regarding NewsGuard's finances are likewise overbroad and intrusive, calling for production of every financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report prepared by or for NewsGuard. NewsGuard CID Specifications 27, 28.

88.    The CID specifies the applicable time frame for responses and document production to be January 1, 2018, to the present. NewsGuard CID at 8 (Instruction I1). NewsGuard was founded and began operations in 2018.

89.    Thus, the FTC's CID effectively demands production of virtually all documents, information, and records of NewsGuard from the company's inception to the present, including those relating to NewsGuard's analyses, methodology, editorial judgments, customers, journalism and reporting.

90.    Under the FTC Act, the agency was required to state the specific conduct constituting an alleged violation that is the subject of investigation and the provision of law applicable to such violation. 15 U.S.C. § 57b-1(c)(2). The FTC did not do that in the NewsGuard CID, leaving the company to guess about what the agency alleged was at issue or how it could have anything to do with legitimate enforcement of antitrust or competition laws.

91.    NewsGuard had substantial and overarching concerns about the CID, particularly that it was targeted at free speech and associational rights of the company and its customers.

92.    NewsGuard raised its concerns from the outset and throughout its dealings with FTC staff attorneys, attempting to explain that NewsGuard's ratings, its editorial decisions, and its dealings with customers are plainly protected First Amendment activities.

93.    Nonetheless, NewsGuard sought to work constructively with FTC staff to provide such information that it could without infringement of First Amendment rights.

94.    In furtherance of NewsGuard's good faith efforts, its counsel participated in ten meet-and-confer discussions and exchanged a similar number of letters back and forth with FTC staff from the time of the initial promulgation of the CID through January 2026, including meet-and-confer discussions on May 28; June 4, 12, 18, and 27; July 10, 17, 18, and 31; August 4, 15, and 21; September 8 and 11; November 17, 2025; and January 13, 2026.

95.    Throughout this period, NewsGuard provided over 40,000 pages of documents in multiple rounds of production to the FTC staff.

96.    In the discussions concerning the CID, NewsGuard demonstrated (as it had earlier in information provided to congressional committees) that its ratings utilize established journalistic standards and practices.

97.    In addition to explaining its news ratings process, NewsGuard also submitted to FTC staff evidence to show that the company's share of the market for advertiser brand safety tools is so *de minimis*—less than 0.1%—that NewsGuard could not possibly be a legitimate target of an antitrust investigation of that market. By January 2026, FTC staff made clear to NewsGuard that its good faith efforts to cooperate were a futile exercise.

98.    On January 15, 2026, two days after the parties' last meet-and-confer discussion, FTC staff sent a letter purporting to be a "good faith effort to reduce

NewsGuard's burden," but which was in reality a doubling down on the CID's unconstitutional demands.

99.    Despite NewsGuard's seven months' efforts to cooperate, FTC staff simply repeated several of the most intrusive, infringing demands the FTC had made from the outset, including: (1) identification of all NewsGuard subscribers; (2) communications with customers; (3) identification of all entities to which NewsGuard had ever assigned a News Reliability Rating; (4) the particulars of each rating assigned to each entity over time; and (5) documents to show how NewsGuard has developed methodologies for ratings (including internal correspondence).

100.    The FTC's persistent, repeated demands for identification of NewsGuard's subscribers (and production of all communications with subscribers) is particularly troubling. Given the tactics and pronouncements of Chairman Ferguson and FCC Chairman Carr about targeting tech and media companies supposedly associated with a "censorship cartel," NewsGuard has ample grounds for concern that the FTC aims to find NewsGuard's customers to pressure them, too. Though today such improper tactics to impose informal censorship are called "jawboning," the FTC's demands are also reminiscent of the witch hunts of the McCarthy era.

101.    NewsGuard has explained to FTC staff that the demands for customer lists and communications plainly violate First Amendment rights of free speech and association, but explanations of the law have fallen on deaf ears at the FTC.

102.    Throughout the dealings with NewsGuard, FTC staff has refused to give assurances that NewsGuard's productions and disclosures satisfied the CID, and they

reiterated that position in the January 15, 2026, letter. FTC staff instead has insisted that NewsGuard remains obligated to provide all documents and information called for by the original CID.

