# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC., <br><br> *Plaintiff*, <br> v. <br><br> FEDERAL TRADE COMMISSION and ANDREW FERGUSON, <br><br> *Defendants*. | Civil Action No.: 1:26-cv-00353-DLF |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 2

STANDARD OF REVIEW....................................................................................... 27

ARGUMENT............................................................................................................ 27

      I.      NewsGuard Is Likely to Prevail on the Merits of Its Claims. ................27

              A.     Chairman Ferguson and the FTC Retaliated Against NewsGuard Because of its Editorial Judgments. .........................28

              B.     The FTC's Intermediary Strategy Reflected in the Omnicom-IPG Consent Order Is Unconstitutional Jawboning.......................................................................................36

              C.     The FTC's Actions Against NewsGuard Violate the First and Fourth Amendments. ..........................................................38

      II.     NewsGuard Will Suffer Irreparable Harm Absent an Injunction. .......42

      III.    The Remaining Equitable Factors Favor Granting Preliminary Relief. ....................................................................................................43

CONCLUSION ........................................................................................................ 44

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
  No. 25-cv-4505, 2026 WL 80796 (D.D.C. Jan. 11, 2026) .......................................... 32
*Am. Family Ass'n, Inc. v. City & County of San Francisco*,
  277 F.3d 1114 (9th Cir. 2002) ...................................................................... 37
*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021) ....................................... 41
*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ................................................................. 28, 29
*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) .................................................................. 37, 38
*Bailey v. Fed. Bureau of Prisons*,
  No. 24-1219, 2024 WL 3219207 (D.D.C. June 28, 2024) ........................................ 42
*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................ 36, 37
*Bell v. Hood*,
  327 U.S. 678 (1946) ................................................................................ 2
*Black Lives Matter D.C. v. Trump*,
  544 F. Supp. 3d 15 (D.D.C. 2021) ................................................................. 32
*Centro Tepeyac v. Montgomery County*,
  722 F.3d 184 (4th Cir. 2013) ...................................................................... 43
*Centro Tepeyac v. Montgomery County*,
  779 F. Supp. 2d 456 (D. Md. 2011) .............................................................. 43
*Cigar Ass'n of Am. v. U.S. Fed. Drug Admin.*,
  317 F. Supp. 3d 555 (D.D.C. 2018) ............................................................... 42
*Consortium for Indep. Journalism, Inc. v. United States*,
  23 Civ. 7088 (KPF), 2025 WL 919504 (S.D.N.Y. Mar. 26, 2025) ............................. 8, 29
*Constantine v. Rectors & Visitors of George Mason Univ.*,
  411 F.3d 474 (4th Cir. 2005) ...................................................................... 30
*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) ...................................................................... 30
*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998) ................................................................... 42
*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nash. & Davidson Cty.*,
  274 F.3d 377 (6th Cir. 2001) ...................................................................... 44
*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................................ 42
*Familias Unidas v. Briscoe*,
  619 F.2d 391 (5th Cir. 1980) ...................................................................... 41
*Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*,
  655 F.2d 380 (D.C. Cir. 1981) ..................................................................... 40

*Fla. EB5 Invs., LLC v. Wolf*,
   443 F. Supp. 3d 7 (D.D.C. 2020).................................................................. 27

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ..................................................................... 44

*Goodwin v. Dist. of Columbia*,
   579 F. Supp. 3d 159 (D.D.C. 2022) .......................................................... 32

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013).................................................................. 43

*Grajales v. P.R. Ports Auth.*,
   682 F.3d 40 (1st Cir. 2012) ....................................................................... 32

*Hartman v. Moore*,
   547 U.S. 250 (2006) ................................................................................. 28

*Hawkins v. District of Columbia*,
   923 F. Supp. 2d 128 (D.D.C. 2013) .......................................................... 32

*Healy v. James*,
   408 U.S. 169 (1972) ................................................................................. 39

*Houston Cmty. Coll. Sys. v. Wilson*,
   595 U.S. 468 (2022) ................................................................................. 28

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) .................................................................. 43

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) ................................................................................. 39

*Jenner & Block LLP v. U.S. Dep't of Just.*,
   784 F. Supp. 3d 76 (D.D.C. 2025) ........................................................... 30

*Johnson v. District of Columbia*,
   726 F. Supp. 3d 8 (D.D.C. 2024)............................................................... 32

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020)............................................................. 42, 43

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)...................................................................... 44

*Lewis v. City of Boston*,
   321 F.3d 207 (1st Cir. 2003) ..................................................................... 31

*Lewis v. Gov't of D.C.*,
   161 F. Supp. 3d 15 (D.D.C. 2015)........................................................ 32, 33

*Manhattan Cmty. Access Corp. v. Halleck*,
   587 U.S. 802 (2019) ............................................................................. 1, 39

*Massey v. Johnson*,
   457 F.3d 711 (7th Cir. 2006) ..................................................................... 31

*Media Matters for Am. v. Bailey*,
   Civil No. 24-cv-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024)............ 1, 17, 31, 33

*Media Matters for Am. v. FTC*,
   Civil Action No. 25-1959 (SLS), 2025 WL 2378009 (D.D.C. Aug. 15, 2025) ..............passim

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025)..............................................................passim

*Media Matters for Am. v. Paxton*,
  732 F. Supp. 3d 1 (D.D.C. 2024) .................................................. 16, 31, 33, 41
*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ................................................................................. 28
*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ............................................................................. 1, 39
*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977) ................................................................................. 32
*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ................................................................................. 40
*NAACP. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ................................................................................. 39
*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) .......................................................................... 36, 37, 38
*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................. 28
*News Am. Publ'g, Inc. v. FCC*,
  844 F.2d 800 (D.C. Cir. 1988) ................................................................... 36
*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ................................................................................. 28
*Okla. Press Publ'g Co. v. Walling*,
  327 U.S. 186 (1946) ................................................................................. 40
*Perry v. Schwarzenegger*,
  591 F.3d 1147 (9th Cir. 2009) ................................................................... 40
*Perry v. Sindermann*,
  408 U.S. 593 (1972) ................................................................................. 28
*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
  573 F. Supp. 3d 1021 (D.S.C. 2021) ........................................................... 44
*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016) ................................................................... 27
*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ................................................................................. 40
*Smith v. De Novo Legal, LLC*,
  905 F. Supp. 2d 99 (D.D.C. 2012) ............................................................. 34
*Stanford v. Texas*,
  379 U.S. 476 1965) ................................................................................. 40
*Sweezy v. New Hampshire ex rel. Wyman*,
  354 U.S. 234 (1957) ................................................................................. 40
*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ..................................................................... 44
*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ................................................................... 30
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................... 27

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 42
*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978) .............................................................................................. 40

## Statutes

15 U.S.C. § 1 ............................................................................................................. 39
15 U.S.C. § 45 ........................................................................................................... 39
15 U.S.C. § 57b-1(c)(2) ............................................................................................. 41

## Other Authorities

Andrew Ferguson
  (@AFergusonFTC), X (Nov. 11, 2024, at 20:51 ET) ............................................ 12
Andrew Ferguson
  (@AFergusonFTC), X (Nov. 27, 2024, at 09:33 ET) ............................................ 12
*Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the
  Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023) ...................... 7
Brendan Carr
  (@BrendanCarrFCC), X (Apr. 15, 2020, at 18:47 ET) ........................................ 15
Brian Stelter,
  *How Brendan Carr, the Attack-Dog FCC Chair, Helped Take Down Jimmy Kimmel with
  Words, Not Actions*, CNN (Sept. 18, 2025)............................................................... 15
Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec.
  2, 2024) .................................................................................................................... 13
Eva Maitland & Madeline Roache,
  *Russia's War on Ukraine: Three Years, Three Hundred and Two False Claims | NewsGuard*,
  Newsweek (Feb. 21, 2025, at 06:00 ET)................................................................... 4
Gordon Crovitz, Opinion, *For Iran,
  Disinformation Comes Just Behind Assassination*, Hill (Nov. 21, 2024, at 12:30 ET) ............ 4
H. Comm. on Small Bus., 118th Cong.,
  *Small Business: Instruments and Casualties of the Censorship-Industrial Complex* 42–59
  (Interim Staff Rep. 2024) ....................................................................................... 10
Indep. Media Council & CPAC Found. Ctr. for Regul. Freedom,
  Comment Letter on Proposed Consent Order 2 (July 28, 2025) ............................. 25
Kari Donovan,
  *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WarRoom (Nov. 30, 2024)..... 12
Kendra Barnett,
  *EXCLUSIVE: FTC Probe Expands to IAS Over Alleged Ad Boycotts, Lawsuit Reveals*,
  Adweek (Feb. 7, 2026)............................................................................................ 18
L. Gordon Crovitz,
  *How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020)................ 7
Laurence H. Silberman, *Hoover's Institution*,
  WALL ST. J., July 20, 2005 ....................................................................................... 1
Letter from Brendan Carr, FCC Comm'r, to CEOs (Nov. 13, 2024) ....................... 13