103.    At the same time, FTC staff has been amenable to extensions and delays, dragging out the process through numerous back-and-forths and thereby increasing NewsGuard's expenses and continuing its uncertainty.

104.    Since the FTC issued the CID and as it has continued its pursuit of NewsGuard, the legal expenses to the company have approached 30% of the revenue derived from the brand-safety services NewsGuard provides to clients. The FTC's "investigation" has also required NewsGuard to devote other resources and time of staff and executives, all of which continues to interfere with the company's core mission.

105.    The FTC staff's January 15, 2026, letter makes clear that only capitulation by NewsGuard will satisfy the FTC's demands. The FTC will continue to pursue NewsGuard with the aim of imposing burden and expense regardless of whether it has any legitimate grounds to investigate until, in Ferguson's words, the company "knuckles under."

106.    Recognizing that further efforts to cooperate with the FTC were futile, NewsGuard filed a petition to quash with the FTC pursuant to 16 C.F.R. § 2.10(a) on January 16, 2026.[33] The FTC has taken no action on that motion to date.

---

[33] Petition to Quash, Civil Investigative Demand Dated May 20, 2025, to NewsGuard Techs., Inc., FTC File No. 251-0061 (Jan. 16, 2026).

**IV.    The FTC Entered an Order Blacklisting NewsGuard.**

107.    Unbeknownst to NewsGuard at the time, the FTC's CID was only a first round in its retaliatory censorship campaign against NewsGuard. As NewsGuard was attempting to work in good faith with the FTC in early 2025, the Commission was working separately to use a merger-review proceeding as an excuse to impose an order aimed at blacklisting NewsGuard.

108.    In an unprecedented move that went beyond unconstitutional "jawboning" to a direct order prohibiting private parties from using NewsGuard's ratings and journalism, the FTC imposed a condition on the merger of Omnicom Group Inc. (Omnicom), and The Interpublic Group of Companies, Inc. (IPG) to specifically target NewsGuard by prohibiting the company or any of its affiliates from contracting with NewsGuard or using its rating services.

109.    Omnicom and IPG were the world's third and fourth largest companies involved in media buying for ad agencies and advertisers, and combined they would become the world's largest advertising agency and media buying company.

110.    Omnicom announced on December 4, 2024, that it had entered into an agreement to acquire IPG. The companies negotiated with the FTC through the first half of 2025 to obtain approval of the merger.

111.    On June 23, 2025, the FTC filed a *pro forma* complaint concerning the merger while simultaneously announcing that it had accepted a proposed consent order from the companies.[34]

---

[34] Press Release, FTC Prevents Anticompetitive Coordination in Global Advertising Merger (June 23, 2025), https://www.ftc.gov/news-events/news/press-

112.    The proposed order did not require any divestiture or other structural changes for the new combined company, despite that it would be the world's largest media-buying advertising agency.

113.    Rather, the draft order focused on precluding Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of."[35]

114.    This condition in the proposed order was intended to target and debilitate if not eliminate news rating services, per Chairman Ferguson's oft-stated views that such organizations were biased against conservative websites and publications.

115.    NewsGuard was at the top of the FTC's and Chairman Ferguson's hit list. When the proposed consent order was made public, Ferguson released a statement specifically calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or

---

releases/2025/06/ftc-prevents-anticompetitive-coordination-global-advertising-merger.

[35] Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025).

ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"[36]

116.   While none of this was true, it made clear that Chairman Ferguson's and the FTC's motivations in proposing and effecting the Omnicom merger conditions were political and ideological.

117.   Following the FTC's publication of the draft order, Newsmax ran a series of stories contending it did not go far enough because, as written, it would not prohibit Omnicom from using NewsGuard's rating services.[37]

118.   This was because, as Newsmax well knew, NewsGuard does not direct or recommend "advertising spend" based on "political or ideological viewpoints." NewsGuard's ratings are strictly based on fully disclosed standards for journalistic accuracy and veracity.