Maggie Miller,
   *State Department Eliminates Key Office Tasked with Fighting Foreign Disinformation*,
   Politico (Apr. 16, 2025, at 13:25 ET) ...................................................................... 11
Matt Skibinski,
   *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind
   the Capitol Riot*, NewsGuard (Jan. 12, 2021).......................................................... 6
Matt Skibinski,
   *Special Report: Top Brands Are Sending $2.6 Billion to Misinformation Websites Each Year*,
   NewsGuard .............................................................................................................. 7
Matt Skibinski,
   *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*,
   NewsGuard .............................................................................................................. 6
McKenzie Sadeghi,
   *Violent, Celebratory Hamas Videos Garner Millions of Views, Despite Bans by Tech
   Platforms*, NewsGuard (Oct. 26, 2023) ................................................................... 4
Mike Benz
   (@MikeBenzCyber), X (Nov. 24, 2024, at 18:59 ET) ............................................ 12
Mike Wendling,
   *What Does the FCC Do – and Can It Revoke a TV Network's License?* BBC (Sept. 19, 2025)
   ............................................................................................................................... 15
NEWSMAX
   (@NEWSMAX), X (July 31, 2025, at 21:58 ET)..................................................... 25
Newsmax Media Inc.,
   Comment Letter on Proposed Consent Order 13 (July 28, 2025)............................ 24
*Newsmax's Tabacco Slams FTC Approval of Omnicom-IPG Merger*, Newsmax (Aug. 3, 2025, at
   07:23 ET)................................................................................................................. 24
*One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the
   War in Ukraine*, NewsGuard (Feb. 16, 2023) .......................................................... 7
Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025) ........... 26, 36
Paul Bond,
   *Megamerger Omnicom, IPG Mum About NewsGuard Bias*, Newsmax (June 26, 2025, at 17:35
   ET) .......................................................................................................................... 24
Petition to Quash, Civil Investigative Demand Dated May 20, 2025, to NewsGuard Techs., Inc.,
   FTC File No. 251-0061 (Jan. 16, 2026)................................................................... 22
Press Release,
   Ass'n of Nat'l Advertisers, ANA Provides "First Look" at In-Depth Programmatic
   Transparency Study (June 19, 2023) ......................................................................... 6
Press Release,
   Fed Trade Comm'n, FTC Prevents Anticompetitive Coordination in Global Advertising
   Merger (June 23, 2025)............................................................................................ 23
Press Release,
   Fed. Trade Comm'n, Federal Trade Commission Launches Inquiry into Tech Censorship (Feb.
   20, 2025).................................................................................................................. 14
Press Release,
   Omnicom, Omnicom to Acquire Interpublic Group to Create Premier Marketing and Sales
   Company (Dec. 9, 2024) ........................................................................................... 22

Press Release,
  PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman ................. 13
Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514
  (June 23, 2025) ....................................................................................................... 23, 36
Pub. Knowledge,
  Comment Letter on Proposed Consent Order (July 28, 2025) ............................................. 25
Statement from Gordon Crovitz, NewsGuard Co-CEO, on Brendan Carr Letter (Nov. 15, 2024)
  ......................................................................................................................................... 14
Statement of Chairman Andrew N. Ferguson, *Omnicom Grp. Inc.*, FTC File No. 251-0049, at 5
  & n.34 (June 23, 2025) ......................................................................................................... 23
Steven Lee Myers,
  *DeepSeek's Answers Include Chinese Propaganda, Researchers Say*, N.Y. Times (Jan. 31,
  2025) .................................................................................................................................... 4
TechFreedom,
  Comment Letter on Proposed Consent Order (July 28, 2025) ............................................. 25
Ted Johnson,
  *Attacking the Watchdog: How Media Rating Site NewsGuard Ended Up as a Target for GOP
  Lawmakers and Regulators*, Deadline (Dec. 19, 2024, at 12:17 ET) .................................. 10
*Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, ProMarket (Apr. 21, 2025) 14, 15
Vikram David Amar & Ashutosh Bhagwat,
  Comment Letter on Proposed Consent Order (July 28, 2025) ............................................. 25
Wajeeha Ahmad, et al.,
  *Companies Inadvertently Fund Online Misinformation Despite Consumer Backlash*, 630
  NATURE 123, 124 (2024) ........................................................................................................ 7
Will Oremus & Naomi Nix,
  *This Company Rates News Sites' Credibility. The Right Wants It Stopped.*, WASH. POST (Dec.
  24, 2024) ............................................................................................................................... 9

**INTRODUCTION**

As former D.C. Circuit Judge Laurence H. Silberman warned, "the most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends." *Media Matters for Am. v. Bailey*, Civil No. 24-cv-147 (APM), 2024 WL 3924573, at \*18 (D.D.C. Aug. 23, 2024) (quoting Laurence H. Silberman, *Hoover's Institution*, WALL ST. J., July 20, 2005). Yet the Federal Trade Commission ("FTC" or "Commission") under Chairman Andrew N. Ferguson is doing precisely that by deploying agency authority to investigate and penalize Plaintiff NewsGuard Technologies, Inc. ("NewsGuard"). Chairman Ferguson initiated and is pursuing this campaign because he erroneously believes NewsGuard's news rating service is biased against conservative news sources. He is wrong about this—NewsGuard evaluates news sources based on nonpartisan and transparent journalistic criteria that are applied uniformly to news media across the political spectrum.

But his error is more fundamental than that—and far more serious—as it proceeds from the bizarre notion that NewsGuard, a private journalistic organization, somehow can be engaged in "censorship." Chairman Ferguson's belief that the FTC is authorized to be the arbiter of news judgment misunderstands the First Amendment completely, as the Free Speech Clause "*constrains* governmental actors and *protects* private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019) (emphasis added). In our constitutional scheme the government has no legitimate role to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks [is] biased." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). Chairman Ferguson's confusion about this basic principle is chilling, for "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42.

1

The FTC's campaign against NewsGuard, including an unbounded and intrusive Civil Investigative Demand ("CID") and a Consent Order that bars the world's largest advertising agency holding company and its affiliates from using NewsGuard's services, has already inflicted irreparable injury, and, unless enjoined, will cause far more harm. Administrative agencies that lack—or refuse to acknowledge—constitutional guardrails are a particular threat to a free society. For that reason it is the standard practice of federal courts "to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946). This Court should do so here to prevent further damage to NewsGuard and First Amendment rights.

## BACKGROUND

### A.    NewsGuard's Ratings and Reporting About Online News Sources.

NewsGuard is a service founded in 2018 with the aim of providing consumers and companies detailed assessments of the reliability of news sources they might encounter online. Declaration of Matthew Skibinski in Support of Plaintiff's Motion for Preliminary Injunction, ¶ 3 (Feb. 11, 2026) ("Skibinski Decl."). NewsGuard was founded by two veteran journalists, Steven Brill (who previously established *The American Lawyer* and Court TV), and Gordon Crovitz (former publisher of *The Wall Street Journal*). *Id.*

Messrs. Brill and Crovitz created NewsGuard because they believed online users would benefit from transparent reports about the accuracy and reliability of news and information websites. NewsGuard's guiding principle has been that no government entity should be in the business of deciding what news people consume, but neither should those decisions be left to unknown and unaccountable algorithms or partisan advocacy groups. *See id.* ¶ 4.

NewsGuard developed a rating process for assessing the reliability of news outlets based on nine journalistic criteria. These criteria assess adherence to basic, long-established practices of journalistic credibility and transparency. They include, for example, whether a news source

repeatedly publishes demonstrably false information, references multiple sources and differing viewpoints, effectively corrects errors, and fully discloses ownership and financing of the site. *Id.* ¶ 5.

NewsGuard fully discloses the nine criteria and explains how ratings are determined. *See id.* ¶ 5 (https://www.newsguardtech.com/ratings/rating-process-criteria). NewsGuard employs a team of journalists who review news websites to assign ratings and provide assessments. *Id.* ¶ 7. Each of the nine criteria is assigned a weighted number of points, which can total to a maximum of 100 points. Each site is assigned an overall score of 0 to 100 and a rating indicating the extent to which it adheres to the criteria in NewsGuard's judgment. *Id.* ¶ 6.

NewsGuard also provides a "Nutrition Label" accompanying each website's listed score, which sets forth in detail NewsGuard's findings and ultimate determination. Nutrition Labels include a grid showing NewsGuard's judgment of the site's performance on each of the nine criteria, as well as a description of the content on the site, who's behind it, and why it received the score it did. *See, e.g.*, *id.* ¶ 8 & Exs. 1 and 2 (examples of full versions of Nutrition Labels). Nutrition Labels are painstakingly prepared and can run to 10,000 words or more.

The ratings, Nutrition Labels, and assessments for news sites are initially prepared by NewsGuard journalist-analysts, but each is reviewed and fact-checked by senior NewsGuard personnel before publication to ensure they are as fair and accurate as possible. *Id.* ¶ 9. NewsGuard also contacts news site publishers to give them an opportunity to respond or object and includes relevant comments in Nutrition Labels. *Id.*

NewsGuard has rated 38,742 news sources, including 12,765 websites, since its founding. *Id.* ¶ 10.

### B.    NewsGuard's Services to Customers.

NewsGuard's services are available to consumers, businesses, advertisers, and others. *Id.* ¶ 11. Consumers can access NewsGuard reliability ratings through a monthly online subscription, which also gives them access to public reports the company produces about false claims spreading in the news. *Id.*[1] The subscription provides a browser extension that allows individuals using the Internet to see NewsGuard trust score icons next to links in their search results and social media feeds:



*See id.* ¶ 12. Hovering over an icon brings up a short description of the site and a link to "See the Full Nutrition Label" for a detailed description and why it received the score it did. *Id.* ¶ 13.

---

[1] NewsGuard is a leading source of journalism about foreign disinformation such as Russian, Chinese, and Iranian influence campaigns targeting Americans. *See, e.g.*, Eva Maitland & Madeline Roache, *Russia's War on Ukraine: Three Years, Three Hundred and Two False Claims | NewsGuard*, Newsweek (Feb. 21, 2025, at 06:00 ET), https://www.newsweek.com/russia-ukraine-disinformation-newsguard-2034104; Steven Lee Myers, *DeepSeek's Answers Include Chinese Propaganda, Researchers Say*, N.Y. Times (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/technology/deepseek-chinese-propaganda.html; Gordon Crovitz, Opinion, *For Iran, Disinformation Comes Just Behind Assassination*, Hill (Nov. 21, 2024, at 12:30 ET), https://thehill.com/opinion/international/5000222-iran-disinformation-trump-threat. NewsGuard reporting has exposed how violent Hamas propaganda videos were promoted to teens on platforms such as TikTok, Facebook, and X during the war in Gaza. McKenzie Sadeghi, *Violent, Celebratory Hamas Videos Garner Millions of Views, Despite Bans by Tech Platforms*, NewsGuard (Oct. 26, 2023), https://www.newsguardtech.com/special-reports/violent-celebratory-hamas-videos-garner-millions-of-views-despite-bans-by-tech-platforms.