119.   Newsmax filed a letter during the comment period for the draft consent order urging the FTC to expand the prohibitory condition. Applying its own ideological and political gloss, Newsmax urged the restriction should be expanded to ensure Omnicom and its ad agencies "can no longer use biased rating organizations,

---

[36]   Statement of Chairman Andrew N. Ferguson, *Omnicom Grp. Inc.*, FTC File No. 251-0049, at 5 & n.34 (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

[37]   *See, e.g.*, Paul Bond, *Megamerger Omnicom, IPG Mum About NewsGuard Bias*, Newsmax (June 26, 2025, at 17:35 ET), https://www.newsmax.com/us/news-bias-ftc-omnicom/2025/06/26/id/1216643/.

fact checkers, and other third parties to engage in censorship of disfavored news outlets."[38]

120.   Newsmax was not subtle about its aim. Its fourteen-page letter mentioned NewsGuard more than a dozen times. Newsmax echoed Chairman Ferguson's repeated statements that NewsGuard's reviews and ratings of news sources based on journalistic standards were "biased" because some conservative-leaning websites and publications scored poorly.

121.   Not content to rely on the official FTC comment process, Newsmax took to the internet to lobby Chairman Ferguson, members of Congress, and the President. In posts on X directed to Chairman Ferguson, Newsmax asserted the FTC's proposed order was inadequate because it "makes no mention of 'censorship' or 'targeting conservatives' and '[f]ully allows Omnicom to use left-wing NewsGuard."[39] Newsmax admitted its comments and advocacy to the FTC were specifically targeted at NewsGuard.[40]

---

[38]   Newsmax Media Inc., Comment Letter on Proposed Consent Order 13 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0008; *see also Newsmax's Tabacco Slams FTC Approval of Omnicom-IPG Merger*, Newsmax (Aug. 3, 2025, at 07:23 ET), https://www.newsmax.com/newsfront/tabacco-ftc-omnicom/2025/08/02/id/1221045 (objecting that the draft order "says nothing at all about stopping these agencies from using third-party services like NewsGuard to block media like Newsmax").

[39]   NEWSMAX (@NEWSMAX), X (July 31, 2025, at 21:58 ET), https://x.com/NEWSMAX/status/1951100290775630054status/1951100290775630054.

[40]   *CPAC, IMC Want FTC to Stop Omnicom-IPG Merger*, Newsmax (July 29, 2025, at 12:49 ET), https://www.newsmax.com/newsfront/cpac-imc-omnicom-ipg/2025/07/29/id/1220531.

122.    Conservative advocacy groups joined the chorus with Newsmax, submitting a letter urging the FTC impose a merger condition barring Omnicom from working with "ostensibly neutral third-party monitors such as NewsGuard," which the groups claimed "in practice serve as gatekeepers that suppress conservative and heterodox content."[41]

123.    The groups submitting the letter did not mention, however, that they are supported by Newsmax and CPAC, the Conservative Political Action Committee (which is also supported by Newsmax).

124.    Numerous First Amendment scholars and free speech organizations also submitted comments regarding the initial proposed order, explaining its unconstitutionality,[42] but the FTC made no mention of these comments and disregarded First Amendment concerns.

125.    The FTC subsequently issued a revised order removing terms about using third-party services with "political or ideological bias." Instead, the FTC revised the Consent Order to prohibit the merged Omnicom entity or its ad agencies from

---

[41] Indep. Media Council & CPAC Found. Ctr. for Regul. Freedom, Comment Letter on Proposed Consent Order 2 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0010.

[42] *See, e.g.*, Public Knowledge, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0013; TechFreedom, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0015; Vikram David Amar & Ashutosh Bhagwat, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0009.

using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[43]

126.    In its press release announcing the final Consent Order, the FTC stated that it revised the order "in response to public comments."[44] But the only public comments advocating such censure came from Newsmax and groups it funds.

127.    There is no indication in the public record that Omnicom proposed or advocated for the censorial provision in the Consent Order aimed at precluding use of NewsGuard services and ratings. And it would be unusual, at the least, for an ad agency and marketing company to seek restrictions on use of services designed to protect advertisers' reputations and brand safety.

128.    In short, the FTC ordered that Omnicom and all its affiliates and ad agencies cannot contract with or use nonpartisan review and ratings services based on journalistic criteria.

129.    This condition targets NewsGuard "with the precision of a laser beam." *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988).