Businesses also subscribe to NewsGuard's ratings and journalism, including, for example, news aggregators and public relations firms with interests in distinguishing between reliable and unreliable online content. *Id.* ¶ 14. Advertisers and ad agencies also use NewsGuard's ratings to help make informed decisions about where (on which websites) ads should and should not be placed. *Id.* ¶ 15.

Online ads predominantly are placed through programmatic ad campaigns, *i.e.*, automated software-based buying and selling of digital ad placements. An average programmatic campaign runs on 44,000 websites at one time.[2] Major brands advertising online cannot know of all the tens of thousands of websites where their ads might appear. So, advertisers rely on ad agencies and automated services to provide methods to avoid ad placements that may be "brand unsafe," meaning ones that could undermine their brands in the consumers' eyes. Skibinski Decl. ¶ 16.

Brand safety for online advertisers has become a multi-billion-dollar industry. *Id.* ¶ 17. This is because, through programmatic ad campaigns, major international brands have had their advertisements unintentionally placed on websites considered unsafe and brand-damaging. *Id.* NewsGuard has reported on these concerns, noting ads inadvertently placed on websites that have been identified as advancing dangerous health treatments,[3] promoting election misinformation,[4] making false claims about the Israel-Hamas conflict,[5] or spreading Russian propaganda.[6] For

---

[2] *See* Press Release, Ass'n of Nat'l Advertisers, ANA Provides "First Look" at In-Depth Programmatic Transparency Study (June 19, 2023), https://www.ana.net/content/show/id/pr-2023-06-programmaticstudy.

[3] Matt Skibinski, *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard, https://www.newsguardtech.com/special-report-advertising-on-covid-19-misinformation (last viewed Feb. 11, 2026).

[4] Matt Skibinski, *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021), https://www.newsguardtech.com/special-reports/special-report-advertising-on-election-misinformation.

[5] *Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023), https://www.newsguardtech.com/press/brand-danger-newsguard-finds-349-top-global-brands-funding-misinformation-about-the-hamas-israel-conflict-with-programmatic-ads.

[6] *One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023), https://www.newsguardtech.com/press/one-year-100-myths-newsguard-has-identified-more-than-100-false-narratives-about-the-war-in-ukraine.

example, NewsGuard reported that in 2019 Berkshire Hathaway's subsidiary GEICO was unintentionally the largest advertiser on Sputnik News, a Kremlin-controlled website.[7] *See* Skibinski Decl. ¶ 18. Research studies by NewsGuard and others estimate that 67% of top brands inadvertently advertise on websites with problematic content,[8] totaling some $2.6 billion of advertising per year.[9] Skibinski Decl. ¶ 19.

NewsGuard's customers in the advertising industry include ad agencies, ad targeting platforms, and advertisers themselves. *Id.* ¶ 20. Their continuing loyalty over the years shows that they value NewsGuard's ratings, analyses, and journalism. However, in this area NewsGuard is a small player compared to the large incumbent ad tech companies, accounting for less than 0.1% of the market for brand safety tools. *Id.*

## C. Attacks on NewsGuard by Publishers Unhappy with Ratings.

For several years, NewsGuard has faced criticisms from across the political spectrum that NewsGuard's ratings are biased in one direction or another. In one year, for example (actually within a period of a few months), one advocacy group produced a report claiming NewsGuard's ratings are biased against conservatives while another published a separate report claiming NewsGuard's ratings are biased in favor of conservatives. *Id.* ¶ 21.

Perhaps not surprisingly, many of the attacks on NewsGuard have come from news publishers that receive lower scores based on NewsGuard's application of journalistic criteria. *Id.*

---

[7] L. Gordon Crovitz, *How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020), https://www.nytimes.com/2020/01/21/opinion/fake-news-russia-ads.html.

[8] Wajeeha Ahmad, et al., *Companies Inadvertently Fund Online Misinformation Despite Consumer Backlash*, 630 NATURE 123, 124 (2024).

[9] Matt Skibinski, *Special Report: Top Brands Are Sending $2.6 Billion to Misinformation Websites Each Year*, NewsGuard, https://www.newsguardtech.com/special-reports/brands-send-billions-to-misinformation-websites-newsguard-comscore-report.

¶ 22. In 2023, *Consortium News*, a left-leaning website that received low reliability ratings, sued NewsGuard for defamation and supposed claims under the First Amendment, but its claims were dismissed, as the court held that NewsGuard's ratings were protected editorial opinion. *Consortium for Indep. Journalism, Inc. v. United States*, 23 Civ. 7088 (KPF), 2025 WL 919504, at *16-20 (S.D.N.Y. Mar. 26, 2025).

At the same time, Newsmax, a conservative cable news network and digital media company, mounted a campaign attacking NewsGuard. Beginning in 2023 and for several years, Newsmax has asserted repeatedly in its programs and publications that NewsGuard is biased against conservative media and websites. Skibinski Decl. ¶ 24. Newsmax also received low ratings for adherence to journalistic standards. *Id.* ¶ 25. But perhaps more relevant to its motivation for attacking NewsGuard, Newsmax's ratings are markedly lower than ratings for other conservative news sources such as Fox News, the *National Review*, and the *Washington Times*, which are Newsmax's competitors for advertising dollars. *See id.*

Newsmax's attacks were and are baseless. NewsGuard's ratings of Newsmax—and all news sources—are based on nonpartisan journalistic criteria and are agnostic to the political or editorial viewpoints of the publishers. Many left-leaning outlets receive lower scores than comparable right-leaning sources. *See id.* ¶ 26 & Ex. 3. For example, Fox News receives a higher reliability rating than MSNBC, while the conservative *Washington Examiner* outscores the liberal *Daily Beast*. As reported by the *Washington Post* in 2024:[10]

---

[10] Will Oremus & Naomi Nix, *This Company Rates News Sites' Credibility. The Right Wants It Stopped.*, WASH. POST (Dec. 24, 2024), https://www.washingtonpost.com/technology/2024/12/24/newsguard-disinformation-censorship-free-speech.



NewsGuard ratings for selected publishers, with 100 being a perfect score

Source: NewsGuard

WILL OREMUS / THE WASHINGTON POST

### D.    Putative Congressional Investigations Targeting NewsGuard.

While Newsmax's attacks on NewsGuard were false, its timing was opportune. When Republicans took control of the House in 2023, several committees opened investigations and issued statements taking aim at media and tech companies for supposed anti-conservative bias. Skibinski Decl. ¶ 27.

The House Oversight and Small Business Committees opened an investigation in June, 2024, with Oversight Committee Chairman James Comer appearing on Newsmax and agreeing that "their [NewsGuard's] goal is obviously to bully conservative media out of existence."[11]

---

[11] Ted Johnson, *Attacking the Watchdog: How Media Rating Site NewsGuard Ended Up as a Target for GOP Lawmakers and Regulators*, Deadline (Dec. 19, 2024, at 12:17 ET), https://deadline.com/2024/12/newsguard-newsmax-trump-fcc-1236202249.

Skibinski Decl. ¶ 28 & Ex. 4. However, after NewsGuard presented evidence to the committee that its ratings are apolitical and nonpartisan, the investigation did not proceed. *Id.* ¶ 28.

In September 2024, the House Small Business Committee released an interim staff report entitled "Small Business: Instruments and Casualties of the Censorship-Industrial Complex," which also took aim at NewsGuard with unsubstantiated claims of bias.[12] That effort also did not proceed further. *Id.* ¶ 29.

In early 2025, the Senate Judiciary Committee held a hearing on what it called the "Censorship Industrial Complex." NewsGuard cooperated, addressed the Committee's questions, again explaining and providing evidence that NewsGuard's ratings are nonpartisan and do not reflect any anti-conservative bias. *See* Skibinski Decl. ¶ 30. The Committee found no evidence to the contrary, and this investigation also has not proceeded. *Id.*

E.      **Administration Officials' Public Attacks Targeting NewsGuard.**

Andrew Ferguson has been a longtime critic of NewsGuard. As a Commissioner on the FTC and continuing after he was appointed Chairman by President Trump, Ferguson has promoted an ideologically motivated effort to pursue and censor NewsGuard and other organizations that address the reliability of online sources. As reflected in his public statements and those of others in the administration (notably Brendan Carr, Chairman of the FCC), Ferguson's view is that (1) the federal government can regulate "purely private censorship," *i.e.*, the government can investigate and punish private parties' speech and editorial views if the government thinks they are biased; (2) providing website ratings or analyses to advertisers to help them protect brand safety

---

[12]  H. Comm. on Small Bus., 118th Cong., *Small Business: Instruments and Casualties of the Censorship-Industrial Complex* 42–59 (Interim Staff Rep. 2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

10

constitutes collusive and impermissible "ad boycotts;" and (3) the government can use its full panoply of powers to pressure, intimidate, and coerce parties—directly and indirectly—to censor speech the government cannot ban outright. Ferguson's specious theory is wrong under the law, but that has not stopped him from pursuing it—in particular, to attack NewsGuard.

On November 12, 2024, then-Commissioner Ferguson posted on X about the closure of the U.S. Department of State's Global Engagement Center[13] by referring to NewsGuard specifically, asserting it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[14] Skibinski Decl. ¶ 31 & Ex. 5. In fact, NewsGuard's work for the State Department traced how Russian influence operations spread throughout Latin America via Venezuelan state media. It had nothing to do with NewsGuard's ratings of news sources. Shortly afterward, Ferguson appeared in a podcast interview discussing how a new Republican-led FTC (after President Trump's inauguration) could act against organizations he believes are part of the "censorship industrial complex."[15] Again he called out NewsGuard by name and warned that "antitrust laws

---

[13] The Global Engagement Center was an interagency entity established in 2016 to expose and counter foreign propaganda and disinformation, closed in April 2025 by Secretary of State Marco Rubio following accusations by GOP lawmakers that the office censored conservative voices. *See* Maggie Miller, *State Department Eliminates Key Office Tasked with Fighting Foreign Disinformation*, Politico (Apr. 16, 2025, at 13:25 ET), https://www.politico.com/news/2025/04/16/state-department-shutters-gec-foreign-disinformation-00292982.