---

[43]  Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

[44]  Press Release, FTC Alters Final Consent Order in Response to Public Comments, Preventing Coordination in Global Advertising Merger (Sept. 26, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-alters-final-consent-order-response-public-comments-preventing-coordination-global-advertising.

130.   There was no further comment period when NewsGuard could address or object to this revised language. The FTC adopted this as the final order on September 26, 2025.

131.   The revised merger condition in the Omnicom Consent Order amounts to a government-imposed blacklist. It prohibits Omnicom and its ad agencies and affiliates from using NewsGuard's services. Other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement actions, and liability if they do not divorce themselves from dealings with NewsGuard.

132.   Oddly, after the FTC altered the Consent Order at Newsmax's insistence, the Commission seemingly still did not appreciate the effect of the order. In announcing the final Consent Order, the FTC stated: "The order eliminates Omnicom's ability to deny advertising dollars to media publishers based on their political or ideological viewpoint." But the terms about "political and ideological" services had been eliminated earlier.[45] If the FTC had not adopted Newsmax's suggested revision, the condition would not have reached NewsGuard at all.

133.   The FTC's Consent Order has adversely affected NewsGuard's business already. In addition to the direct restrictions imposed on Omnicom and its affiliates, other NewsGuard clients have been scared away by the FTC's actions.

134.   One long-time client that has done significant business with IPG and Omnicom indicated it would not renew its contract after the Consent Order, noting

---

[45] *See id.*

"recent developments that require us to take a more cautious approach to this area of our business."

135.    Given the breadth and punitive nature of the Omnicom Consent Order, likely other NewsGuard customers will follow suit.

### FIRST CAUSE OF ACTION
### First Amendment Violation
### (Unconstitutional Retaliation Based on Perceived Viewpoints)

132.    The First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).

133.    A government official engages in unconstitutional retaliation when he (1) targets activity protected by the First Amendment; (2) takes action that is sufficient to deter a person of ordinary firmness from speaking again; and (3) there is a causal link between the exercise of the constitutional right and the official's adverse action. *Aref v. Lynch*, 833 F.3d 242, 290 (D.C. Cir. 2016). The FTC's actions targeting NewsGuard meet each of these conditions.

134.    The First Amendment protects matters of journalistic judgment and editorial decisions. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254-56 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).

135.    NewsGuard's rating service is quintessential journalistic activity, and it is "obviously engaged in conduct protected under the First Amendment." *Media Matters*, 138 F.4th at 584; *see also Consortium for Indep. Journalism*, 2025 WL

919504, at *18 n.11 (NewsGuard's use of journalistic criteria as a news rating system is akin to "a newspaper's editorial section").

136.   Defendants have taken regulatory actions against NewsGuard targeting its journalistic activity that would deter a person of ordinary firmness from continuing to engage in protected activity. These actions include the FTC's overly broad and punitive CID and the Consent Order terms in connection with the Omnicom merger that target NewsGuard and seek to undermine or destroy NewsGuard's business.

137.   The CID's blunderbuss demands have burdened NewsGuard by diverting revenue and resources away from NewsGuard's core mission. NewsGuard's staff has had to devote countless hours to responding to the FTC's demands.

138.   FTC staff has not engaged in genuine good faith negotiations with NewsGuard concerning the overbroad scope or the First Amendment infringing aspects of the CID. The FTC's tack instead has been to drag out its "investigation" and thereby add still more costs and burdens on NewsGuard.

139.   The possibility that the FTC will seek to enforce the CID in federal court raises the specter of additional legal expenses and diversion of resources.

140.   Additionally, the FTC's Consent Order foreclosing Omnicom from serving the advertisers it represents by continuing to facilitate their use of NewsGuard's service has had a direct and substantial effect on NewsGuard, which has already lost customer contracts. NewsGuard expects and is preparing to lose additional customer relationships in the coming months.

141.    Omnicom faces the prospect of violating the consent decree if it continues to serve its thousands of clients by working with NewsGuard. NewsGuard also expects, given current market dynamics, that other advertising agencies will propose to merge in the coming years, and that the FTC will similarly require abandoning any agency relationship with NewsGuard as a condition of such a merger.