[14] Andrew Ferguson (@AFergusonFTC), X (Nov. 11, 2024, at 20:51 ET), https://x.com/AFergusonFTC/status/1856152760850243905.

[15] Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, at 18:59 ET), https://x.com/mikebenzcyber/status/1860835679560765841.

may have something to do with what's been going on [with] … advertiser boycotts."[16] Skibinski Decl. ¶ 32 & Ex. 6.

Later in November 2024 during an interview on Steve Bannon's WarRoom podcast, Ferguson reiterated his view of the importance of going after "purely private censorship" and the "censorship industrial complex."[17] Skibinski Decl. ¶ 37 & Ex. 7. "[P]rogressives, Silicon Valley, everyone who is fighting 'disinformation,' they're not just going to give up because of the election …. And that's where I think that it's really important that the FTC take investigative steps in the new administration under President Trump."[18] *Id.*

Brendan Carr, the Chairman of the Federal Communications Commission appointed by President Trump, has echoed Ferguson's attacks on NewsGuard. In a November 2024 letter to the CEOs of Alphabet, Microsoft, Meta, and Apple, then-Commissioner Carr claimed NewsGuard was part of a "censorship cartel" and that the company "leverag[es] its partnerships with advertising agencies to effectively censor[] targeted outlets."[19] Carr said the incoming Trump Administration would investigate and take action against NewsGuard and companies that used its

---

[16] *Id.*; *see also* Andrew Ferguson (@AFergusonFTC), X (Nov. 27, 2024, at 09:33 ET), https://x.com/AFergusonFTC/status/1861780403092099278 (Ferguson post on X forwarding podcast host's tweet that Ferguson had "laid out a compelling vision for how the FTC can take on advertiser boycott collusion in the Internet censorship space").

[17] Kari Donovan, *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WarRoom (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am.

[18] *Id.*

[19] Letter from Brendan Carr, FCC Comm'r, to CEOs (Nov. 13, 2024), https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.

services for protecting brand safety, declaring that the so-called "cartel" must be "completely dismantled."[20] *See* Skibinski Decl. ¶ 34 & Ex. 8.

Echoing Carr's threats, in December 2024 Commissioner Ferguson asserted the FTC "ought to conduct … an investigation" because, he said, NewsGuard "seems to give a free pass to … major left-leaning outlets."[21] Skibinski Decl. ¶ 35 & Ex. 9. At the time, Ferguson was a candidate for FTC chairman, and in public statements to promote his candidacy, he touted that he had a "track record of standing up to … the radical left" and would "[i]nvestigate advertiser boycotts" and "'progressives who are targeting disinformation.'"[22] Skibinski Decl. ¶ 35 & Ex. 10. Ferguson's and Carr's publicized comments about NewsGuard ratings were simply false. NewsGuard responded and said so, demonstrating that many conservative-leaning news sources earn high reliability ratings while other, liberal publications receive lower ratings based on NewsGuard's journalistic criteria.[23]

But the facts did not deter the FTC or get in the way of its vendetta against NewsGuard. In February 2025, after Ferguson was named Chairman, the Commission issued a Request for Information ("RFI") seeking public comment on "Technology Platform Censorship," asserting

---

[20] *Id.*

[21] Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

[22] Press Release, PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf.

[23] Statement from Gordon Crovitz, NewsGuard Co-CEO, on Brendan Carr Letter (Nov. 15, 2024), https://www.newsguardtech.com/wp-content/uploads/2024/11/NewsGuard-Statement-on-Brendan-Carr-Letter.pdf.

that social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal."[24] Skibinski Decl. ¶ 37 & Ex. 12.

In an April 2025 interview, Chairman Ferguson explained how the FTC could use its "tremendous array of investigative tools" and "coercive power—formal and informal" to demand compliance to its views about supposed online "censorship." Ferguson laid out a roadmap of tactics his FTC would later use against NewsGuard: "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say.'"[25] Skibinski Decl. ¶ 38 & Ex. 13.

Ferguson's message was clear that the FTC would use its powers and the burdens and expenses it can impose not to determine if there was any legitimate basis for regulation, but rather to intimidate and coerce NewsGuard to do what the FTC demands. He noted that the FTC's investigative powers and tools "are expensive when applied to you even if we don't win at the end of the day, so knuckle under."[26] Or, in the words of FCC Chairman Carr in his not-so-subtle threat to ABC and its affiliate stations about Jimmy Kimmel's late-night comedy monologue mentioning Charlie Kirk (which the administration found objectionable): "[W]e can do this the easy way or the hard way."[27]

---

[24] Press Release, Fed. Trade Comm'n, Federal Trade Commission Launches Inquiry into Tech Censorship (Feb. 20, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship; *see* Request for Public Comment Regarding Technology Platform Censorship, https://www.ftc.gov/system/files/ftc_gov/pdf/P251203CensorshipRFI.pdf.

[25] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, ProMarket (Apr. 21, 2025), https://www.promarket.org/2025/04/21/transcript-ftc-chairman-andrew-ferguson-keynote-part-ii.

[26] *Id.*

[27] Brian Stelter, *How Brendan Carr, the Attack-Dog FCC Chair, Helped Take Down Jimmy Kimmel with Words, Not Actions*, CNN (Sept. 18, 2025), https://www.cnn.com/2025/09/18/media/brendan-carr-jimmy-kimmel-fcc-first-amendment; *see*

14

In earlier days (and different political climates), Ferguson and Carr said very different things about First Amendment protections and limitations on government powers to restrict or censor speech. Before he was appointed as FTC Chairman, Ferguson said "No government agency should be in the business of policing speech."[28] Before he became FCC Chairman, Carr said that "the government shutting down speech" is "a 1A [First Amendment] issue, but "a private platform doing it [is] not."[29] "It's always a person in power (merely fallible or with a political agenda) that censors speech."[30] But that was then; this is now.

### F.    FTC's Tactics and Threats to Suppress Other Platforms.

The FTC's tactics toward NewsGuard are part of a broader retaliatory campaign against tech and media companies (including other review and rating services) for exercising their First Amendment rights.

In May 2025, the FTC launched an extraordinarily broad, intrusive investigation of Media Matters for America (a nonprofit media watchdog organization), when it published articles about the rise of "extremist and racist rhetoric" on X after Elon Musk's acquisition of the platform, reporting that X began placing major companies' ads "next to pro-Nazi content." *Media Matters for Am. v. FTC*, Civil Action No. 25-1959 (SLS), 2025 WL 2378009, at *2–3 (D.D.C. Aug. 15, 2025).

---

Mike Wendling, *What Does the FCC Do – and Can It Revoke a TV Network's License?* BBC (Sept. 19, 2025), https://www.bbc.com/news/articles/c87yel3wgqgo.

[28]  Andrew Ferguson (@AFergusonFTC), *supra* note 14.

[29]  Brendan Carr (@BrendanCarrFCC), X (Apr. 15, 2020, at 18:47 ET), https://x.com/BrendanCarrFCC/status/1250601632339034114.

[30]  *Id.*

Musk responded by promising to file a "thermonuclear lawsuit against Media Matters." *Id.* at *3. Musk's vendetta was picked up and advanced by many Republican allies, including state attorneys general and the FTC and FCC. For example, Stephen Miller (the current White House deputy chief of staff) accused Media Matters of "fraud" for its reporting, urging the "2 dozen+ conservative state Attorneys General" to go after the organization. *Id.*

The attorneys general of Texas and Missouri took up the cudgel and issued overbroad, oppressive CIDs to Media Matters. Media Matters sued and won preliminary injunctions precluding both investigations in this Court.

In the case concerning the Texas CID, this Court entered a preliminary injunction blocking the investigation, which the D.C. Circuit affirmed. *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd*, 138 F.4th 563, 569 (D.C. Cir. 2025). The Circuit Court opined that Media Matters was the "target of a government campaign of retaliation" and an "arguably bad faith investigation" infringing "exercise of their First Amendment rights and imposing special burdens on their newsgathering activities and operation of their media company." 138 F.4th at 581.

In the case concerning the Missouri investigation, this Court held: "A reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities." *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *15 (D.D.C. Aug. 23, 2024).

But the FTC was undeterred by the failed cases of the Texas and Missouri AGs or the rulings of this Court and the D.C. Circuit that the states' actions and coercion against Media Matters were pretextual pursuits in likely violation of the First Amendment. The FTC decided to go after Media Matters with an extensive, burdensome CID of its own.

16

On May 20, 2025, the FTC issued a CID to Media Matters with 20 detailed specifications demanding all documents and information about methodologies for addressing online speech or misinformation; all communications with tech companies or platforms; everything related to Media Matters' newsgathering, reporting, and editorial decisions; all programs, policies, and analyses; all of the company's financial reports and information, and much more. *Media Matters v. FTC*, 2025 WL 2378009, at *5.

Media Matters filed suit in this Court alleging the FTC violated First and Fourth Amendment rights by pursuing its onerous investigation in retaliation for Media Matters' speech. Media Matters moved for a preliminary injunction to bar the FTC's investigation from going forward, which this Court granted, noting: "This case presents a straightforward First Amendment violation." *Id.* at *1. The Court rejected the government's argument that the FTC Act foreclosed any suit in the district court, observing, *inter alia*, that reading the statute to preclude Media Matters' First Amendment claims would "foreclose all meaningful judicial review." *Id*. at *11 (quotation marks omitted).