142.    The FTC's actions were designed to chill NewsGuard's First Amendment-protected speech, journalism, and editorial activities by intruding on NewsGuard's news judgment and to violate NewsGuard's First Amendment association rights by disrupting its client relationships by exposing them to government retaliation.

143.    The FTC's various actions targeting NewsGuard, including the CID and the Omnicom merger conditions, are sufficient to chill a reasonable publisher in NewsGuard's position from engaging in protected expression. *See Aref*, 833 F.3d at 258. A combination of adverse actions and statements by officials is sufficient to demonstrate retaliatory motive. *E.g.*, *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 2026 WL 80796, at *16-20 (D.D.C. Jan. 11, 2026).

144.    Here, there is a direct causal connection between NewsGuard's protected journalistic activity and the FTC's retaliatory actions. The FTC's campaign against NewsGuard is based on the false premise that its news rating service disfavors conservative viewpoints. This is incorrect, but even if true, it would be a patently unconstitutional basis for government action.

145.    For purposes of this constitutional review, the government's motivation to restrict speech is what matters. *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016).

146.    Government retaliation is even more of a concern where the speech restriction is based on a disfavored viewpoint. "Viewpoint discrimination is … an egregious form of content discrimination" and is essentially unconstitutional *per se*. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). "Viewpoint discrimination is poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring), and the government lacks any legitimate interest is selectively penalizing disfavored viewpoints. *Healy v. James*, 408 U.S. 169, 187-88 (1972).

147.    Chairman Ferguson has spoken publicly of his "intent to target media groups and other actors in language that focuses on their viewpoints and the content of their speech." *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025) (per curiam). He has called for investigations of what he called Big Tech "censorship," and he specifically named NewsGuard as a target.

148.    When the Omnicom Consent Order was first proposed, Chairman Ferguson released a statement explicitly calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"

149. Chairman Ferguson's various statements that frame the FTC's investigations and other regulatory actions in ideological terms provide an unambiguous causal link to the adverse actions taken against NewsGuard. *See, e.g.*, *Media Matters for Am. v. FTC*, __ F. Supp. 3d __, 2025 WL 2378009 (D.D.C. Aug. 15, 2025), *stay pending appeal denied*, 2025 WL 2988966 (D.C. Cir. 2025), *appeal docketed*, No. 25-5302 (D.C. Cir. Aug. 19, 2025). His statements and the FTC's actions ignore "a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S. 726, 745-46 (1978).

150. Although Chairman Ferguson purports to be acting within the context of enforcing antitrust law, the FTC is using a statutory regime designed to focus on economic conduct to regulate the speech of private actors. Using antitrust laws to govern private speech falls clearly outside the FTC's statutory mandate.

151. Chairman Ferguson's references to a valid regulatory purpose under antitrust law are purely pretextual. His numerous statements focusing on NewsGuard and the timing of the CID make clear that "retaliatory animus was the but-for cause of the FTC's CID." *Media Matters*, 2025 WL 2378009, at *2.

152. The sweeping scope of the actions targeting NewsGuard provides further evidence of pretext. *Id.* at *21. The CID's "demands . . . go well beyond the investigation's purported scope," which is apparently an effort by the FTC to determine whether NewsGuard "has information about the use of 'brand suitable' or 'brand safe' lists to 'coordinate ad placement.'" *Id.*

153.    Likewise, the conditions imposed by the Omnicom Consent Order are disconnected from any valid regulatory purpose. The government "may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741.

154.    This Court has jurisdiction over actions arising under the Constitution, including challenges to unconstitutional action by federal agencies that violate the First Amendment. *Trudeau v. FTC*, 456 F.3d 178, 185-86 (D.C. Cir. 2006). In particular, this jurisdiction includes claims for unconstitutional retaliation. *Id.* at 190 & n.22 (collecting cases); *accord Hubbard v. U.S. Env't Prot. Agency*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) ("the court's power to enjoin unconstitutional acts by the government … is inherent in the Constitution itself") (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). And it includes challenges to overly broad investigations that intrude on First and Fourth Amendment rights. *See, e.g.*, *Media Matters v. Paxton*, 138 F.4th at 563.