The FTC moved in the D.C. Circuit for a stay of the District Court's preliminary injunction order pending appeal. The Circuit Court denied the emergency request. No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) (per curiam).[31]

The FTC's CID to Media Matters is just one of many the Commission has issued and pursued against advertisers and ad agencies, third-party review services, and others in the FTC's pursuit of its theory. In addition to NewsGuard and Media Matters, the FTC has also pursued Global Disinformation Index, a nonprofit news review service, Integrated Ad Science, Inc., a brand

---

[31] The FTC has appealed the *Media Matters* preliminary injunction order, and that appeal remains pending. No. 25-5302 (D.C. Cir. docketed Aug. 19, 2025).

safety platform, and reportedly a total of at least sixteen media credibility and news rating organizations.[32]

### G.    The FTC's Burdensome CID to NewsGuard.

On May 20, 2025, the FTC issued a sweeping CID to NewsGuard, 21 pages long, containing 31 Specifications (with dozens of subparts) demanding vast numbers of confidential and sensitive documents.

The CID requires production of "all documents relating to NewsGuard's News Reliability Ratings and any other rating[s]"; all materials about NewsGuard's work product and methodology; all documents about websites and news sources rated; all ratings and reviews issued; any and all analyses of the effects of NewsGuard's ratings on advertisers and publishers; and any studies relating to social media or digital advertising; identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. *See* Skibinski Decl. ¶ 40 & Ex. 15 (FTC Civil Investigative Demand, FTC File No. 251-0061 (May 20, 2025)); *see, e.g.*, NewsGuard CID Specifications 5, 8, 11, 12, 14-16.

Among its all-inclusive document demands, the CID also requires production of materials relating to NewsGuard's journalism and reporting, including reporters' notes and sources, as well as every financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report prepared by or for NewsGuard. NewsGuard CID Specifications 5, 27, 28.

The CID calls for all documents from January 1, 2018, to the present. NewsGuard CID at 8 (Instruction I1). As NewsGuard was founded and began operations in 2018, it is no exaggeration

---

[32] Kendra Barnett, *EXCLUSIVE: FTC Probe Expands to IAS Over Alleged Ad Boycotts, Lawsuit Reveals*, Adweek (Feb. 7, 2026), https://www.adweek.com/media/exclusive-ftc-probe-expands-to-ias-over-alleged-ad-boycotts-lawsuit-reveals.

to say that the CID demanded virtually all documents, information, and records of NewsGuard, including those relating to NewsGuard's analyses, methodology, editorial judgments, customers, journalism and reporting.

Under the FTC Act, the Commission was required to state the specific conduct constituting an alleged violation that is the subject of investigation and the provision of law applicable to such violation. 15 U.S.C. § 57b-1(c)(2). The FTC did not do that in the NewsGuard CID, leaving the company to guess what the agency alleged was at issue or how it could have anything to do with legitimate enforcement of antitrust or competition laws.

On its face, the CID raised serious concerns, as it was targeted at free speech and associational rights of the company and its customers and was extraordinarily overbroad and burdensome. NewsGuard raised its concerns from the outset and throughout its dealings with FTC staff, attempting to explain that NewsGuard's ratings, its editorial decisions, and its dealings with customers are plainly protected First Amendment activities. Skibinski Decl. ¶ 42.

Still, NewsGuard sought to work constructively with FTC staff to provide such information as it could without infringement of First Amendment rights. NewsGuard participated in ten meet-and-confer discussions over the course of eight months and produced over 40,000 pages of documents. *Id.* ¶ 43.

In the discussions with FTC staff, NewsGuard demonstrated (as it had earlier in information provided to congressional committees) that its ratings utilize established journalistic standards and practices. NewsGuard also submitted information demonstrating that the company's share of the market for advertiser brand safety tools is so *de minimis*—less than 0.1%—that NewsGuard could not possibly be a legitimate target of an antitrust investigation of that market. *Id.* ¶ 44.

19

By January 2026, FTC staff made clear to NewsGuard that its good faith efforts to cooperate were futile. On January 15, 2026, two days after the parties' last meet-and-confer discussion, FTC staff sent a letter purporting to be a "good faith effort to reduce NewsGuard's burden," but which was in reality a doubling down on the CID's unconstitutional demands. *Id.* ¶ 45 & Ex. 16.

Despite NewsGuard's seven months' efforts to cooperate, FTC staff simply repeated several of the most intrusive, infringing demands made from the outset, including: (1) identification of all NewsGuard subscribers; (2) communications with customers; (3) identification of all entities to which NewsGuard had ever assigned a News Reliability Rating; (4) the particulars of each rating assigned to each entity over time; and (5) documents to show how NewsGuard has developed methodologies for ratings, including internal correspondence. *Id.* ¶ 46.

The FTC's persistent, repeated demands for identification of NewsGuard's subscribers (and production of all communications with them) are especially troubling. Given the tactics and pronouncements of Chairman Ferguson and FCC Chairman Carr about targeting tech and media companies supposedly associated with a "censorship cartel," NewsGuard has ample grounds for concern the FTC aims to find NewsGuard's customers to pressure them, too. *Id.* ¶ 47. NewsGuard has explained to FTC staff that the demands for customer lists and communications plainly violate First Amendment rights of free speech and association, but explanations of the law have fallen on deaf ears at the FTC. *Id.* ¶ 42.

Throughout the dealings with NewsGuard, FTC staff refused to give assurances that NewsGuard's productions and disclosures satisfied the CID, and they reiterated that position in the January 15, 2026 letter. FTC staff instead insisted NewsGuard remains obligated to provide all documents and information called for by the *original* CID. *Id.* ¶ 48.

20

Responding to the CID was an immensely time-consuming and expensive effort. NewsGuard's executives and staff spent hundreds of hours working to provide information and documents to the FTC. NewsGuard's expenses mounted as the investigation continued, to the point that legal fees alone amounted to more than 30% of NewsGuard's total revenues from its sales of brand-safety services to advertising industry customers. *Id.* ¶ 49.

The January 15, 2026, letter makes clear the FTC will continue to pursue NewsGuard with the aim of imposing burdens and expense regardless of whether it has any legitimate grounds, until, in Chairman Ferguson's words, the company "knuckles under." NewsGuard will not do so, and accordingly filed a petition to quash the CID with the FTC,[33] and filed the present action in this Court.

### H.    The FTC's Consent Order Blacklisting NewsGuard.

Unbeknownst to NewsGuard at the time, the FTC's CID was only a first round in its retaliatory censorship campaign against NewsGuard. As NewsGuard was attempting to work in good faith with the FTC concerning the CID in early 2025, the Commission was working separately to use a merger-review proceeding as an excuse to impose an order aimed at blacklisting NewsGuard.

In an unprecedented move, the FTC imposed a condition on the merger of Omnicom Group Inc. (Omnicom), and The Interpublic Group of Companies, Inc. (IPG) to specifically target NewsGuard by prohibiting the merged company or its affiliates from contracting with NewsGuard or using its rating services.

---

[33]  Petition to Quash, Civil Investigative Demand Dated May 20, 2025, to NewsGuard Techs., Inc., FTC File No. 251-0061 (Jan. 16, 2026).

Omnicom and IPG were the world's third and fourth largest companies involved in media buying for ad agencies and advertisers. Omnicom announced on December 9, 2024, that it had entered into an agreement to acquire IPG.[34]  Skibinski Decl. ¶¶ 50-51. The companies negotiated with the FTC through the first half of 2025 to obtain approval of the merger.

On June 23, 2025, the FTC filed a *pro forma* complaint concerning the merger while simultaneously announcing that it had accepted a proposed consent order from the companies.[35] *Id.* ¶ 53. The proposed order did not require any divestiture or other structural changes for the new combined company, despite that it would be the world's largest advertising agency and media buying company. Rather, the draft order focused on precluding Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of."[36] *Id.* ¶ 54.

This condition in the proposed order was intended to target and debilitate if not eliminate news rating services, per Chairman Ferguson's oft-stated views that such organizations were biased against conservative websites and publications. NewsGuard was at the top of the FTC's and Ferguson's hit list. When the proposed consent order was made public, Ferguson released a

---

[34] Press Release, Omnicom, Omnicom to Acquire Interpublic Group to Create Premier Marketing and Sales Company (Dec. 9, 2024), https://www.omc.com/newsroom/omnicom-to-acquire-interpublic-group-to-create-premier-marketing-and-sales-company.

[35] Press Release, Fed Trade Comm'n, FTC Prevents Anticompetitive Coordination in Global Advertising Merger (June 23, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-prevents-anticompetitive-coordination-global-advertising-merger.

[36] Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025).

statement specifically calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"[37] *Id.* ¶ 55 & Ex. 18. While none of this was true, it made clear that Chairman Ferguson's and the FTC's motivations in proposing and effecting the Omnicom merger conditions were entirely political and aimed squarely at censoring speech.

As discussed above, Newsmax had been a longtime critic of NewsGuard because Newsmax had received low reliability ratings, which it claimed demonstrated that NewsGuard was biased against conservative news sources generally. Following the FTC's publication of the proposed order, Newsmax ran a series of stories contending it did not go far enough because, as written, it would not prohibit Omnicom from using NewsGuard's rating services.[38] *Id.* ¶ 56. This was because, as Newsmax well knew, NewsGuard does not direct or recommend "advertising spend" based on "political or ideological viewpoints." *Id.* NewsGuard's ratings are strictly based on fully disclosed, nonpartisan standards for journalistic accuracy and veracity. *See id.* ¶ 5.

During the comment period for the proposed consent order, Newsmax filed a letter urging the FTC to expand the prohibitory condition to ensure Omnicom and its ad agencies "can no longer use biased rating organizations, fact checkers, and other third-parties to engage in censorship of

---

[37] Statement of Chairman Andrew N. Ferguson, *Omnicom Grp. Inc.*, FTC File No. 251-0049, at 5 & n.34 (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

[38] *See, e.g.*, Paul Bond, *Megamerger Omnicom, IPG Mum About NewsGuard Bias*, Newsmax (June 26, 2025, at 17:35 ET), https://www.newsmax.com/us/news-bias-ftc-omnicom/2025/06/26/id/1216643.

disfavored news outlets."[39] *Id.* ¶ 58 & Ex. 20. Newsmax was not subtle about who it was targeting. Its fourteen-page letter mentioned NewsGuard more than a dozen times. On air and online, Newsmax commentators said the proposed order was inadequate because it "says nothing at all about stopping these agencies from using third-party ratings services like NewsGuard to block media like Newsmax."[40] *Id.* ¶ 59 & Ex. 21.