155.    In deciding whether the FTC has exceeded its constitutional authority, federal courts owe no duty of deference to the agency. *Loper Bright Enters. v. Raimondo*, 603 US 369, 392-93 (2024). This principle is especially important in determining whether a federal agency has engaged in unconstitutional retaliation. Not only is the agency self-interested, but "courts, not agencies, are expert on the First Amendment." *Porter v. Califano*, 592 F.2d 770, 780 n.15 (5th Cir. 1979). Administrative agencies receive no deference "when reviewing a potential violation

of a constitutional right." *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999).

156.    By engaging in a campaign of retaliation for disfavored speech, the FTC has forfeited any claim to a presumption of regularity. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 889 (D.D.C. 2025) ("The retaliatory nature of the Executive Order at issue … is clear from its face"). As numerous judges have pointed out, "courts have seen instance after instance of departures from this tradition" of assuming that executive or administrative authority is in service of a good faith application of law. *Fed. Educ. Ass'n. v. Trump*, 795 F. Supp. 3d 74, 88-92 (D.D.C. 2025) (collecting numerous cases), *stay pending appeal denied*, 2025 WL 2738626, at *8 (D.C. Cir. Sept. 25, 2025) (Pan, J., concurring) (upholding denial of presumption of regularity where executive action "reflects retaliatory motive"); *see also Am. Acad. of Pediatrics*, 2026 WL 80796, at *20 (constellation of factors rebuts presumption of regularity).

## SECOND CAUSE OF ACTION
### First and Fourth Amendment Violations
### (Unjustified and Overly Burdensome CIDs)

157.    Even if there were no retaliatory motive, the FTC's CIDs served on NewsGuard are overly broad and intrusive.

158.    The First and Fourth Amendments impose important restrictions on the reach of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). In particular, the First Amendment affords NewsGuard a privilege that protects it from having to disclose information if doing so would chill

its constitutional rights of free speech and free expression. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009).

159. These constitutional protections are interrelated; when an administrative subpoena seeks materials that could fall under First Amendment protection, courts require that the Fourth Amendment's standards be met with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

160. Investigating a news organization because of its perceived editorial policies is not a valid governmental interest. "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press." *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957).

161. First Amendment case law makes clear that "before a state or federal body can compel disclosure of information which would trespass upon [F]irst [A]mendment freedoms, a 'subordinating interest of the State' must be proffered, and it must be 'compelling.'" *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 389 (D.C. Cir. 1981) (quoting *NAACP v. Alabama*, 357 U.S. 449, 463 (1958)).

162. The FTC's investigation of NewsGuard is a classic fishing expedition. The CID did not "state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation" as required by 15 U.S.C. § 57b-1(c)(2). Instead, the CID simply provided a boilerplate

statement that it was seeking information "to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission."

163.    The FTC's extensive demands intrude on NewsGuard's constitutionally protected editorial processes. Overall, the CID's Specifications demand vast numbers of confidential, highly sensitive documents, a request that effectively encompasses virtually all the company's emails, reporters' notes and drafts, texts, and other documents created since its founding in 2018. The CID also demands the identities of, NewsGuard's subscribers and all communications with them.

164.    NewsGuard met and conferred with FTC staff on ten occasions and has produced more than 40,000 pages of responsive documents in a good faith effort to comply. Despite NewsGuard's efforts, the FTC demands additional document productions.

165.    A January 15, 2026, letter, misleadingly characterized as a "good-faith effort to reduce NewsGuard's burden," actually doubles down on the FTC's unconstitutional demands. The letter reiterates the CID's most burdensome requests, including for productions encompassing the identities of and communications with NewsGuard's customers, the identity of all entities to which NewsGuard has ever assigned a News Reliability Rating (as well as how they were rated), the rating methodology, and "internal correspondence about the process of developing the methodology."

166.    The CID's requests for information identifying NewsGuard's customers target information protected by NewsGuard's First Amendment associational rights.

The CID demands "all communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser … with whom NewsGuard had a commercial relationship relating to NewsGuard News Reliability Ratings" and the names of customers.