Newsmax also took to the internet to lobby Chairman Ferguson, members of Congress, and the President. In posts on X directed to Chairman Ferguson, Newsmax asserted the FTC's proposed order was insufficient because it "makes no mention of 'censorship' or 'targeting conservatives' and '[f]ully allows Omnicom to use left-wing NewsGuard."[41] *Id.* ¶ 60 & Ex. 22.

Conservative advocacy groups joined in with Newsmax, submitting a letter urging the FTC to impose a merger condition barring Omnicom from working with "ostensibly neutral third-party monitors such as NewsGuard," which the groups claimed "in practice serve as gatekeepers that suppress conservative and heterodox content."[42] *Id.* ¶ 61. The groups submitting the letter did not mention, however, that they are supported by Newsmax and CPAC, the Conservative Political Action Committee (which is also supported by Newsmax).

---

[39] Newsmax Media Inc., Comment Letter on Proposed Consent Order 13 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0008.

[40] *Newsmax's Tabacco Slams FTC Approval of Omnicom-IPG Merger*, Newsmax (Aug. 3, 2025, at 07:23 ET), https://www.newsmax.com/newsfront/tabacco-ftc-omnicom/2025/08/02/id/1221045 (objecting that the draft order "says nothing at all about stopping these agencies from using third-party services like NewsGuard to block media like Newsmax").

[41] NEWSMAX (@NEWSMAX), X (July 31, 2025, at 21:58 ET), https://x.com/NEWSMAX/status/1951100290775630054status/1951100290775630054.

[42] Indep. Media Council & CPAC Found. Ctr. for Regul. Freedom, Comment Letter on Proposed Consent Order 2 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0010.

Numerous First Amendment scholars and free speech organizations also submitted comments regarding the initial proposed order, explaining its unconstitutionality,[43] but the FTC made no mention of these comments and disregarded First Amendment concerns. *Id.* ¶ 62.

The FTC subsequently issued a revised order removing terms about using third-party services with "political or ideological bias," which Newsmax had figured out would not cover NewsGuard. Instead, the FTC revised the Consent Order to prohibit the merged Omnicom entity or its ad agencies from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[44] *Id.* ¶ 63 & Ex. 23.

There is no indication in the public record that Omnicom proposed or advocated for the censorial provision in the Consent Order aimed at precluding use of NewsGuard services and ratings. And it would be unusual, at the least, for an ad agency and marketing company to seek restrictions on use of services designed to protect advertisers' reputations and brand safety. In sum, the FTC ordered that Omnicom and all its affiliates and ad agencies cannot contract with or use nonpartisan review and ratings services based on journalistic criteria.

There was no further comment period when NewsGuard could address or object to this revised language. The FTC adopted this as the final order on September 26, 2025. *Id.* ¶ 63 & Ex. 23.

---

[43] *See, e.g.*, Pub. Knowledge, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0013; TechFreedom, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0015; Vikram David Amar & Ashutosh Bhagwat, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0009.

[44] Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

### I.    Harms to NewsGuard and Its Customers from the Consent Order.

The FTC's imposition of the Omnicom Consent Order has already had negative impacts on NewsGuard's business, and the harm in all likelihood will continue. For example, after the Consent Order was issued out, a longtime client that does significant business with Omnicom informed NewsGuard that it would not be renewing its contract, not because of any dissatisfaction with NewsGuard's service but because of "[r]ecent developments that require us to take a more cautious approach to this area of our business." *Id.* ¶ 66.

NewsGuard also stands to lose business from the newly merged Omnicom directly as a result of the Consent Order. Since 2019, NewsGuard has had a contract with IPG to make data available to brands represented by the agency that seek information about the reliability of different publishers. IPG has proudly touted this arrangement and data available through the agreement in press releases, industry event panels, and case studies. But it is questionable (or doubtful) that the agency will be able to continue with the contract now that it has been absorbed by Omnicom and is subject to the Consent Order. *Id.* ¶ 67.

The Omnicom Consent Order amounts to a government-imposed blacklist prohibiting Omnicom and its affiliates from using NewsGuard's services. Other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement actions, and liability if they do not divorce themselves from dealings with NewsGuard. Overall, the burdens and restrictions imposed by the FTC through its onerous "investigation" and the prohibition of the Consent Order have made it nearly impossible for NewsGuard to conduct its journalism business. *Id.* ¶ 68.

### STANDARD OF REVIEW

A plaintiff seeking preliminary relief must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the

26

balance of equities tips in [their] favor;" and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when plaintiff attempts to preliminarily enjoin a government action," *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020), "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

### I.    NewsGuard Is Likely to Prevail on the Merits of Its Claims.

The common element in the FTC's various actions against NewsGuard is disagreement with its journalistic judgements. The pretextual investigation of NewsGuard through an expansive and burdensome CID as well as the Omnicom merger condition—designed to starve NewsGuard of revenue—violate the First Amendment's prohibition of retaliation against protected speech and its proscription against censorship through intermediaries. These actions violate both the First and Fourth Amendments to the United States Constitution.

### A.    Chairman Ferguson and the FTC Retaliated Against NewsGuard Because of its Editorial Judgments.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). *See also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)); *Perry v. Sindermann,* 408 U.S. 593, 597 (1972) (the government may not punish a person or deprive him of a benefit to limit "constitutionally protected speech"). This includes retaliation against journalistic activity. *Paxton*, 138 F.4th at 570. A government official engages in unconstitutional retaliation when (1) he targets activity protected by the First Amendment; (2) the adverse action is sufficient to deter a person of ordinary firmness from speaking again; and (3) there is a causal link between the exercise of the constitutional right and the official's action.

*Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The FTC's actions targeting NewsGuard meet each of these conditions.

### 1. NewsGuard's News Rating Service Is Protected Journalistic Activity.

The First Amendment protects journalistic judgment and editorial decisions. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254–56 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). NewsGuard's evaluation of news sites for accuracy and reliability is "quintessential First Amendment activit[y]," *Paxton*, 138 F.4th at 584, and in publishing its ratings NewsGuard is "obviously engaged in conduct protected under the First Amendment." *Id.* NewsGuard's rating system is akin to "a newspaper's editorial section." *Consortium for Indep. Journalism, Inc.*, 2025 WL 919504, at *18 n.11. Defendants have never questioned this fact, nor could they.

### 2. The FTC's Campaign Against NewsGuard Is Sufficient to Deter Protected Activity.

Defendants' adverse regulatory actions targeting NewsGuard include the FTC's overly broad and punitive CID and the Omnicom-IPG Consent Order that operates as a blacklist against NewsGuard's provision of brand safety services to the largest advertising agencies in the world. Compl. ¶¶ 107-135. The blunderbuss CID demands have devoured countless hours of NewsGuard staff and outside counsel time, forcing NewsGuard to divert revenue and resources away from its core journalistic mission. Compl. ¶¶ 136-39. The Consent Order foreclosing Omnicom from using NewsGuard's service already has had a direct and substantial effect on NewsGuard, and further losses are imminent. Compl. ¶¶ 140-41; *see also* Skibinski Decl. ¶¶ 65-67.

These actions are sufficient to chill a reasonable publisher in NewsGuard's position from engaging in protected expression. *See Aref*, 833 F.3d at 258. That is their point—the FTC's campaign was designed to chill NewsGuard's First Amendment-protected speech, journalism, and

editorial activities by intruding on NewsGuard's operations and to violate NewsGuard's First Amendment associational rights by disrupting its client relationships. Chairman Ferguson laid out his strategy for retaliation in official statements, interviews, and social media posts explaining how the FTC can use its investigative and coercive powers to force companies like NewsGuard to "knuckle under" and "[d]o what we say." Skibinski Decl. ¶ 38.

As Chairman Ferguson foretold, the FTC's campaign against NewsGuard has been costly and intrusive. The company has produced more than 40,000 pages of documents attempting to comply with the CID, as the FTC continually demanded more disclosures with no end in sight. The sweeping demands include virtually all documents, information, and records of NewsGuard from the company's inception to the present, including those relating to NewsGuard's analyses, methodology, editorial judgments, journalism and reporting. Compl. ¶¶ 83-89, 95-99; *see also* Skibinski Decl. ¶ 40. And the demands did not stop with probing NewsGuard's editorial processes and business practices. The FTC also sought information on NewsGuard's customers and subscribers, demanding disclosure of all communications with them. Compl. ¶¶ 99-102. NewsGuard's legal expenses alone have exceeded 30 percent of the revenue derived from the brand-safety services the company provides to clients, but that does not account for other costs including lost productivity and business opportunities. Compl. ¶ 104.

It is "not a high" bar to show that such burdens would deter a person of reasonable firmness from engaging in protected activity, *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025), *appeal docketed*, No. 25-5265 (D.C. Cir. July 22, 2025), and it is of no moment that NewsGuard has refused to "knuckle under." *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity

29

altogether."). It is sufficient to show that the FTC's CID would chill certain First Amendment activities of similarly situated individuals and organizations of ordinary firmness. *Id.*; *see also White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (explaining that an investigation involving "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" "more than meets th[e] standard" of an action that "would chill or silence a person of ordinary firmness from future First Amendment activities"); *Cooksey v. Futrell*, 721 F.3d 226, 236–37 (4th Cir. 2013) (same).