167.    NewsGuard is a journalistic organization with a First Amendment right to associate with its customers to engage in the free exchange of ideas protected by the Constitution. *See NAACP*, 357 U.S. at 460 ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). Because "compulsory disclosure of organizational ties can constitute a significant encroachment on freedom of association," *Familias Unidas v. Briscoe*, 619 F.2d 391, 399 (5th Cir. 1980), it can only be justified if it is narrowly tailored to further a sufficiently important government interest, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021). The FTC's open-ended demand for customer identities untethered to any legitimate investigatory interest is the antithesis of a constitutionally tailored information request.

168.    "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Brock v. Loc. 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349 (9th Cir. 1988) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). Accordingly, "before requiring that

44

organizations reveal sensitive information about their members and supporters," the government must satisfy "exacting scrutiny." *Ams. for Prosperity*, 594 U.S. at 609.

169.    The FTC's expansive investigation of NewsGuard cannot satisfy exacting scrutiny. A government actor's "intentional service of [a] CID" can be "the act that caused chilling effects" on a media organization's First Amendment rights, as serving a CID "legally obligate[s]" the organization "to produce records." *Media Matters v. Paxton*, 732 F. Supp. 3d at 22.

170.    This Court has jurisdiction over actions arising under the Constitution, including challenges to unconstitutional action by federal agencies that violate the First Amendment. *Trudeau*, 456 F.3d at 185-86.

### THIRD CAUSE OF ACTION
### First Amendment Violation
### (Unlawful Targeting of NewsGuard's First Amendment Activity Via Intermediaries)

171.    A public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" violates the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

172.    A government official cannot do indirectly what he or she is barred from doing directly. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). Specifically, "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67-69*)*. No doubt,

government officials may criticize private speakers, and in doing so can "rely on the merits and force of [their] ideas, the strength of [their] convictions, and [their] ability to inspire others," but they cannot "use the power of the State to punish or suppress disfavored expression." *Id.* at 188.

173.    This means the First Amendment bars the government from penalizing speech indirectly by applying regulatory pressure on third-party intermediaries. For example, in *Bantam Books* the Supreme Court held the government could not apply pressure on third-party booksellers in order to impose a blacklist on publications. 372 U.S. at 71. And in *Backpage.com*, the Seventh Circuit enjoined a sheriff and held that he had violated the First Amendment by pressuring credit card companies to stop doing business with a classified advertising website because he objected to the content of ads om the site. *Backpage.com,* 807 F.3d at 235.

174.    The Supreme Court unanimously reaffirmed this principle in *Vullo*, where it held the New York Department of Financial Services ("DFS") could not leverage its regulatory authority over insurance companies to penalize the National Rifle Association for its political positions on gun control. State officials advised the regulated insurance companies that doing business with the NRA sent the wrong message and entered agreements with companies that "agreed not to provide any NRA-endorsed insurance programs." 602 U.S. at 184-85. In particular, the Court held it offends the First Amendment for DFS to enter consent decrees granting regulatory concessions to regulated insurance companies on condition they cease doing business with a disfavored speaker. *Id.* at 198.

175.    Such an "intermediary strategy" is particularly threatening to the First Amendment because it "allows government officials to expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over." *Id*. at 197-98 (cleaned up). It magnifies the effectiveness of speech suppression efforts because it targets entities with less incentive to resist the government's censorial efforts—the "business partners" of the disfavored speaker. *Id*. at 198.

176.    To state a claim that the government is violating the First Amendment through the coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could reasonably be understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech. *Id*. at 191.

177.    Chairman Ferguson's many statements and the FTC's direct actions targeting NewsGuard represent an unconstitutional attempt to impose a regulatory penalty on NewsGuard because of its news rating service.

178.    Chairman Ferguson's repeated statements that NewsGuard allegedly "censors" conservative news sites (because some receive poor ratings) evinces a fundamental misunderstanding of the concept of censorship. First, "[t]he Free Speech Clause of the First Amendment *constrains* governmental actors and *protects* private actors." *Halleck*, 587 US at 804 (emphasis added). And second, it is not the government's legitimate role to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks biased." *Moody*, 603 U.S. at 719.