That showing is easily met here, as confirmed by the number of courts that have found similar (and in some cases, identical) tactics constitute retaliatory investigations sufficient to intimidate speakers into silence. *See*, *e.g.*, *Media Matters for Am. v. FTC*, 2025 WL 2378009, at *2 ("There can be no doubt that such a CID would deter a reporter of ordinary firmness from speaking again."), *Paxton*, 732 F. Supp. 3d at 28 ("[T]he threat of administrative and judicial intrusion into newsgathering and editorial process that arises from official process and its possible enforcement" "is sufficient to deter protected speech." (quotation marks omitted)); *Bailey*, 2024 WL 3924573, at *11 ("Paxton's announcement of an investigation and issuance of a CID demanding records relating to Media Matters' organization, funding, and journalism would sufficiently deter a news organization or journalist 'of ordinary firmness' from speaking again.").

But the FTC's campaign against NewsGuard goes even further than just an investigation and includes the Omnicom-IPG merger condition that bars Omnicom and its affiliates and ad agencies from contracting with or using nonpartisan news website review and ratings services based on journalistic criteria. Skibinski Decl. ¶ 63. Not only does this condition prohibit the Omnicom entities from using NewsGuard's services, other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement

30

actions, and liability if they do not divorce themselves from dealings with NewsGuard. The direct censorship and widespread chilling effects of this condition are obvious.

### 3.    The FTC's Retaliatory Campaign Directly Targets NewsGuard Because of Its News Judgments.

There is a direct causal link between NewsGuard's journalism and Defendants' retaliatory acts. By both word and deed, Chairman Ferguson and the FTC have left no doubt they are targeting NewsGuard because they disagree with its editorial judgments. But NewsGuard need not present "direct evidence" of retaliatory motive[45] even though it exists here in abundance. Courts review various factors to assess causation, including suspicious timing of the government's actions, *Johnson v. District of Columbia*, 726 F. Supp. 3d 8, 30 (D.D.C. 2024), and its pretextual explanations for targeting speech. *Goodwin*, 579 F. Supp. 3d at 175. And courts will consider whether the alleged retaliation is part of a broader "campaign" targeting the plaintiff. *Lewis v. Gov't of D.C.*, 161 F. Supp. 3d 15, 29 (D.D.C. 2015). Taken together, a combination of adverse actions and statements by officials is sufficient to demonstrate retaliatory motive. *E.g.*, *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-4505, 2026 WL 80796, at \*16-20 (D.D.C. Jan. 11, 2026). In this case, all relevant factors confirm Defendants' retaliatory purpose. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

---

[45] Plaintiffs "are not required to come forward with … 'the so-called smoking gun,'" *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006) (quoting *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003)), which courts recognize is "rarely available" to prove something so "protean … as an actor's motive or intent," *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012). While the government's statements about its own motivation provide important (and sometimes dispositive) context, *see Hawkins v. District of Columbia*, 923 F. Supp. 2d 128, 143 (D.D.C. 2013), "direct evidence of retaliatory animus is not required," *Goodwin v. Dist. of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022) (quoting *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46-47 (D.D.C. 2021)).

*First*, this case is particularly notable because Chairman Ferguson publicly explained not just *why* he was targeting NewsGuard, but also *how* he planned to bring the company to heel. Even before he was elevated to the chairmanship, then-Commissioner Ferguson referred to NewsGuard in November 2024 post on X and asserted it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[46] The following month, Ferguson suggested the FTC "ought to conduct … an investigation," incorrectly claiming that NewsGuard "seems to give a free pass to … major left-leaning outlets."[47] After becoming Chairman, Ferguson explained in an April 2025 interview exactly how the FTC could use its "tremendous array of investigative tools" and "coercive power—formal and informal" to demand compliance with its views about supposed online "censorship," and he laid out a roadmap of the tactics his FTC would ultimately use against NewsGuard.[48] Such statements were a prologue to, and an explanation for, the actions the FTC would take against NewsGuard.

Under these circumstances, "[a] reasonable factfinder is likely to interpret Defendants' words as targeting [the plaintiff] not for legitimate law enforcement purposes but instead for its protected First Amendment activities." *Bailey*, 2024 WL 3924573, at *15; *see also id.* at *14 ("Defendant's public statements are direct evidence of retaliatory intent."); *Media Matters v. FTC*, 2025 WL 2378009, at *19–20 ("Chairman Ferguson and his colleagues have made comments characterizing [the plaintiff] and this investigative push 'in ideological terms.'"); *Paxton*, 732 F. Supp. 3d at 28 ("Defendant's description of [plaintiff] as a 'radical anti-free speech' and 'radical

---

[46] Andrew Ferguson (@AFergusonFTC), *supra* note 14.

[47] Concurring Statement of Commissioner Andrew Ferguson, *supra* note 20.

[48] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, *supra* note 24.

left-wing organization … is evidence of retaliatory intent."). Chairman Ferguson's numerous statements focusing on NewsGuard make clear that "retaliatory animus was the but-for cause of the FTC's CID." *Media Matters v. FTC*, 2025 WL 2378009, at *2.

*Second*, the timing and sequence of the FTC's actions targeting NewsGuard support a finding of retaliatory purpose. It is reasonable to infer retaliation where a defendant's actions are part of a broader "campaign" targeting the plaintiff, *Lewis*, 161 F. Supp. 3d at 29, as it is here. Chairman Ferguson publicly campaigned for his current position by pledging to crack down on services like NewsGuard (which he specifically named). Compl. ¶¶ 56, 71. Almost immediately after he assumed the chairmanship of the agency, the FTC issued a Request for Information ("RFI") seeking public comment on "Technology Platform Censorship," asserting that social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal."[49] This mirrored a series of actions by state governments, purporting to take aim at the so-called "censorship industrial complex." Compl. ¶¶ 66-82. Despite the fact that the state investigations were enjoined as retaliatory (as the FTC's investigation of Media Matters would be), the agency issued its own expansive CID probing every aspect of NewsGuard's business, followed shortly thereafter by the Omnicom merger condition suppressing NewsGuard. Compl. ¶¶ 83-135. Under these circumstances, a court need not suspend disbelief in analyzing causation—where common sense "suggests that there may be more to this story." *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 104 (D.D.C. 2012).

*Third*, the sweeping scope of the CID and the restriction in the Omnicom merger condition targeting services that evaluate "viewpoints as to the veracity of news reporting" and "adherence

---

[49] Press Release, *supra* note 23; *see* Request for Public Comment Regarding Technology Platform Censorship*, supra* note 23.

to journalistic standards or ethics" confirm the causal link to NewsGuard's protected speech. *See Media Matters v. FTC*, 2025 WL 2378009, at *21. The CID requires production of "all documents relating to NewsGuard's News Reliability Ratings and any other rating[s];" identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. Skibinski Decl. ¶ 40 & Ex. 15. It effectively demands production of virtually all NewsGuard documents, including those relating to NewsGuard's analyses, editorial judgments, customers, and journalism. *Id.* This includes all materials about NewsGuard's work product and methodology. And it necessarily includes production of information, materials, and communications relating to NewsGuard's journalism and reporting, including reporters' notes and sources. *See id.*, Specification 5.

The CID Specifications regarding NewsGuard's finances are likewise overbroad and intrusive, calling for production of every financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report prepared by or for NewsGuard. *Id*. And its demands for customer lists and correspondence raise special concerns regarding rights of free speech and association. *Id*. And, as noted, contrary to requirements under the FTC Act, the Commission gave no explanation in the CID (or since) of any alleged violation that is the subject of investigation and the provision of law applicable to such violation, it failed to do so in the NewsGuard CID, leaving the company to guess about how the agency's demands relate to any legitimate enforcement of antitrust or competition laws. Its failure to provide any legitimate rationale, coupled with "the sweeping scope of the FTC's CID … suggests pretext on the part of the FTC." *Media Matters v. FTC*, 2025 WL 2378009, at *21.

The terms of the Omnicom Consent Order likewise reflect retaliatory intent. When the Consent Order was first proposed, Chairman Ferguson released a statement explicitly calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising

34

industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'" Skibinski Decl. ¶ 55 & Ex. 18. In line with this distorted characterization of NewsGuard, the Consent Order as originally proposed would have barred Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of." Skibinski Decl. ¶ 54 & Ex. 17 (quoting Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025)).

Ironically, Newsmax objected to this formulation, telling the Commission that the condition as proposed would not reach NewsGuard, thus undermining its claims (and those of Chairman Ferguson) that NewsGuard was ideologically biased against conservatives. In response, and at the urging of Newsmax, FTC revised the Consent Order to prohibit the merged Omnicom entity or its affiliates from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[50] As modified, the condition targets NewsGuard "with the precision of a laser beam," *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988), and confirms the causal link between the FTC's actions and NewsGuard's journalism.

## B.    The FTC's Intermediary Strategy Reflected in the Omnicom-IPG Consent Order Is Unconstitutional Jawboning.

Whether or not the FTC's actions might be classified as retaliation, its use of the Omnicom-IPG Consent Order to target NewsGuard violates another First Amendment rule that the Supreme Court recently reaffirmed unanimously: A government official cannot do indirectly what he or she

---

[50] Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

35

is barred from doing directly. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). Specifically, "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67–69*)*.

No doubt, government officials may criticize private speakers (as Chairman Ferguson has done) and in doing so can "rely on the merits and force of [their] ideas, the strength of [their] convictions, and [their] ability to inspire others." *Id.* at 188. But the *Vullo* Court drew the constitutional line there; officials cannot "use the power of the State to punish or suppress disfavored expression." *Id.* A public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" violates the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

This means the First Amendment bars the government from penalizing speech indirectly by applying regulatory pressure on third-party intermediaries. For example, in *Bantam Books* the Supreme Court held the government could not apply pressure on third-party booksellers in order to impose a blacklist on publications. 372 U.S. at 71. And in *Backpage.com*, the Seventh Circuit enjoined a sheriff and held that he had violated the First Amendment by pressuring credit card companies to stop doing business with a classified advertising website because he objected to the content of ads on the site. 807 F.3d at 235.