179.    By accusing NewsGuard of providing "biased" evaluations of news sites, Chairman Ferguson has inverted the relationship between the government and the

First Amendment. NewsGuard is a private business that offers assessments of the quality of news sites based on disclosed journalistic criteria. As a matter of law, NewsGuard cannot be a censor. But by asserting FTC control over the market for NewsGuard's services, Chairman Ferguson has embraced the censor's role.

180.    The FTC has taken concrete steps to undermine NewsGuard's business by imposing conditions in the Consent Order approving the Omnicom-IPC merger that requires the merged company to cease doing business with NewsGuard. The Consent Order  effectively imposes a blacklist on NewsGuard's services. The First Amendment associational rights implicated by the CID's demand for NewsGuard's customer lists are eclipsed by the consent decree, which imposes an absolute prohibition on Omnicom's association with NewsGuard.

181.    Those conditions were imposed after Chairman Ferguson repeatedly criticized NewsGuard for what he perceived to be its editorial viewpoint and after he described what regulatory strategies he would use against NewsGuard. The conditions were also added at the behest of news organizations that disagree with NewsGuard's journalistic standards (and in NewsGuard's judgment fail to meet the standards).

182.    NewsGuard has already lost business as a consequence of the Consent Order, and the loss of substantial additional business is likely imminent.

183.    The Consent Order as imposed by the FTC violates the First Amendment for the same reason as the publication blacklist in *Bantam Books*, the

pressure campaign on credit card companies in *Backpage.com*, and the consent decree conditions barring business relationships with the NRA in *Vullo*.

184.    NewsGuard has standing to challenge the merger conditions, as they adversely affect its business, and this Court has jurisdiction to hear that challenge. NewsGuard's constitutional challenge is wholly collateral to the FTC's merger review provisions, the constitutional questions are outside the agency's expertise, and precluding district court review would foreclose all meaningful judicial review of the FTC's actions. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023); *see Porter*, 592 F.2d at 780 n.15.

## **CONCLUSION**

The Supreme Court unanimously reaffirmed just two terms ago that "the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or … through private intermediaries." *Vullo*, 602 U.S. at 198. This rule applies equally when federal regulators operate quietly behind closed doors as it does when they shout their unconstitutional intentions from the rooftops. Here, Chairman Ferguson telegraphed his intention to suppress NewsGuard's speech even before taking office and then  implemented this strategy in plain sight. Although he tries to dress his campaign against NewsGuard in the garb of FTC authority, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). This Court must require Chairman Ferguson and the FTC to operate within constitutional bounds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    Declare the FTC's CID to NewsGuard constitutes a First Amendment retaliatory action in violation of Plaintiff's rights under the First Amendment to the U.S. Constitution.

B.    Declare the FTC's CID to NewsGuard violates Plaintiff's rights under the First and Fourth Amendments of the U.S. Constitution.

C.    Declare the Omnicom-IPG merger condition barring the merged entity from doing business with news rating services violates Plaintiff's rights under the First Amendment to the U.S. Constitution.

D.    Preliminarily enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the CID in violation of Plaintiff's constitutional rights.

E.    Preliminarily enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the Omnicom-IPG merger condition in violation of Plaintiff's constitutional rights.

F.    Permanently enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the CID or further investigating Plaintiff in violation of its constitutional rights.

G.    Permanently enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the Omnicom-IPG

merger condition in violation of Plaintiff's constitutional rights or to enforce any similar merger condition.

H.    Grant Plaintiff any and all other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

In compliance with Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: February 5, 2026                    Respectfully Submitted,

                                                        /s/ Robert Corn-Revere
                                                           Robert Corn-Revere
                                                           (D.C. Bar No. 375415)
                                                        James C. Grant
                                                           (WA Bar No. 14358)
                                                        Sara E. Berinhout
                                                           (MA Bar No. 703217)
                                                        FOUNDATION FOR INDIVIDUAL
                                                           RIGHTS AND EXPRESSION
                                                        700 Pennsylvania Ave. SE, Ste. 340
                                                        Washington, DC 20003
                                                        (215) 717-3473
                                                        bob.corn-revere@fire.org
                                                        jim.grant@fire.org
                                                        sara.berinhout@fire.org

                                                        *Counsel for Plaintiff*