The Supreme Court's unanimous reaffirmation of this principle in *Vullo* is directly on point. The Court held the New York Department of Financial Services ("DFS") could not leverage its regulatory authority over insurance companies to penalize the National Rifle Association for its

36

political positions on gun control. State officials advised the regulated insurance companies that doing business with the NRA sent the wrong message and entered agreements with companies that "agreed not to provide any NRA-endorsed insurance programs." *Vullo*, 602 U.S. at 184-85. Of particular relevance here, the Court held it offends the First Amendment for regulators to enter consent decrees granting concessions to regulated insurance companies on condition they cease doing business with a disfavored speaker. *Id.* at 198. Yet this is precisely what the FTC has done in this case.

The revised merger condition puts NewsGuard on a government-imposed blacklist. It prohibits Omnicom and its ad agencies and affiliates—now the world's largest ad agency—from using NewsGuard's services. And other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement actions, and liability if they continue to use NewsGuard's services. As a consequence, NewsGuard has already lost business as a direct result of the condition and will lose more unless enforcement of the merger condition is enjoined. *See* Skibinski Decl. ¶¶ 65-67.

The FTC Consent Order violates the First Amendment for the same reason as the publication blacklist in *Bantam Books*, the pressure campaign on credit card companies in *Backpage.com*, and the consent decree conditions barring business relationships with the NRA in *Vullo*. Judge Richard Posner aptly described such an intermediary strategy designed to deprive a media company of revenues as akin to "killing a person by cutting off his oxygen supply rather than by shooting him." *Backpage.com*, 807 F.3d at 231. Accordingly, he found the "only remedy is an injunction against the [government's] violating [the company's] First Amendment rights," which the Seventh Circuit immediately ordered. *Id.* at 238–39. This Court should do the same and enjoin the FTC from enforcing the Omnicom merger condition.

C.    **The FTC's Actions Against NewsGuard Violate the First and Fourth Amendments.**

The FTC's campaign against NewsGuard violates NewsGuard's First and Fourth Amendment rights. Chairman Ferguson's oft-stated position that he is taking action against NewsGuard to combat what he calls "Big Tech censorship" misunderstands basic constitutional law. The most fundamental rule of the First Amendment is that the Free Speech Clause protects private actors against the government. *Manhattan Cmty. Access Corp.*, 587 U.S. at 804. In our constitutional scheme the government has no legitimate role in deciding "what counts as the right balance of private expression" or to "'un-bias' what it thinks [is] biased." *Moody*, 603 U.S. at 719.

Although Chairman Ferguson attempts to clothe himself as a free speech warrior, "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741–42. The Supreme Court has made clear that the First Amendment fully protects editorial decisions by publications, websites, and platforms, *id.* at 734, 741–42, and Chairman Ferguson's claim that he is taking action against news ratings services based on his belief (mistaken or not) that they are biased against conservative news sites gives away the game.

The FTC's jurisdiction over unfair competition in commerce and agreements that unreasonably restrain trade, 15 U.S.C. §§ 1, 45, does not empower it to serve as a referee of journalistic judgments. The Commission simply has no legitimate role to play that would permit it to intervene in the market for advertiser brand safety tools where NewsGuard's position is *de minimis*—less than 0.1%—of that market. Yet even if the FTC had some colorable regulatory hook on which to hang its claim of authority, it would not be able to avoid the inevitable First Amendment conflict. *See NAACP. v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982).

38

Here, the FTC's CID violates the First Amendment not only because it is retaliatory and burdensome, but also because it is an exercise in viewpoint discrimination, as Chairman Ferguson proudly admits. "Viewpoint discrimination is poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring), and the government lacks any legitimate interest in selectively penalizing disfavored viewpoints. *Healy v. James*, 408 U.S. 169, 187–88 (1972). It is "an egregious form of content discrimination" and is essentially unconstitutional *per se*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995), yet it is the driver of all of the FTC's actions against NewsGuard.

The sweeping CID demands infringe both NewsGuard's First and Fourth Amendment rights. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). In particular, the First Amendment affords NewsGuard a privilege that protects it from having to disclose information if doing so would chill its constitutional rights of free speech and free expression. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). These constitutional protections are interrelated; when an administrative subpoena seeks materials that could fall under First Amendment protection, courts require that the Fourth Amendment's standards be met with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

First Amendment case law makes clear that "before a state or federal body can compel disclosure of information which would trespass upon [F]irst [A]mendment freedoms, a 'subordinating interest of the State' must be proffered, and it must be 'compelling.'" *Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 389 (D.C. Cir. 1981) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958)). And, in particular, investigating a news organization because the government views its editorial policies as biased is not a valid

governmental interest. "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press." *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234, 245 (1957).

But the FTC has flouted those requirements here, and its investigation of NewsGuard is a classic fishing expedition. The CID did not "state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation" as required by 15 U.S.C. § 57b-1(c)(2). Instead, the CID simply provided a boilerplate statement that it was seeking information "to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission." Nevertheless, the CID demands that NewsGuard produce vast numbers of confidential, highly sensitive documents, a request that effectively encompasses virtually all the company's emails, reporters' notes and drafts, texts, and other documents created since its founding. The CID also demands the identities of NewsGuard's subscribers and all communications with them.

This blunderbuss approach not only tramples NewsGuard's editorial rights, the demand for customers' identities and forced disclosure of all communications intrudes on associational rights as well. *See Patterson*, 357 U.S. at 460 ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). Because "compulsory disclosure of organizational ties can constitute a significant encroachment on freedom of association," *Familias Unidas v. Briscoe*, 619 F.2d 391, 399 (5th Cir. 1980), it can be justified only if narrowly tailored to further a sufficiently important government interest, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021). The FTC's open-ended demand for

40

customer identities untethered to any legitimate investigatory interest cannot satisfy exacting scrutiny. A government actor's "intentional service of [a] CID" can be "the act that caused chilling effects" on a media organization's First Amendment rights, as serving a CID "legally obligate[s]" the organization "to produce records." *Paxton*, 732 F. Supp. 3d at 20, 22.

## II.    NewsGuard Will Suffer Irreparable Harm Absent an Injunction.

The CID and the Omnicom Consent Decree have caused—and are causing—NewsGuard ongoing irreparable constitutional injury, economic loss, and associational harm. These injuries easily satisfy the requirements for emergency relief: irreparable harm that is "certain and great, … actual … not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)).

The Supreme Court has repeatedly held "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *see also Cigar Ass'n of Am. v. U.S. Fed. Drug Admin.*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018); *Bailey v. Fed. Bureau of Prisons*, No. 24-1219, 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (noting plaintiff can establish irreparable harm can be established by showing that "First Amendment freedoms are actually" or "imminently will be" lost). As in *Paxton*, where the D.C. Circuit held this Court properly concluded the Texas AG's "campaign of retaliation" led to "self-censorship," such an injury constitutes "irreparable harm." 138 F.4th at 570. And this Court enjoined the FTC's retaliatory CID issued to Media Matters, finding the irreparable injury requirement "is easily met" for the same reasons. *Media Matters v. FTC*, 2025 WL 2378009, at *22. With such constitutional injuries, "there is a 'presumed

availability of federal equitable relief.'" *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (citation omitted); *see Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020).

Here, NewsGuard has alleged "present, concrete, and objective harms" that currently "adversely affect[] [its] newsgathering activities and media business operations." *Paxton*, 138 F.4th at 579. It has been burdened with voluminous and intrusive document demands that have imposed significant costs and diverted the company from its mission. Skibinski Decl. ¶ 49. It has been threatened with disclosure of sensitive editorial materials as well as customer identities and communications. *Id.* ¶¶ 40-41. And it has been barred from future contracts with the largest international advertising agency. *Id.* ¶¶ 63-64. The irreparable harm is obvious, ongoing, and imminent.

## III. The Remaining Equitable Factors Favor Granting Preliminary Relief.

The remaining equitable factors—the balance of equities and the public interest—strongly favor NewsGuard. "It is well settled that the balance of equities and public interest factors merge if the government is the opposing party." *Paxton*, 138 F.4th at 585. "In other words, '[w]hen a private party seeks injunctive relief against the government,'" the Court "must 'weigh[ ] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined.'" *Id.* (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)).

Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Centro Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456, 471 (D. Md. 2011)); *see Karem*, 960 F.3d at 668 ("[E]nforcement of an unconstitutional law is always contrary to the public interest.") (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). "The public's

interest in protecting First Amendment rights" is beyond dispute and allowing unconstitutional government action to stand "is always contrary to the public interest." *Pursuing Am.'s Greatness*, 831 F.3d at 511-12 (quoting *Gordon*, 721 F.3d at 653). The balance of equities also favors injunctive relief because "no substantial harm to others can be said to inhere" in allowing a violation of constitutional rights to continue. *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nash. & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).

Granting preliminary relief will not harm the government. Because the FTC's investigation and the Consent Order condition are devoid of any legitimate basis, Defendants lack a legitimate interest continuing their pursuit of NewsGuard. Defendants "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quoting *Giovani Carandola, Ltd. v. Bason*, 147 F. Supp. 2d 383, 395 (M.D.N.C. 2001)); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding there is "substantial public interest" in ensuring the government "abide[s]" by the law (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))). The strong public interest in assuring that journalists can report on important matters unencumbered by political pressure requires entry of a preliminary injunction.

## CONCLUSION

For the reasons set forth above, the Court should grant NewsGuard's motion for a preliminary injunction.

Dated: February 11, 2026                         Respectfully Submitted,

/s/ Robert Corn-Revere
   Robert Corn-Revere
   (D.C. Bar No. 375415)
James C. Grant
   (WA Bar No. 14358)
Sara E. Berinhout
   (MA Bar No. 703217)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org

*Counsel for Plaintiff*

44

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing upon all ECF filing participants.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 11, 2026.


Dated: February 11, 2026                    Respectfully submitted,

                                            By: /s/ Robert Corn-Revere

                                            Robert Corn-Revere

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This document complies with the page limit of Local Rule LCvR 7(e) because this document does not exceed 45 pages.

2.  This document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman.

Dated: February 11, 2026                       Respectfully submitted,

                                               By: <u>/s/ Robert Corn-Revere</u>

                                               Robert Corn-Revere