IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEWSGUARD TECHNOLOGIES, INC.,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION and
ANDREW FERGUSON, in his official
capacity as Chairman of the Federal Trade
Commission,

*Defendants*.

No. 1:26-cv-0353 (DLF)

**DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................................ 1

**BACKGROUND** ................................................................................................................ 2

    I.    Statutory and Regulatory Framework ....................................................... 2

    II.    The Commission's Efforts to Address Anticompetitive Advertising Boycotts.......... 7

        A.    Advertising Boycott Investigation......................................................... 8

        B.    The Omnicom-IPG Complaint and Consent Order. ............................................ 12

    III.    NewsGuard's Complaint and Motion for Preliminary Injunction ........................... 14

**LEGAL STANDARDS** ..................................................................................................... 14

**ARGUMENT** ..................................................................................................................... 14

    I.    NewsGuard is Not Entitled to a Preliminary Injunction Against
Enforcement of the CID. .......................................................................................... 14

        A.    NewsGuard Cannot Show That It is Likely to Prevail on the Merits.................. 14

            1.    This Court Lacks Authority to Hear NewsGuard's Pre-Enforcement
Challenge to the CID. .................................................................................. 15

                i.    The Court lacks jurisdiction because Congress channeled
NewsGuard's claims in the FTC Act's exclusive review scheme........... 16

                ii.    NewsGuard lacks a cause of action. ...................................................... 18

            2.    NewsGuard's Retaliation Claim Fails on the Merits. ..................................... 20

                i.    NewsGuard cannot show its speech prompted the CID........................... 20

                    a.    The FTC acted for nonretaliatory reasons. ......................................... 21

                    b.    NewsGuard's purported evidence of retaliation fails........................... 22

                ii.    NewsGuard cannot show that the CID has
a sufficient chilling effect. .................................................................... 27

                iii.    NewsGuard's reliance on Media Matters is misplaced............................ 29

            3.    NewsGuard's First and Fourth Amendment Claim Fails on the Merits.......... 30

        B.    The Equitable Factors Weigh Heavily Against a Preliminary Injunction. .......... 32

II. Newsguard is Not Entitled to a Preliminary Injunction Against Any Part of the Omnicom-IPG Consent Order. ....................................... 34

 A. NewsGuard Cannot Show That It is Likely to Prevail on the Merits. ................ 34

  1. This Court Lacks Authority to Hear NewsGuard's Unprecedented Challenge to the Consent Order. ...................................................... 34

   i. The courts of appeals have exclusive jurisdiction to review FTC orders. .......................................................................... 34

   ii. NewsGuard has no right to review of an FTC adjudicatory order that does not govern it. ................................................. 35

   iii. NewsGuard failed to exhaust its claim. ................................. 37

  2. NewsGuard Has Not Established Standing to Challenge the Consent Order. ...................................................................... 38

  3. NewsGuard's Retaliation Challenge to the Consent Order Fails on the Merits. ......................................................................... 40

   i. There is no cognizable claim for "retaliatory settlement of litigation." ...................................................................... 40

   ii. NewsGuard fails to show that the consent order was retaliatory. ............. 40

    a. NewsGuard cannot show that its speech prompted the consent order. ................................................... 40

    b. NewsGuard cannot show that the consent order chilled its speech. ................................................. 42

  4. NewsGuard's "Jawboning" Claim Likewise Fails. ......................... 42

   i. NewsGuard has not come close to demonstrating that Omnicom and IPG were coerced. ........................................... 43

   ii. NewsGuard fails to show a nexus between the consent order and its speech. ................................................... 44

 B. The Equitable Factors Weigh Heavily Against a Preliminary Injunction. .......... 45

**CONCLUSION** ............................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................................................ 19

*Amato v. Elicker*,
  534 F. Supp. 3d 196 (D. Conn. 2021) ...................................................................... 31

*Anheuser-Busch, Inc. v. FTC*,
  359 F.2d 487 (8th Cir. 1966) .................................................................................... 15

*Archer v. Chisholm*,
  870 F.3d 603 (7th Cir. 2017) .................................................................................... 27

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ......................................................... 20, 27, 40, 42

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) .................................................................................................. 19

*Arrington v. Santander Consumer USA Inc.*,
  2025 WL 4083338 (D.D.C. Nov. 24, 2025) ...................................................... 33, 45

*Ass'n of Irritated Residents v. EPA*,
  494 F.3d 1027 (D.C. Cir. 2007) ................................................................................ 37

*Atl. Richfield Co. v. FTC*,
  546 F.2d 646 (5th Cir. 1977) .................................................................................... 15

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) ............................................................................................ 17, 18

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) .................................................................................... 44

*Baltimore Gas & Elec. Co. v. FERC*,
  252 F.3d 456 (D.C. Cir. 2001) ............................................................................ 37, 45

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .................................................................................................... 44

*Belle Fourche Pipeline Co. v. United States*,
  751 F.2d 332 (10th Cir. 1984) .................................................................................. 15

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ............................................................................................ 36, 37

*Blue Ribbon Quality Meats, Inc. v. FTC*,
  560 F.2d 874 (8th Cir. 1977) ................................................................................ 5, 15

*Breaux v. City of Garland*,
  205 F.3d 150 (5th Cir. 2000) .................................................................................... 27

*Camreta v. Greene,*
    563 U.S. 692 (2011) ................................................................................................ 19

*Carr v. Saul,*
    593 U.S. 83 (2021) .................................................................................................. 38

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ............................................................................... 45

*Citizens for Resp. & Ethics in Wash. v. FEC,*
    971 F.3d 340 (D.C. Cir. 2020) ............................................................................... 19

*City of Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005) ................................................................................................ 19

*Constantine v. Rectors & Visitors of George Mason Univ.,*
    411 F.3d 474 (4th Cir. 2005) .................................................................................. 28

*Consumer Fed'n of Am. v. FTC,*
    515 F.2d 367 (D.C. Cir. 1975) ............................................................................... 36

*Consumer Fed'n of Am.,*
    515 F.2d 367 (D.C. Cir. 1975) ............................................................................... 37

*Consumers for Auto Reliability and Safety v. FTC,*
    No. 17-1038, 2017 U.S. App. LEXIS 12921 (D.C. Cir. July 14, 2017) .................. 37

*Cort v. Ash,*
    422 U.S. 66 (1975) .................................................................................................. 18

*DeVillier v. Texas,*
    601 U.S. 285 (2024) ................................................................................................ 18

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) .................................................................................................... 35

*Five Flags Pipe Line Co. v. Dep't of Transp.,*
    854 F.2d 1438 (D.C. Cir. 1988) ............................................................................. 35

*FTC v. Boehringer Ingelheim Pharm., Inc.,*
    778 F.3d 142 (D.C. Cir. 2015) ................................................................................. 4

*FTC v. Church & Dwight Co.,*
    665 F.3d 1312 (D.C. Cir. 2011) ............................................................................... 4

*FTC v. Claire Furnace Co.,*
    274 U.S. 160 (1927) ................................................................................. 1, 5, 15, 19

*FTC v. Invention Submission Corp.,*
    965 F.2d 1086 (D.C. Cir. 1992) ........................................................................... 3, 4

*FTC v. Ken Roberts Co.,*
    276 F.3d 583 (D.C. Cir. 2001) .............................................................................. 4, 5

*FTC v. Match Grp., Inc.*,
　2023 WL 3181351 (D.D.C. May 1, 2023) ................................................................ 4

*FTC v. Mt. Olympus Fin., LLC*,
　211 F.3d 1278 (Table),
　2000 WL 419825 (10th Cir. 2000) ......................................................................... 4

*FTC v. O'Connell Assocs., Inc.*,
　828 F. Supp. 165 (E.D.N.Y. 1993) ........................................................................ 27

*FTC v. Owens-Corning Fiberglas Corp.*,
　626 F.2d 966 (D.C. Cir. 1980) ............................................................................... 4

*FTC v. Standard Oil of Cal.*,
　449 U.S. 232 (1980) .............................................................................................. 34

*FTC v. Texaco*,
　555 F.2d 862 (D.C. Cir. 1977) ................................................................... 6, 31, 32

*Fund for Animals v. Frizzell*,
　530 F.2d 982 (D.C. Cir. 1975) ............................................................................. 33

*Gen Fin. Corp. v. FTC*,
　700 F.2d 366 (7th Cir. 1983) .................................................... 1, 5, 15, 17, 32

*Gonzalez v. Trevino*,
　602 U.S. 653 (2024) .............................................................................................. 20

*Gonzalez v. Walgreen Co.*,
　140 F.4th 663 (5th Cir. 2025) .............................................................................. 25

*Green v. U.S. Dep't of Justice*,
　54 F.4th 738 (D.C. Cir. 2022) .............................................................................. 14

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
　527 U.S. 308 (1999) .............................................................................................. 19

*Gustave-Schmidt v. Chao*,
　360 F. Supp. 2d 105 (D.D.C. 2004) ..................................................................... 25

*Hamilton v. Geithner*,
　666 F.3d 1344 (D.C. Cir. 2012) ........................................................................... 25

*Harris v. Wackenhut Servs., Inc.*,
　648 F. Supp. 2d 53 (D.D.C. 2009) ....................................................................... 24

*Hartman v. Moore*,
　547 U.S. 250 (2006) .............................................................. 20, 21, 27, 28

*Heckler v. Chaney*,
　470 U.S. 821 (1985) .............................................................................................. 37

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) ............................................................................... 14

*In re Architect of Capitol Emp. Disp.*,
   2024 WL 3359515 (D.D.C. July 10, 2024) ............................................................ 24

*In re Grand Jury Procs.*,
   220 F.3d 568 (7th Cir. 2000) ................................................................................. 30

*In re Grand Jury Procs.*,
   486 F.2d 85 (3d Cir. 1973) .................................................................................... 30

*In re Grand Jury Subpoena, Judith Miller*,
   438 F.3d 1141 (D.C. Cir. 2006) ............................................................................ 30

*J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*,
   39 F.4th 489 (8th Cir. 2022) ................................................................................. 27

*Johnson v. Interstate Mgmt. Co.*,
   849 F.3d 1093 (D.C. Cir. 2017) ............................................................................ 18

*Kohls v. Ellison*,
   __ F.4th __, 2026 WL 350923 (8th Cir. 2026) ...................................................... 33

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ........................................................................... 28, 40

*Lakkis v. Lahovski*,
   994 F. Supp. 2d 624 (M.D. Pa. 2014) ................................................................... 25

*Lewis v. Becerra*,
   2022 WL 123909 (D.D.C. Jan. 13, 2022) .............................................................. 33

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................... 38, 39

*Maldonado v. D.C.*,
   2019 WL 6877913 (D.D.C. Dec. 16, 2019) ........................................................... 33

*Media Matters for Am. v. Bailey*,
   2024 WL 3924573 (D.D.C. Aug. 23, 2024) ...................................................... 20, 29

*Media Matters for Am. v. FTC*,
   2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) .............................................. 10, 23, 29

*Media Matters for Am. v. FTC*,
   805 F. Supp. 3d 105 (D.D.C. 2025) ................................................................. 10, 29

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ............................................................................. 27

*Media Matters for Am. v. Paxton*,
   732 F. Supp. 3d 1 (D.D.C. 2024) .......................................................................... 29

*Minter v. District of Columbia,*
  809 F.3d 66 (D.C. Cir. 2015) ................................................................... 25, 26

*Mistretta v. United States,*
  488 U.S. 361 (1989) ........................................................................................ 22

*Moore v. Garnand,*
  83 F.4th 743 (9th Cir. 2023) ......................................................................... 28

*Mylan Pharms., Inc. v. Shalala,*
  81 F. Supp. 2d 30 (D.D.C. 2000) .................................................................. 33

*N.Y. Rehab. Care Mgmt., LLC v. NLRB,*
  506 F.3d 1070 (D.C. Cir. 2007) ..................................................................... 22

*N.Y. State Dep't of Law v. FCC,*
  984 F.2d 1209 (D.C. Cir. 1993) ..................................................................... 45

*Nat'l Lifeline Ass'n v. FCC,*
  983 F.3d 498 (D.C. Cir. 2020) ....................................................................... 38

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024) ........................................................................... 24, 43, 44

*Newdow v. Bush,*
  355 F. Supp. 2d 265 (D.D.C. 2005) ............................................................. 33

*Nieves v. Bartlett,*
  587 U.S. 391 (2019) ........................................................................................ 20

*NRDC v. Pena,*
  147 F.3d 1012 (D.C. Cir. 1998) ..................................................................... 32

*NTEU v. Vought,*
  149 F.4th 762 (D.C. Cir. 2025) ................................................................ 16, 20

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC,*
  48 F. Supp. 3d 87 (D.D.C. 2014) ............................................................... 1, 33

*Perry v. Schwarzenegger,*
  591 F.3d 1147 (9th Cir. 2010) ....................................................................... 32

*Rehberg v. Paulk,*
  611 F.3d 828 (11th Cir. 2010) ....................................................................... 27

*Reisman v. Caplin,*
  375 U.S. 440 (1964) .................................................................................. 15, 19

*Sanitation & Recycling Indus., Inc. v. City of N.Y.,*
  107 F.3d 985 (2d Cir. 1997) .......................................................................... 31

*Schering Corp. v. Heckler,*
  779 F.2d 683 (D.C. Cir. 1985) ....................................................................... 37

*SEC v. McGoff*,
   647 F.2d 185 (D.C. Cir. 1981) ................................................................. 30

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) ............................................................................. 4

*Sierra Club v. EPA*,
   793 F. Supp. 3d 158 (D.D.C. 2025) ......................................................... 33

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022) ................................................................ 14

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ........................................................................... 14

*Telecomm. Rsch. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ............................................................... 35

*Thompson v. Hall*,
   426 F. App'x 855 (11th Cir. 2011) ........................................................ 27

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ........................................................................... 16

*Trump v. CASA, Inc.*,
   606 U.S. 83 (2025) ............................................................................ 33

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ........................................................................... 21

*Ukiah Adventist Hosp. v. FTC*,
   981 F.2d 543 (D.C. Cir. 1992) ........................................................... 6, 35

*United States v. Bell*,
   414 F.3d 474 (3d Cir. 2005) ................................................................ 31

*United States v. Benson*,
   561 F.3d 718 (7th Cir. 2009) ............................................................... 31

*United States v. Fokker Servs. B.V.*,
   818 F.3d 733 (D.C. Cir. 2016) ............................................................. 21

*United States v. Johnson*,
   2021 WL 3737681 (D.D.C. Aug. 24, 2021) ............................................. 22

*United States v. Morton Salt Co.*,
   338 U.S. 632 (1950) ...................................................................... 3, 5, 22

*United States v. Rundo*,
   108 F.4th 792 (9th Cir. 2024) .............................................................. 25

*Wearly v. FTC*,
   616 F.2d 662 (3d Cir. 1980) ....................................................... 5, 15, 19

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................. 45

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ................................................................................. 18

**STATUTES**

15 U.S.C. § 21 ................................................................................................ 6

15 U.S.C. § 45 ............................................................................. 2, 6, 34, 35

15 U.S.C. § 46 ................................................................................................ 2

15 U.S.C. § 57b-1 ..................................................... 3, 4, 5, 11, 16, 17

**REGULATIONS**

16 C.F.R. § 2.1 ............................................................................................... 2

16 C.F.R §§ 2.31–2.34 ................................................................................. 7

16 C.F.R. § 2.4 ....................................................................................... 2, 3, 16

16 C.F.R. § 2.7 ........................................................................................... 3, 16

16 C.F.R. § 2.10 ...................................................................................... 3, 4, 12

16 C.F.R. Part 3, §§ 3.1–3.31A ................................................................ 6

16 C.F.R. § 4.14 ......................................................................................... 42

**REGULATORY MATERIALS**

90 Fed. Reg. 27304 (June 26, 2025) ............................................ 12, 13, 41

Complaint, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*,
  FTC Dkt. No. 251-0049 (June 23, 2025) ............................................. 12

Concurring Statement of Commissioner Andrew N. Ferguson,
  *FTC v. 1661, Inc. d/b/a GOAT*, FTC Dkt. No. 2223016 (Dec. 2, 2024) .................................. 7

Decision and Order, *Aaron's, Inc.*, 169 F.T.C. 380 (May 11, 2020) ............................................. 36

Decision and Order, *Mars, Inc.*, 164 F.T.C. 821 (Nov. 30, 2017) ................................................. 36

Decision and Order, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*,
  FTC Dkt. No. 251-0049 (September 26, 2025) .......................... 13, 35, 41

Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand
  to Global Disinformation Index Dated May 20, 2025*,
  FTC Dkt. No. 251-0061 (Dec. 10, 2025) .............................................. 8

Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand
  to Media Matters for Am. Dated May 20, 2025*,
  FTC Dkt. No. 251-0061 (July 25, 2025) ........................................ 8, 9, 26

Petition to Quash Civil Investigative Demand,
   FTC Dkt. No. 251-0061 (Jan. 16, 2026) ............................................................ 11, 27

Proposed Order, *In re Valvoline Inc.*,
   FTC Dkt. No. C-4824 (Nov. 14, 2025) ...................................................................... 36

Statement of Chairman Andrew N. Ferguson, *In re Omnicom Grp. / The Interpublic Grp. Of Cos.*, FTC Dkt. No 2510049 .................................................................................... 31

## OTHER AUTHORITIES

*FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt.1–2 (D.D.C. Jan. 15, 2025) ................................. 26

*FTC v. IT Media, Inc.*, No. 2:16-cv-09483, Dkt.1–2 (C.D. Cal. Dec. 22, 2016) ......................... 26

FTC, *Federal Trade Commission Launches Inquiry on Tech Censorship* (Feb. 20, 2025) ............ 8

FTC, *Request for Public Comment Regarding Technology Platform Censorship* ......................... 8

NewsGuard, *NewsGuard Offers Targeted Services* (June 30, 2022) ............................................... 9

Regulations.gov, *Comment from CPAC & Independent Media Council* (July 29, 2025) ............ 41

Regulations.gov, *Comment from GB News Limited* (July 29, 2025) ........................................... 41

Regulations.gov, *Comment from Newsmax Media Inc.* (July 28, 2025) ...................................... 41

Transcript of Motion Hearing, *Media Matters for Am. v. FTC*,
   No. 1:25-cv-1959 (Aug. 13, 2025) ............................................................................ 32

U.S. House Judiary Comm., 2024 Interim Staff Report ...................................................... 9, 22

U.S. House Small Bus. Comm., 2024 Interim Staff Report ............................................... 9, 21, 22

## INTRODUCTION

Plaintiff NewsGuard Technologies, Inc. seeks a preliminary injunction against the enforcement of (1) a Civil Investigative Demand ("CID") that was issued by the FTC pursuant to an investigation into unlawful collusion in the digital advertising industry and (2) a condition in a consent order regarding the merger of two large advertising agencies. The preliminary injunction can straightforwardly be denied for lack of irreparable harm based on NewsGuard's extraordinary delay in seeking this relief. The CID in question was issued *over eight months ago*, and the consent order at issue was entered *over four months ago*. "Such dilatory action … stands in stark contrast to the high bar [NewsGuard] must clear to show irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). At any rate, both of NewsGuard's challenges are entirely meritless.

**CID challenge.** To begin, NewsGuard misunderstands the proper forum for challenging a CID. It has long been established that FTC CIDs can be reviewed only in an enforcement action brought by the Commission. There is an unbroken, nearly century-long line of appellate decisions denying pre-enforcement review of FTC subpoenas and CIDs. *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *Gen Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983). NewsGuard's challenge should similarly be rejected.

NewsGuard fares no better on the merits. Its central claim is retaliation, but its purported evidence of retaliation fails as a matter of law. NewsGuard ignores undisputed indications of the CID's proper purpose, while itself relying on evidence that either does not support its position or actively undercuts it (for example, NewsGuard misleadingly characterizes Chairman Ferguson's *criticism* of heavy-handed government tactics as an *endorsement* of those tactics, *see infra* Part I.A.2.i). NewsGuard's First and Fourth Amendment privilege claim also lacks merit, including because NewsGuard does not identify a single specific document that is in dispute.

**Consent order challenge.** Once again, NewsGuard's claims fail at the threshold. Under the Federal Trade Commission Act, challenges to agency orders must be brought (1) in a court of appeals (2) by a party subject to the order (3) within 60 days. This case was brought (1) in district court (2) by a third party (3) over four months later. In addition, NewsGuard has failed to demonstrate standing to challenge the consent order and, at any rate, the order is unreviewable because decisions to settle litigation are committed to agency discretion by law. Finally, NewsGuard failed to exhaust its claims because it did not submit a comment on the proposed order during the public comment period.

The claims also fail on the merits. The consent order retaliation claim is at least as flawed as the CID retaliation claim. And NewsGuard's jawboning claim entirely lacks both of the fundamental elements of a jawboning claim: coercion by a public official or any nexus to disfavored speech.

In sum, NewsGuard's aggressive theories are untethered from both law and fact. If successful, they threaten to severely impede the effectiveness of federal agency investigations and the finality of agency orders. In addition, the equities—most prominently, NewsGuard's significant delay—categorically preclude relief. The preliminary injunction should be denied.

## BACKGROUND

### I.    Statutory and Regulatory Framework

**A.**    Section 5 of the FTC Act prohibits "persons, partnerships, or corporations" from engaging in "unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a). Congress "empowered and directed" the FTC "to prevent" these anticompetitive practices, *id.* § 45(a)(2), and thus authorized the agency "to investigate … any person, partnership, or corporation engaged in or whose business affects commerce," *id.* § 46(a); *see* 16 C.F.R. § 2.1 (describing how Commission investigations are initiated), *id.* § 2.4 (the Commission "encourages

the just and speedy resolution of investigations," and "will … employ compulsory process when in the public interest"). To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642–43 (1950).

To aid the agency in conducting its investigations, the FTC Act authorizes the Commission to issue civil investigative demands (CIDs)—a type of agency subpoena—to "any person" who may have "any information" relevant to potential violations of the laws enforced by the Commission. 15 U.S.C. § 57b-1. The issuance of a CID is not final agency action. *See FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992). Instead, it is simply one step in an ongoing investigation, which initiates a process of discussion and negotiation. This process is "cooperative[]": the Commission expects CID recipients "to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought." 16 C.F.R. § 2.4.

That cooperative process includes negotiations between a CID recipient and FTC staff "to discuss compliance and to address and attempt to resolve all issues," including legal objections to a CID. *Id.* § 2.7(k). The Commission's regulations authorize FTC staff to modify a CID's terms following those meet-and-confer negotiations. *Id.* § 2.7(*l*). That meet-and-confer process is required before a recipient may file a petition to quash the CID. *Id.* § 2.7(k).

The petition-to-quash process following those negotiations offers the Commission an opportunity to address any remaining objections to a CID. *Id.* § 2.10; *see* 15 U.S.C. § 57b-1(f)(1). The petition process builds on the meet-and-confer negotiations. 16 C.F.R. § 2.7(k) ("absent extraordinary circumstances," the Commission "will consider only issues raised during the meet and confer process"); *id.* § 2.10(a)(2) (requiring "a signed separate statement representing that counsel for the petitioner has conferred with Commission staff … in good faith to resolve by

agreement the issues raised by the petition and has been unable to reach such an agreement"). FTC staff may reply to the petition to quash, and the Commission generally has 40 days to rule on any such petition; the deadline to comply with the CID is suspended during the pendency of a petition to quash, and the Commission sets a new compliance deadline if it denies the petition in whole or in part. *Id.* § 2.10(a)(4), (b), (c); *see* 15 U.S.C. § 57b-1(f)(2). Together, these administrative procedures allow the parties to identify and narrow or resolve disputed issues before judicial review of any remaining objections in an enforcement action.

If that administrative process fails to resolve any differences between the CID recipient and Commission staff, the Commission may file a petition for enforcement in a federal district court pursuant to 15 U.S.C. § 57b–1(e). *See Invention Submission Corp.*, 965 F.2d at 1088–91. The court hearing a CID enforcement action (and an appellate court following the district court's decision) can address a wide range of issues, from routine discovery disputes, *see, e.g.*, *FTC v. Match Grp., Inc.*, 2023 WL 3181351 (D.D.C. May 1, 2023) (motions to seal and for discovery), to claims of trade secrets and attorney-client privilege or work-product protection, *see, e.g.*, *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142 (D.C. Cir. 2015); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966 (D.C. Cir. 1980), to issues of statutory construction, *see, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), and assertions that the scope of the investigation prompting the CID was not properly authorized by a Commission resolution, *see FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011). Likewise, constitutional challenges to an agency CID may be (and often are) adjudicated in an enforcement action. *E.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 208–09 (2020); *FTC v. Mt. Olympus Fin., LLC*, 211 F.3d 1278 (Table), 2000 WL 419825, at *1–2 (10th Cir. 2000).

A CID is not self-executing, and a recipient incurs no penalty or other legal detriment for failing to comply with a CID before a court orders enforcement. "[T]here are no sanctions for

failing to comply with a subpoena of this type unless and until a district court enters an order under section 20(e) of the Act, 15 U.S.C. § 57b-1(e), directing compliance." *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); *see also*, *e.g.*, *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927) ("the defendants cannot suffer" until the government brings an enforcement action); *Wearly v. FTC*, 616 F.2d 662, 668 (3d Cir. 1980) ("a subpoena from the FTC is not self-enforcing").

The scope of the Commission's authority to investigate and to issue CIDs is broader than its enforcement authority under Section 5 of the FTC Act. The FTC Act gives the Commission broad authority to seek information from "any person" by issuing a CID if the Commission "has reason to believe" that the recipient "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce … or to antitrust violations." 15 U.S.C. § 57b-1(c). Thus, the Commission is entitled to seek information from entities that are themselves not suspected of any wrongdoing. Courts have consistently held that administrative agencies are accorded "wide latitude in asserting their power to investigate by subpoena," and that "an individual may not normally resist an administrative subpoena on the ground that an agency lacks regulatory jurisdiction if the subpoena is issued at the investigative stage." *Ken Roberts Co.*, 276 F.3d at 586; *see also*, *e.g.*, *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977) ("the investigatory power granted the FTC … reaches further than [its] regulatory power").

Moreover, the Commission need not be certain that a CID recipient possesses relevant information: the statutory standard requires only a "reason to believe" that the recipient "may have" relevant information. 15 U.S.C. § 57b-1(c). That undemanding standard accords with the FTC's broad investigative power. The Supreme Court has emphasized the Commission's "power to get information" is analogous to that of a grand jury in a criminal investigation. *Morton Salt*, 338 U.S. at 642. And the D.C. Circuit has noted "the important governmental interest in the

expeditious investigation of possible unlawful activity." *FTC v. Texaco*, 555 F.2d 862, 872 (D.C. Cir. 1977) (en banc) (the "very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate").

      **B.**     In addition to its investigative power, when the Commission has "reason to believe" that there has been a violation of the laws it enforces, it has the statutory authority to enforce the FTC Act and the antitrust laws by bringing administrative proceedings against any "person, partnership, or corporation [that] has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce." 15 U.S.C. § 45(b); *see also* 15 U.S.C. § 21 (Clayton Act Section 11). It initiates such an enforcement proceeding by issuing and serving "a complaint stating its charges in that respect and containing a notice of a hearing" before the Commission. 15 U.S.C. § 45(b). A complaint may allege for instance that a company's conduct, or its merger with another company or acquisition of another company's assets, constitutes an unfair method of competition (prohibited by the FTC Act) or would substantially lessen competition or tend to create a monopoly (prohibited by the Clayton Act).

      The named respondents may dispute the allegations and litigate the charges in an adjudicative proceeding before an Administrative Law Judge and ultimately before the Commission. *See generally* 16 C.F.R. Part 3, §§ 3.1–3.31A. Any final order issued by the Commission directing the respondent to cease and desist is subject to judicial review in a court of appeals. The respondent named in the order must file a petition for review within 60 days in a circuit within which the respondent resides or carries on business or where the challenged practice was used. 15 U.S.C. § 45(c). The court of appeals has exclusive jurisdiction to review the Commission's order. *Id.* "It is undisputed that review of FTC cease and desist orders is committed to the courts of appeals." *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992).

Alternatively, if the Commission staff and respondents negotiate a consent agreement, the respondents may consent to the entry of a final Commission order (without admitting liability) and waive judicial review. Pursuant to its procedural rules, the Commission publishes the complaint and the proposed consent agreement and order in the Federal Register and provides an opportunity for public comment before determining whether to accept the agreement and enter the consent order. *See* 16 C.F.R §§ 2.31–2.34. If, after review of any public comments, the Commission decides to amend the complaint and modify the order, the respondent may choose to agree to any modifications, or it may decide to litigate the complaint in an adjudicative proceeding, as described above. If agreed, the Commission enters the consent order specifying the terms the Commission determines are appropriate to address the violations of law specified in the complaint.

## II.    The Commission's Efforts to Address Anticompetitive Advertising Boycotts

Chairman Ferguson and the FTC have expressed concern about, and taken action to prevent, anticompetitive collusion in the digital advertising industry that withholds advertising from certain disfavored media.[1] This issue is a high priority for the Commission because such concerted action would likely violate the federal antitrust laws and harm the public. Unlawful collusion could reduce competition in markets for advertising purchasing and other advertising-related products or services, which could in turn reduce consumer choice in content, degrade the quality of advertisements, and ultimately stifle debate on matters of public importance.

Accordingly, the Commission has taken several steps to investigate online censorship from advertiser boycotts. In February 2025, for example, the Commission launched a public inquiry into tech censorship, seeking comment on whether tech platforms have "funded or collaborated with organizations, for-profit or non-profit, that advocated for or enabled censorship, and whether "such

---

[1] *See, e.g.*, Concurring Statement of Commissioner Andrew N. Ferguson, *FTC v. 1661, Inc. d/b/a GOAT*, FTC Dkt. No. 2223016 (Dec. 2, 2024), https://tinyurl.com/32tzaf4a.

activities, *such as advertising boycotts*, [were] designed to facilitate collusion or censorship." FTC, *Federal Trade Commission Launches Inquiry on Tech Censorship* (Feb. 20, 2025), https://tinyurl.com/373z74he (emphasis added); FTC, *Request for Public Comment Regarding Technology Platform Censorship*, https://tinyurl.com/2s4kuy7m. This litigation pertains to certain other steps the Commission has taken to address possible advertiser boycotts.

### A.    Advertising Boycott Investigation.

**1.** To further address the concern about potentially anticompetitive advertising boycotts, the Commission opened a broad investigation into potential boycotts in digital advertising against certain media (that is, concerted refusals to deal with those media) on the basis of lists or ratings using agreed-upon definitions of subjective terms such as "misinformation" or "brand safety." The Commission has explained the purpose and scope of that investigation in its decisions denying petitions to quash CIDs issued to two other entities in the course of the investigation. *See* Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Global Disinformation Index Dated May 20, 2025*, FTC Dkt. No. 251-0061 (Dec. 10, 2025), https://tinyurl.com/3jz23jcy (*GDI* PTQ Order); Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Media Matters for Am. Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25, 2025), https://tinyurl.com/48pc74bz (*Media Matters* PTQ Order).

In furtherance of this investigation, the Commission issued seventeen currently outstanding CIDs to entities "that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement." *GDI* PTQ Order at 2. Those entities include ad agencies, advertising trade associations, brand safety and suitability rating organizations, and policy and advocacy groups focused on digital advertising. *Id.*

**2.** One of those CID recipients was plaintiff NewsGuard, which received a CID on May 20, 2025. Dkt.11-17. NewsGuard provides "assessments of the reliability of [internet] news sources," Dkt.11-2 ¶ 4, including through ratings and "Exclusion Lists," NewsGuard, *NewsGuard Offers Targeted Services* (June 30, 2022), https://tinyurl.com/23dma8f4. "Advertisers and ad agencies" use these subscription services to determine "where (on which websites) ads should and should not be placed." Dkt.11-2 ¶ 15. NewsGuard describes "[b]rand safety for online advertisers" as "a multi-billion-dollar industry." *Id.* ¶ 17. Congressional investigations have connected NewsGuard's services to "coordinated action to demonetize" disfavored media entities. U.S. House Judiciary Comm., 2024 Interim Staff Report at 1, 3, 25–26, https://tinyurl.com/2v7ej2wj (Judiciary Committee Report); *see* U.S. House Small Bus. Comm., 2024 Interim Staff Report at 43, 49, https://tinyurl.com/ymevubkd (Small Business Committee Report).

The CID to NewsGuard seeks several categories of documents and information, including: information pertaining to NewsGuard's organizational structure; documents and data relating to NewsGuard's ratings of content publisher entities; communications with other entities related to the subject of the investigation; the methodology by which NewsGuard determines the ratings, labels, or categorizations that it applies to news or information sites; lists that NewsGuard has provided to third parties that evaluate or categorize content publisher entities; identification of NewsGuard's customers and its communications with those customers; and NewsGuard's financial information, among other subjects. Dkt.11-17 at 3–8 (CID specifications).

**3.** One of the other CID recipients in the ad boycott investigation was Media Matters, a policy and advocacy group. On June 18, 2025, it filed a petition to quash the CID, which the Commission denied. *Media Matters* PTQ Order at 13. Media Matters also filed a federal lawsuit, asserting a First Amendment retaliation claim and a First and Fourth Amendment privilege claim.

Media Matters sought a preliminary injunction against enforcement and implementation of the CID. Its briefing focused principally on the retaliation claim. Media Matters relied on a range of facts that are specific to Media Matters and do not apply to NewsGuard, such as (1) the fact that Media Matters is a policy and advocacy entity (rather than a brand safety organization like NewsGuard); and (2) the fact that it has previously prevailed in litigation where it asserted that certain subpoenas from state attorneys general were issued in retaliation for a specific 2023 article regarding Elon Musk and X.com. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 113–15 (D.D.C. 2025).

Judge Sooknanan granted a preliminary injunction, *see id.* at 138, and a divided motions panel declined to issue a stay pending appeal, *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *1 (D.C. Cir. Oct. 23, 2025) (per curiam). The majority emphasized the "unique fact pattern" of *Media Matters* and noted that there was no reason to believe that any other CID recipient "could plausibly … seek similar relief." *Id.* at *2, *11. Judge Walker would have granted the stay because "the FTC is (very) likely to prevail on the merits." *Id.* at *12 (Walker, J., dissenting).

The Commission's appeal is ongoing. The Commission contends that the court lacked the authority to consider Media Matters' pre-enforcement challenge to the CID and that, at any rate, it erred in crediting Media Matters' purported evidence of retaliation.

Another CID recipient, Global Disinformation Index (GDI), has also sued and sought a preliminary injunction against enforcement of the CID it received. GDI's suit was filed on November 25, 2025. No. 1:25-cv-4137-CJN (D.D.C.). GDI filed an amended motion for a preliminary injunction on February 2, 2026. Pursuant to the parties' stipulation, the FTC's response to that motion is due March 20, and GDI's reply is due April 3.

**4.** NewsGuard explains that it "participated in ten meet-and-confer discussions [with Commission staff] over the course of eight months and produced over 40,000 pages of documents

in multiple rounds" in response to the CID. Dkt.11-2 ¶ 43. That meet-and-confer process served to substantially narrow the disputes between the Commission staff and NewsGuard. Following the most recent meet-and-confer, Commission staff sent NewsGuard a letter on January 15, 2026, significantly modifying the scope of the CID and confirming the narrow demands that remain outstanding. The letter modified four of the five specifications that NewsGuard disputed, limiting the scope of the requested information in response to NewsGuard's concerns and focusing on the most important information relevant to the FTC's investigation. Dkt.11-18 at 2–3.[2] The letter explicitly stated that NewsGuard's previous productions had "satisfied its CID obligations" as to the remaining specifications. *Id.* at 3.[3]

Shortly after receiving that letter, NewsGuard filed a petition to quash. *See* Petition to Quash Civil Investigative Demand, FTC Dkt. No. 251-0061 (Jan. 16, 2026), https://tinyurl.com/4xx3d3p6 (Petition). The petition raised two grounds to quash the CID. First, NewsGuard argued, citing the district court's preliminary injunction decision in *Media Matters*, that the CID "represents unconstitutional retaliation against NewsGuard based on its protected First Amendment activities." *Id.* at 6. Second, the petition argued that "the CID's overbroad demands and impermissible requests for sensitive subscriber information, customer communications, and internal deliberative materials violate the First and Fourth Amendments' restrictions on administrative subpoenas." *Id.* at 6–7.

NewsGuard's compliance period is stayed while the petition to quash remains pending. 15 U.S.C. § 57b-1(f)(2). If the Commission denies the petition in whole or in part, it will "specify

---

[2] The remaining unmodified specification was one that NewsGuard had not yet responded to.

[3] NewsGuard oddly describes this letter as "insist[ing] [that] NewsGuard remains obligated to provide all documents and information called for by the *original* CID." Dkt.11-1 at 28. As discussed in the main text, that is patently false. The letter expressly provides "modifications" that substantially narrow NewsGuard's obligations under the CID. Dkt.11-18 at 3.

new terms for compliance, including a new return date." 16 C.F.R. § 2.10(b). Under the Commission's rules, a decision on the petition is due by March 6, 2026. *See id.* § 2.10(c).

## B.    The Omnicom-IPG Complaint and Consent Order.

In June 2025, the Commission filed an administrative complaint addressing antitrust concerns associated with a proposed transaction that would merge two of the six largest advertising agency holding companies, creating the largest media buying advertising agency in the United States. The Commission's June 2025 complaint alleged that the merger of these two major players in the industry—Omnicom Group, Inc. and The Interpublic Group of Companies (IPG)—would result in a significantly "more concentrated" market. Complaint ¶ 13, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*, FTC Dkt. No. 251-0049 (June 23, 2025), https://tinyurl.com/2kt5y2bp. Increased concentration, in turn, would "meaningfully increase[] the risk" of collusion among the remaining market participants. *Id.* ¶ 15. And the risk of "anticompetitive coordination" was particularly significant in this instance due to a "history of coordination" among major advertisers. *Id.* ¶¶ 16–17. As the complaint detailed, "[m]ajor advertisers have discussed and ultimately declined to advertise on certain websites" and those "decisions appear to have been coordinated through one or more associations of advertising industry players, including ad agencies." *Id.* ¶ 17. Accordingly, due to the increased risk of "anticompetitive coordination" from the acquisition, the complaint charged that it would violate both the FTC Act and the Clayton Act. *Id.* ¶¶ 23–24.

To address these concerns, the Commission also issued a proposed consent agreement. The Commission published an analysis of the proposed agreement in the Federal Register and solicited public comment. 90 Fed. Reg. 27304 (June 26, 2025). The analysis explained that the agreement would prohibit Omnicom from certain conduct that the FTC identified as likely to facilitate

anticompetitive coordination. *See id.* at 27306 (identifying terms of consent agreement). The FTC received several comments over the course of the following 30 days.

After considering the comments, the Commission issued a decision and entered a consent order directing Omnicom to cease and desist from certain conduct. Decision and Order, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*, FTC Dkt. No. 251-0049 (September 26, 2025), https://tinyurl.com/mrjtt8sr (*Omnicom* Decision). The consent order eliminates Omnicom's ability to deny advertising dollars to media publishers based on their political or ideological viewpoint, except at the express and individualized direction of Omnicom's advertiser customers.

The final consent order's wording was altered in response to comments. Among the prohibitions in the order, Omnicom must not enter into, enforce, or maintain any agreement with a third party that directs or restricts advertising based on certain grounds, such as political or ideological viewpoints, including "viewpoints as to the veracity of news reporting or other politically or ideologically contested facts," and "adherence to journalistic standards or ethics established" by a third party. *Id.* at 2–3. The order also prohibits Omnicom and its subsidiaries from relying on "exclusion lists" or "inclusion lists" to differentiate among media outlets on prohibited grounds; such lists are permitted at the request of a particular client but Omnicom must not offer to share them with other clients. *Id.* at 4. The order does not mention NewsGuard or its products.

The Commission determined that the restrictions in the consent order were necessary to address "harm to competition," including the risk that the acquisition "increased the likelihood of coordination among competitors in the Media Buying Services industry relating to the placement of advertisements based on [p]olitical or ideological viewpoints." *Id.* at 8.

III.    **NewsGuard's Complaint and Motion for Preliminary Injunction**

NewsGuard filed this action on February 6, 2026. The complaint and preliminary injunction motion, both invoking *Media Matters*, assert that the CID and the Omnicom order violate NewsGuard's First and Fourth Amendment rights. *See* Dkt.1; Dkt.11.

## LEGAL STANDARDS

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). Thus, "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id*. at 346. "The balance of the equities and the public interest 'merge when, as here, the Government is the opposing party.'" *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). Thus, "[w]hen a private party seeks injunctive relief against the government," the Court must "weigh[] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022).

## ARGUMENT

I.    NEWSGUARD IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AGAINST ENFORCEMENT OF THE CID.

A.    **NewsGuard Cannot Show That It is Likely to Prevail on the Merits.**

NewsGuard cannot satisfy the first and most important factor in the preliminary injunction analysis: that it is likely to succeed on the merits. *See Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745 (D.C. Cir. 2022). NewsGuard's pre-enforcement claims regarding the CID are not reviewable for several independent reasons. They also fail on their own terms.

### 1. This Court Lacks Authority to Hear NewsGuard's Pre-Enforcement Challenge to the CID.

For nearly a century, the Supreme Court and lower courts have consistently held that disputes about federal CIDs or subpoenas should be resolved in an enforcement action. *See FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *see also Reisman v. Caplin*, 375 U.S. 440, 443 (1964) (upholding dismissal of pre-enforcement challenge to IRS summons). Relying on *Claire Furnace* and *Reisman*, courts of appeals have unanimously rejected pre-enforcement challenges to FTC and other federal agency CIDs and subpoenas. *See Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (a plaintiff "must wait till the government sues … since that is the method of judicial review of FTC investigations that Congress has prescribed"); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334–35 (10th Cir. 1984); *Wearly v. FTC*, 616 F.2d 662, 668 (3d Cir. 1980); *Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1335–37 (6th Cir. 1979); *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876–77 (8th Cir. 1977); *Atl. Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1977); *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490–91 (8th Cir. 1966) (Blackmun, J.).

These cases have a common thread. Recipients of agency CIDs or subpoenas are not entitled to equitable relief in a pre-enforcement posture because they have an adequate remedy at law: challenging the CID or subpoena in an enforcement action. *E.g.*, *Atl. Richfield*, 546 F.2d at 649. And this doctrine serves important purposes. On the one hand, it protects CID and subpoena recipients by ensuring that they face no legal penalty until they have an opportunity to raise their objections in an enforcement action in federal court. On the other, it ensures that agencies are able to conduct investigations as directed by Congress, allows the parties to narrow and potentially resolve any disputes prior to litigation, and prevents litigants from dragging courts into abstract disagreements without the specific factual context presented in an enforcement action. This case illustrates the problem, as NewsGuard has insisted on forcing this Court to consider these issues

before the Commission has had an opportunity to weigh in on them (and while the CID's compliance date is stayed by the pendency of NewsGuard's petition to quash). Adhering to the traditional prohibition on pre-enforcement review of CIDs would avoid this sort of wasteful dual-track decisionmaking.

A preliminary injunction here would depart from these well-established precedents. As discussed below, this would be error for two reasons. First, Congress has precluded pre-enforcement review of CIDs under the claim-channeling doctrine of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). And second, NewsGuard lacks a cause of action.

### i. The Court lacks jurisdiction because Congress channeled NewsGuard's claims in the FTC Act's exclusive review scheme.

*Claire Furnace*, *Reisman*, and their progeny confirm that district courts should not entertain pre-enforcement challenges to CIDs. And this is precisely the outcome dictated by the FTC Act.

*Thunder Basin* explains that Congress may establish a statutory scheme that channels judicial review to an exclusive jurisdictional mechanism, divesting district courts of their ordinary federal-question jurisdiction. 510 U.S. at 218. A statute channels review when "a preclusive intent is 'fairly discernible in the statutory scheme,'" and "the claims at issue 'are of the type Congress intended to be reviewed within' the special scheme." *NTEU v. Vought*, 149 F.4th 762, 774 (D.C. Cir. 2025). This framework effectuates Congress's objective of directing certain challenges to agency actions "to a single review process," streamlining investigations and enforcement proceedings. *Thunder Basin*, 510 U.S. at 211. Both *Thunder Basin* prongs are satisfied here.

**a.** Congress's preclusive intent is "fairly discernible" in the FTC Act. The FTC Act and its implementing regulations create an interdependent scheme to protect CID recipients. The scheme allows recipients to discuss and negotiate the CID with FTC staff to resolve or narrow disputes, 16 C.F.R. §§ 2.4, 2.7(k); petition the Commission to quash the CID, 15 U.S.C. § 57b-1(f); and obtain judicial review of the CID, including any objections, when the FTC seeks to enforce it, *id.*

§ 57b-1(h). CIDs are not self-executing, and recipients face no penalties for noncompliance until the court rules in an enforcement action. *See Gen. Fin. Corp.*, 700 F.2d at 368–69. This process allows the parties to narrow disputed issues without unnecessarily embroiling district courts in broad legal disputes that lack a well-developed factual record.

**b.** NewsGuard's claims are squarely "of the type" Congress intended to be reviewed through the exclusive statutory mechanism.

*Thunder Basin* identified three factors that must be considered in evaluating whether a litigant's claims are of the type that Congress intended to be reviewed within the statutory structure: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review"; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). Here, the answer to each question is no. Unlike *Axon*'s "structural constitutional claims" that contest an agency's "power to proceed at all," *id.* at 191–92, NewsGuard's claims challenge a discrete agency action and implicate issues about which the FTC has considerable expertise.

*First*, precluding this pre-enforcement challenge would not foreclose meaningful judicial review because all objections, including constitutional claims, can be raised in a CID-enforcement action in federal court. *See* 15 U.S.C. § 57b-1(h). Indeed, this is how federal agency CIDs and subpoenas have always been reviewed, and it is not credible to suggest that this traditional mechanism—endorsed by numerous courts—does not amount to meaningful judicial review.

*Second*, there is nothing "wholly collateral" about NewsGuard's claims. Unlike in *Axon*, NewsGuard challenges something "particular about how [the FTC's] power was wielded"— namely, the issuance of the CID—not the Commission's "power generally." *Axon*, 598 U.S. at 193. NewsGuard's motion implicates "procedural or evidentiary matters," *id.*, such as the adequacy of

the breadth of the CID. *E.g.*, Dkt.11-1 at 41–42, 48. NewsGuard's challenge, thus, directly "relate[s] to the subject of [an] enforcement action[]." *Axon*, 598 U.S. at 193.

*Third*, questions about the propriety of CIDs fall directly within the FTC's expertise; thus, the agency should be permitted to decide whether to narrow its CID before commencing an enforcement action. Disputes about whether CIDs have been properly issued, or whether they are overbroad, raise "considerations of agency policy" in which the FTC has "competence and expertise." *Id.* at 194 (cleaned up). The FTC routinely issues CIDs and has considerable experience negotiating with recipients over CIDs' scope and breadth and in evaluating petitions to quash. And NewsGuard's constitutional claims are "intertwined with or embedded in" the FTC's areas of expertise, *id.* at 195, since, as detailed above, the Commission has authority to consider any objections, including constitutional arguments, in a petition to quash.

### ii.    *NewsGuard lacks a cause of action.*

NewsGuard also has no cause of action. NewsGuard does not allege that there is a cause of action under the Administrative Procedure Act and instead relies on an implied equitable cause of action "arising under the First and Fourth Amendments." Dkt.1 ¶ 8. But "[c]onstitutional rights do not typically come with a built-in cause of action." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). And the Supreme Court has warned federal courts to hesitate before implying constitutional causes of action. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 134–35 (2017) ("separation-of-powers principles are or should be central to the analysis"); Likewise, "since *Cort v. Ash*, [422 U.S. 66 (1975),] the Supreme Court has been very hostile to implied [statutory] causes of action." *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017).

That hostility to implied causes of action is related to the inherent limitations on the "traditional equitable powers" of federal courts. *Ziglar*, 582 U.S. at 133. Those powers are limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A.*

*v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and pre-enforcement injunctions against agency

CIDs and subpoenas were not available at equity, *e.g.*, *Claire Furnace*, 274 U.S. at 174.

In addition, the equitable power to "enjoin unlawful executive action is subject to express

and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327

(2015). In *Exceptional Child Center*, the Court relied on the Medicaid Act's implicit preclusion of

private enforcement in declining to employ federal courts' equitable powers. *Id.* at 327–29.

Likewise here, the FTC Act provides no express cause of action, and Congress's choice of an

administrative process, followed by an enforcement action, as the sole remedy for CID recipients

impliedly restricts equitable collateral attacks. *See City of Rancho Palos Verdes v. Abrams*, 544

U.S. 113, 121 (2005) ("The provision of an express, private means of redress in the statute itself is

ordinarily an indication that Congress did not intend to leave open a more expansive remedy.");

*Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (same). Unsurprisingly, the Supreme Court and

lower courts have frequently grounded their dismissals of pre-enforcement CID challenges in the

want of equity and an adequate remedy at law. *See Reisman*, 375 U.S. at 443; *Claire Furnace*, 274

U.S. at 174; *Wearly*, 616 F.2d at 665.[4]

\*      \*      \*      \*

Although NewsGuard (and other CID recipients) would prefer immediate review, Congress

weighed the policy factors and channeled such disputes to enforcement actions. And the scheme

Congress adopted takes the interests of CID recipients into account, including through the petition-

---

[4] The district court's preliminary injunction ruling in *Media Matters* disagreeing with these threshold barriers to a pre-enforcement challenge is "is not binding," *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011), and the same is true of the divided D.C. Circuit panel's unpublished order declining to issue a stay pending appeal, *Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 351 (D.C. Cir. 2020). Moreover, as the FTC explained in its pending appeal, the *Media Matters* ruling is mistaken in numerous respects. Appellants' Br. 19–36, *Media Matters*, No. 25-5302 (D.C. Cir. Jan. 5, 2026)

.

to-quash process where CID recipients present their challenges to the agency. While NewsGuard awaits judicial review, it faces no penalties and is not required to "engage in, or to refrain from, any conduct." *Vought*, 149 F.4th at 786. By contrast, permitting pre-enforcement challenges would have drastic and unwelcome consequences, potentially allowing any recipient of process to bring law enforcement investigations to a halt simply by claiming retaliation. That is not the law.

### 2. NewsGuard's Retaliation Claim Fails on the Merits.

NewsGuard claims the CID retaliates against NewsGuard for its "journalistic judgments." Dkt.11-1 at 35. To prevail on this claim, NewsGuard must show that (1) it "engaged in conduct protected under the First Amendment," (2) the FTC took an action "sufficient to deter a person of ordinary firmness in [NewsGuard's] position from speaking," and (3) there is "a causal link" between the protected conduct and "the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). While the Commission does not dispute that NewsGuard engages in some protected speech, NewsGuard fails the other two prongs: it cannot show the necessary causal link between its speech and the CID, and it cannot show that the CID caused a cognizable chilling effect.

### i. *NewsGuard cannot show its speech prompted the CID.*

To show causation, NewsGuard must demonstrate at a *minimum* that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[5] In making that but-for showing, NewsGuard must overcome the "presumption of regularity" that attaches to government action. *Hartman v. Moore*, 547 U.S. 250, 263 (2006). That presumption is

---

[5] In fact, the requisite showing is more robust: NewsGuard must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *See Nieves*, 587 U.S. at 399–400. The logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *12–13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). However, the Court need not reach that issue because NewsGuard cannot satisfy even the basic but-for standard.

at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion … should be minimal." *Id.* Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016); *see Trump v. Hawaii*, 585 U.S. 667, 702 (2018). Accordingly, NewsGuard must put forward enough evidence to displace the presumption and show that the but-for cause of the CID was retaliation for its First Amendment speech. NewsGuard has not come close to carrying that burden.

### a. The FTC acted for nonretaliatory reasons.

The CID issued to NewsGuard is part of a broad investigation into a high priority issue—advertising boycotts that violate the antitrust laws. In particular, the FTC is investigating whether certain entities unlawfully agreed to withhold the placement of ads using lists of disfavored publishers. *E.g.*, Dkt.11-18 at 2. The FTC has issued seventeen currently outstanding CIDs to a variety of entities, including advertising trade associations, policy/advocacy groups, and brand safety/suitability rating organizations like NewsGuard.

The investigation's breadth refutes NewsGuard's theory that the CID was issued in retaliation for NewsGuard's speech. Needless to say, the other entities that received a CID did not engage in the same speech. The fact that they received CIDs anyway demonstrates that the NewsGuard CID would have been issued regardless of any purported retaliatory motive.

Moreover, NewsGuard's own allegations reflect ample *nonretaliatory* reasons for issuing a CID to NewsGuard. For example, NewsGuard acknowledges that it has been the subject of relevant congressional investigations. Dkt.11-1 at 17–18. One congressional committee report concluded that NewsGuard's "aim" is to "systematically defund" outlets it deems "untrustworthy" by creating "exclusion lists," which operate as "blacklists" for advertisers. Small Business Committee Report at 43, 49. The report also found that "advertising organizations" pressured their

members to use these lists, including through "agreements" that "may have antitrust implications." *Id.* at 59. Another congressional report similarly concluded that certain advertising entities may have "participated in boycotts and other coordinated action to demonetize" disfavored entities and that this "anticompetitive behavior" included "push[ing] [advertisers] to use [entities] like … NewsGuard." Judiciary Committee Report at 1, 3, 25–26, 38.

As Chairman Ferguson explained in reaction to these reports, "[c]ongressional investigations revealed [that] … NewsGuard … led collusive ad-boycotts—possibly in violation of our antitrust laws." Dkt.11-7 at 2. These congressional reports furnished an ample basis for the Commission to investigate whether NewsGuard has information relevant to violations of the antitrust laws. Indeed, that is how the system is supposed to work: "Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest." *Mistretta v. United States*, 488 U.S. 361, 408 (1989). NewsGuard may object to these reports, but the Commission may investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43. In sum, far from demonstrating causation, the undisputed evidence disproves it.

### b.  NewsGuard's purported evidence of retaliation fails.

NewsGuard points to three categories of evidence to show retaliation: (1) statements from Chairman Ferguson, (2) the timing of the CID, and (3) the scope of the CID. All of this evidence fails as a matter of law.

***Statements by Chairman Ferguson.*** NewsGuard points to three statements from Chairman Ferguson as evidence of a retaliatory motive. Dkt.11-1 at 40–41.[6] In reality, two of these statements

---

[6] NewsGuard mentions other statements from Chairman Ferguson elsewhere, but it does not apply them in its retaliation analysis and has thus forfeited reliance on them. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007); *United States v. Johnson*, 2021 WL 3737681, at *4 (D.D.C.), *aff'd*, 2021 WL 5537704 (D.C. Cir. Nov. 17, 2021).

simply reflect a concern with potential antitrust violations, while the third is a firm *rejection* of coercive and retaliatory tactics by the government.

*First*, NewsGuard identifies what it sees as Chairman Ferguson's rationale for issuing the CID, Dkt.11-1 at 40: "Congressional investigations revealed [that] … NewsGuard … led collusive ad-boycotts—possibly in violation of our antitrust laws." Dkt.11-7 at 2. This offers no help to their position: Chairman Ferguson was simply making the accurate observation that, per congressional investigations, antitrust violations may have occurred. These sorts of statements are commonplace for federal enforcement officials and cannot possibly serve as a basis for derailing federal investigations. *Cf. Media Matters*, 2025 WL 2988966, at *14 (Walker, J., dissenting) ("Ferguson's sequence of conduct—saying what he would do in office, and then doing it—is what we expect of public servants tasked with enforcing the law.").

*Second*, NewsGuard points to Chairman Ferguson's statement that the FTC "ought to conduct an investigation" of "collusion that may suppress competition [in the advertising context]." Dkt.11-11 at 5. Because that is simply another unremarkable expression of a legitimate antitrust concern, NewsGuard focuses on Chairman Ferguson's further observation that, per congressional investigations, NewsGuard's ratings "seem[] to give a free pass to deceptive and biased news coverage by major left-leaning outlets." *Id.* at 5 & n.19. But that is merely another accurate characterization of the outcome of congressional investigations. And NewsGuard tellingly omits the next two sentences: "NewsGuard is, of course, free to rate websites by whatever metric it wants. But the antitrust laws do not permit third parties to facilitate group boycotts among competitors." *Id.* at 5. This further demonstrates that Chairman Ferguson carefully distinguished protected speech from collusion that violates the antitrust laws.

*Finally*, NewsGuard offers a demonstrably misleading characterization of Chairman Ferguson's remarks in an April 2025 interview, falsely attributing to him views that he

categorically rejected. In that portion of the interview, Chairman Ferguson described (and strongly criticized) the aggressive state government tactics at issue in *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024). Dkt.11-15 at 5–7. The Chairman said that New York regulators had warned regulated entities against working with the NRA, and characterized the nature of their threat as follows: "We [i.e., the New York regulators] have a tremendous array of investigative tools. Those tools are expensive when applied to you even if we don't win at the end of the day, so knuckle under." *Id.* at 6. As Ferguson explained, "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say.'" *Id.*

Chairman Ferguson could not have been clearer that he categorically rejected such coercive tactics. *Id.* at 5–7. And yet NewsGuard brazenly describes these remarks *as the Chairman's own plan*—an "expla[nation of] how the FTC could use" its investigative tools and coercive power "to demand compliance to its views." Dkt.11-1 at 22; *id.* at 36 (relying on the same misunderstanding to claim that the FTC's actions were "designed to chill NewsGuard's First Amendment-protected speech"); *see also* Dkt.1 ¶ 6 (referring to Chairman Ferguson's purported "public statements that the Commission would use its 'tremendous array of investigative tools [and] coercive power' to force online publishers to 'Do what we say.'"). In short, NewsGuard places crucial reliance on a statement that means the exact opposite of what NewsGuard suggests. This is a telling reflection of the fundamental weakness of its position.[7]

---

[7] NewsGuard also repeatedly quotes FCC Chairman Brendan Carr. *E.g.*, Dkt.11-1 at 20–21, 22–23, 28. But those statements are irrelevant because NewsGuard does not allege that Chairman Carr had *any* involvement in the issuance of the CID. *See, e.g.*, *In re Architect of Capitol Emp. Disp.*, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers" who "did not work for the [relevant entity]" and who plaintiffs "never link[ed] to [their] termination"); *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (concluding that "comments made by … non-decisionmakers[]

*Timing.* NewsGuard also argues that the "timing" of the CID "support[s] a finding of retaliatory purpose." Dkt.11-1 at 41. But a causal inference arises from timing only where an adverse action closely follows protected conduct. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012). And NewsGuard's analysis of "timing" does not include a single date, so it cannot possibly show proximity between any two events. More fundamentally, NewsGuard's timing argument is a nonstarter because it does not identify *any* specific speech for which the CID purportedly retaliates. It is impossible to find a temporal connection to an unknown event. *See Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 634 (M.D. Pa. 2014) (allegations "not anchored in time" cannot "enable a fact-finder to infer a causal link").

NewsGuard cannot rehabilitate its timing argument by asserting that the CID was issued promptly after Mr. Ferguson became Chairman. In fact, the CID was issued *four months* later, which is beyond the typical "outer limit" for causation. *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118–19 (D.D.C. 2004). At any rate, launching the investigation quickly would not constitute evidence of retaliation because it is equally consistent with what actually occurred: an effort to prioritize an important inquiry into advertising boycotts. *See, e.g.*, *Gonzalez v. Walgreen Co.*, 140 F.4th 663, 674 (5th Cir. 2025) (a fact that is equally consistent with both sides' positions does not constitute evidence in favor of either).

Besides, even if the timing supported NewsGuard's retaliation theory, "temporal proximity" alone is insufficient. *Minter v. District of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015); *United States v. Rundo*, 108 F.4th 792, 805 (9th Cir. 2024) ("[T]iming" does not demonstrate "improper motive" because it "can merely be the sign of the government's change in enforcement priorities."). A plaintiff must identify "positive evidence [of retaliation] beyond mere proximity,"

---

are inadmissible" where "plaintiff [had] failed to proffer evidence … that the speakers had any influence … on the [relevant] decision").

*Minter*, 809 F.3d at 71–72, which—as discussed throughout this section—NewsGuard has not done.

 ***The Scope of the CID.*** Finally, NewsGuard asserts that "the sweeping scope of the CID" serves to "confirm the causal link to NewsGuard's protected speech." Dkt.11-1 at 41–42. But each of the CID's specifications follows naturally from the Commission's goal to investigate potential advertising boycotts. Tellingly, NewsGuard does not argue otherwise. Instead, it raises general objections to the CID's breadth. But it never contends that the CID is *unusually* broad for an FTC CID (nor could it, as in fact the CID is wholly typical).[8] Without even an argument that the CID's specifications are irrelevant or abnormally broad, there is no conceivable basis to treat its scope as evidence of retaliation.

 NewsGuard also insists that the CID must be retaliatory because it "gave no explanation" of the subject of the investigation, supposedly in violation of the FTC Act. Dkt.11-1 at 42. But that's incorrect. The explanation provided in the CID was legally sufficient, *see* Dkt.11-17 at 23, as the Commission explained in ruling on a petition to quash a CID with an identical description of the investigation:

> [The statement] identifies the nature of the conduct ("persons … facilitating collusion or coordination in any way with any other market participants"), the methods of law violations ("private communications, public statements, sharing information, or other actions"), the relevant law that may have been violated (Section 5 of the FTC Act), and the investigation's purpose ("to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest").

*Media Matters* PTQ Order at 5. At any rate, even if there were some technical deficiency in the CID's description, it would at most be a regulatory or statutory concern that would have no bearing on NewsGuard's constitutional claim. And the record reflects that NewsGuard was fully aware of

---

[8] *E.g.*, *FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt.1–2 (D.D.C. Jan. 15, 2025) (43 specifications); *FTC v. IT Media, Inc.*, No. 2:16-cv-09483, Dkt.1–2 (C.D. Cal. Dec. 22, 2016).

the nature of the investigation. *See* Dkt.11-18 at 2 ("As [FTC] staff have said consistently ... this investigation seeks information regarding potential anticompetitive behavior ... including whether certain companies may have colluded to deny advertising revenue to" certain entities.). Indeed, so unimportant was this issue that NewsGuard did not even raise it in its petition to quash or purport to have raised it in the meet-and-confer process, *see* Petition at 6–18 & Exhibit 2—which means that, in addition to everything else, this argument fails for lack of exhaustion. *E.g.*, *FTC v. O'Connell Assocs., Inc.*, 828 F. Supp. 165, 168, 170 (E.D.N.Y. 1993).

### ii. *NewsGuard cannot show that the CID has a sufficient chilling effect.*

NewsGuard must also demonstrate that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *Aref*, 833 F.3d at 258. It has not made this showing.

As an initial matter, it appears unlikely that a retaliatory investigation claim, such as the one being asserted here, is even cognizable. The Supreme Court and the D.C. Circuit have declined to resolve the question. *See Hartman*, 547 U.S. at 262 n.9; *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584–85 (D.C. Cir. 2025). And several courts of appeals have suggested that such claims should *not* be recognized. *See, e.g.*, *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157–61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country."). And the Eleventh Circuit has squarely held that "a retaliatory investigation" "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *accord Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam).

This caselaw suffices to deny a preliminary injunction. After all, the claim here is either not cognizable or at a minimum is unprecedented. The novelty of the claim itself "suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—

is missing." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *aff'd*, 605 U.S. 495 (2025). At any rate, the uncertainty about whether the "adverse consequences of a retaliatory investigation would *ever* justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 262 n.9 (emphasis added), counsels skepticism that the adverse consequences of any particular investigation would chill a person of ordinary firmness.

To put it another way, even if a retaliatory investigation claim is theoretically cognizable—which only one federal court of appeals appears to have assumed—it could arise only in extraordinary circumstances that are absent here. *See Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment (emphasis omitted)). For similar reasons, an investigation could have a sufficient chilling effect only under extraordinary circumstances. But NewsGuard has raised an entirely generic retaliatory investigation claim. The scope of the CID is standard for FTC investigations, and NewsGuard has not alleged any unusual injury resulting from the CID. Indeed, NewsGuard does not allege *any* change in its speech. While subjective responses are not "dispositive" and a plaintiff need not show that it "altogether" ceased speaking, it is telling that the CID has apparently had *zero* impact on NewsGuard's speech over the nine months it has been pending. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

Meanwhile, the injuries NewsGuard *does* identify are plainly insufficient. It alleges that complying with the CID would be "costly" in time and resources and "intrusive" in that it would require the production of documents. Dkt.11-1 at 36–37. But if such consequences were enough, then *any* CID or investigation would chill speech.

NewsGuard argues that three nonbinding decisions involving Media Matters have reached just that conclusion. *Id.* at 38. But those cases do not support such an expansive position, which

would make this prong of a retaliation claim meaningless. In two of them, the defendants forfeited the argument that the CID would objectively chill a person of ordinary firmness, *see Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025); *Bailey*, 2024 WL 3924573, at *11, and in all three Matter Matters alleged that the relevant CID actually changed its behavior, *e.g.*, *Media Matters*, 805 F. Supp. 3d at 131—something NewsGuard has not tried to show here.

### iii.    NewsGuard's reliance on *Media Matters* is misplaced.

NewsGuard's retaliation analysis repeatedly relies on the *Media Matters* litigation. That reliance is misplaced. As noted above, *see supra* pg. 19 n.4, neither the district court ruling nor the stay panel ruling in *Media Matters* are binding. The reasoning of *Media Matters* is also inapplicable here because the determinative facts are entirely different.

As Judge Sooknanan concluded in her order rejecting another CID recipient's related-case designation, each element of the retaliation ruling in *Media Matters* "turned on facts unique to Media Matters." Docket Order, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Dec. 16, 2025). The stay panel majority, too, described *Media Matters* as involving "unique factual circumstances" and expressed skepticism that other CID recipients in the investigation "could plausibly … seek similar relief." *Media Matters*, 2025 WL 2988966, at *11. For example, those rulings placed significant reliance on the fact that Media Matters had previously prevailed in litigation where it asserted that certain state subpoenas were issued in retaliation for a specific 2023 article. *Media Matters*, 805 F. Supp. 3d at 113–15. Nothing similar occurred here. Thus, any ruling regarding Media Matters cannot help NewsGuard show that the FTC retaliated against NewsGuard or that it suffered a cognizable chilling effect.

At any rate, as the Commission has explained on appeal, *Media Matters*' analysis was wrong even on its own terms, radically lowering the bar for retaliation claims. *See* Appellants' Br.

36–54, *Media Matters*, No. 25-5302 (D.C. Cir. Jan. 5, 2026). For example, the court imputed to the FTC Chairman the views of an individual who is not even in government and who is not alleged to have played any role in the CID's issuance. NewsGuard asks this Court not only to repeat the *Media Matters* court's errors, but to exacerbate them by finding retaliation in a case where the purported evidence of a retaliatory motive is even more sparse.

### 3. NewsGuard's First and Fourth Amendment Claim Fails on the Merits.

NewsGuard invokes a smattering of First and Fourth Amendment principles to argue that the CID is somehow unlawful, but all of those arguments are misconceived.

The core of NewsGuard's argument is that it possesses a First Amendment privilege not to disclose some documents implicated by the CID, either as a function of a journalistic privilege or of the freedom of association. Dkt.11-1 at 47–48. *First*, it is axiomatic that any such assertion of privilege must proceed on a "document-by-document basis," *In re Grand Jury Procs.*, 220 F.3d 568, 571 (7th Cir. 2000), and NewsGuard has not identified even a single privileged document that is in dispute. That's fatal to a claim of privilege.

*Second*, at any rate, neither privilege applies.[9] A journalistic privilege is inapplicable because the D.C. Circuit has held that any such privilege does not apply in grand jury proceedings, *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145–49 (D.C. Cir. 2006), and an FTC investigation is "analogous to the Grand Jury," *Morton Salt*, 338 U.S. at 642–43; *see In re Grand Jury Procs.*, 486 F.2d 85, 90 (3d Cir. 1973) ("Grand jury subpoenas … are exactly analogous to subpoenas issued by a federal administrative agency."); *SEC v. McGoff*, 647 F.2d 185, 192 (D.C. Cir. 1981) (same). No associational interests are implicated either. As a for-profit entity with a

---

[9] Moreover, the CID includes a procedure for NewsGuard to invoke privilege claims. Dkt.11-17 at 20. The motion makes no mention of this procedure, which is routinely used to protect any privileged information pending enforcement litigation in federal court, where those claims could be presented and resolved.

commercial relationship with customers who pay for its products, NewsGuard's customer lists are not shielded from disclosure. *See, e.g.*, *United States v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005) ("Producing a customer list does not offend the First Amendment."); *United States v. Benson*, 561 F.3d 718, 727 (7th Cir. 2009) (same). The same is true for NewsGuard's communications with those customers. *See Sanitation & Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 996 (2d Cir. 1997) (right of association "generally will not apply … to business relationships"); *Amato v. Elicker*, 534 F. Supp. 3d 196, 209 (D. Conn. 2021) (association with customers "falls outside First Amendment associational protection").

NewsGuard also claims that, due to its asserted First Amendment interests, the CID violates the Fourth Amendment as overbroad. Dkt.11-1 at 47–48. But even if those First Amendment interests applied (and they do not), the argument fails. To prevail on such a claim, NewsGuard must show more than "[b]roadness" or a "burden"; it must show that the CID is "*unduly* burdensome or *unreasonably* broad." *FTC v. Texaco*, 555 F.2d 862, 882 (D.C. Cir. 1977) (en banc). That standard is particularly demanding here because "the agency's inquiry is pursuant to a lawful purpose"—investigating collusive agreements in violation of the antitrust laws—and NewsGuard does not contest that "the requested documents are relevant" to that investigation. *Id.*; *see* Statement of Chairman Andrew N. Ferguson at 5–6, *In re Omnicom Grp. / The Interpublic Grp. Of Cos.*, FTC Dkt. No 2510049 (explaining that "coordinated action by advertising agencies against politically disfavored publishers is tantamount to an agreement not to compete on quality"—"the supreme evil of antitrust") (cited at Dkt.11-20). NewsGuard has not met that standard, failing even to allege (let alone show) that complying with the CID would "unduly disrupt or seriously hinder normal [business] operations." *Texaco*, 555 F.2d at 882. And the undisputed evidence shows otherwise: FTC staff determined that NewsGuard has complied with

31

26 of the CID's 31 specifications, and staff "substantial[ly]" narrowed four of the five remaining specifications in a "good-faith effort to reduce NewsGuard's burden." Dkt.11-18 at 2–3.

In sum, NewsGuard's contentions are meritless. More broadly, they are also premature.[10] Each argument hinges on the risk of *compelled disclosure*, but NewsGuard faces no legal penalty until a federal court orders production in an enforcement action. *Gen. Fin. Corp.*, 700 F.2d at 368. Similarly, NewsGuard's claims are premature because they call for highly factual determinations that cannot be adjudicated in a pre-enforcement setting. In an enforcement proceeding, by contrast, CID recipients like NewsGuard have ample opportunity to assert that a certain document is privileged or that complying with a certain specification poses an undue burden. Likewise, any relevant associational interests can be protected at that time "by entry of a protective order," *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 n.6, 1165 (9th Cir. 2010); *Texaco*, 555 F.2d at 884 & n.62 (describing protective orders for FTC subpoenas).

## B. The Equitable Factors Weigh Heavily Against a Preliminary Injunction.

The equitable prongs of the preliminary injunction analysis also preclude relief. To begin, NewsGuard has not come close to showing irreparable harm. That much is evident from its own extraordinary delay in seeking relief.

To reiterate, NewsGuard filed its complaint *over eight months* after the CID was issued. But it is well-established that a "district court should be reluctant to award relief" when a plaintiff fails to "promptly" request injunctive relief, *NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998), because "such delay implies a lack of urgency and irreparable harm," *Newdow v. Bush*, 355 F.

---

[10] At oral argument, the *Media Matters* district court expressed skepticism regarding a similar claim, observing that it would be "odd" "to apply privilege in the abstract at this stage" and that any privilege argument could be raised "in a more concrete way" in an enforcement action, where it would be clear if the FTC is "going to take issue with [the] assertions of privilege." Transcript of Motion Hearing 14–15, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959, Dkt.43 (D.D.C. Aug. 13, 2025). The court did not rely on the privilege claim in its preliminary injunction decision.

Supp. 2d 265, 292 (D.D.C. 2005); *see also, e.g.*, *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (44-day delay in seeking injunction was "inexcusable" and "bolstered" the court's "conclusion that an injunction should not issue"); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (36-day delay cut against preliminary injunction); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay "militates against a finding of irreparable harm"); *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) (three-month delay was "in tension with the high bar [plaintiffs] must clear to establish irreparable harm."); *Arrington v. Santander Consumer USA Inc.*, 2025 WL 4083338, at *1 (D.D.C. Nov. 24, 2025) (holding that delay demonstrated lack of irreparable harm, and citing *Open Top Sightseeing*, *Fund for Animals*, and *Mylan Pharms.*). The same principle applies "where First Amendment rights are allegedly at stake." *Kohls v. Ellison*, __ F.4th __, 2026 WL 350923, at *4 (8th Cir. 2026).

NewsGuard avers that it spent those eight months "attempt[ing] to work in good faith with the FTC concerning the CID," Dkt.14 at 6, but that merely reinforces that the CID did not cause any irreparable harm. *Maldonado v. D.C.*, 2019 WL 6877913, at *3–4 (D.D.C. Dec. 16, 2019) (plaintiffs' "litigation strategy," including engaging in lengthy "settlement discussions," "strongly discredit[ed their] claim that they [were] suffering irreparable harm"); *Lewis v. Becerra*, 2022 WL 123909, at *9 (D.D.C. Jan. 13, 2022) (delay suggested a lack of irreparable harm even if litigation tactics were adopted for "valid strategic reasons"). At any rate, the only potentially irreparable harm NewsGuard identifies is First Amendment harm, which it has not suffered because (as shown above) there has been no First Amendment violation.

The balance of equities and the public interest also weigh against an injunction. "[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [courts'] authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers) ("[A]ny time a State is

enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). An injunction would also harm the public, which benefits from the robust enforcement of the antitrust laws. *See FTC v. Standard Oil of Cal.*, 449 U.S. 232, 242 (1980). On the other hand, NewsGuard has suffered no irreparable harm and any other alleged injury cannot outweigh the grievous harms to the public and to the FTC, which are exacerbated by the likelihood that an injunction here will further encourage a barrage of copycat pre-enforcement challenges to federal CIDs and subpoenas.

II.     **NEWSGUARD IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AGAINST ANY PART OF THE OMNICOM-IPG CONSENT ORDER.**

A.     **NewsGuard Cannot Show That It is Likely to Prevail on the Merits.**

As with its CID challenge, NewsGuard's challenge to a condition in the consent order is not likely to prevail on the merits both because its claims are not reviewable and because they are entirely meritless in any event.

1.     **This Court Lacks Authority to Hear NewsGuard's Unprecedented Challenge to the Consent Order.**

This Court cannot hear NewsGuard's claims relating to the consent order because (1) the FTC Act vests jurisdiction over challenges to FTC orders exclusively in the courts of appeals and requires petitions to be filed within sixty days; (2) Congress limited the ability to obtain review of an FTC order to only those entities that are bound by the order; and (3) NewsGuard failed to exhaust its claims.

i.     ***The courts of appeals have exclusive jurisdiction to review FTC orders.***

Congress has provided for judicial review of FTC adjudicatory orders, but only in the courts of appeals. Section 5(c) of the FTC Act allows "[a]ny person … required by an order of the Commission to cease and desist … [to] obtain a review of such order in the court of appeals of the United States." 15 U.S.C. § 45(c). Once a petition for review is filed, the court of appeals "shall

have jurisdiction of the proceeding and of the question determined therein concurrently with the Commission," *id.*, but once the record is filed, "the jurisdiction of the court of appeals … shall be exclusive." *Id.* § 45(d).

Congress is free to "choose the court in which judicial review of agency decisions may occur." *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988) (cleaned up). When Congress "vests jurisdiction in a particular court," it "manifest[s] an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power," and thereby "cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) (*TRAC*); *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–11 (2012).

Here, Congress through the FTC Act precluded jurisdiction in this Court over FTC cease-and-desist orders of the type under challenge. "It is undisputed that review of FTC cease and desist orders is committed to the courts of appeals." *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992). Any other tribunals—including this one—lack jurisdiction to hear appeals of such orders, and this dooms NewsGuard's claim.

Moreover, the FTC Act provides that any petition for review of a Commission order must be filed in the court of appeals "within sixty days from the date of the service of such order." 15 U.S.C. § 45(c). Here, the consent order was issued on September 26, 2025, *Omnicom* Decision at 8, and NewsGuard sought review over four months later. Thus, NewsGuard's challenge would be untimely in any event.

### ii.    *NewsGuard has no right to review of an FTC adjudicatory order that does not govern it.*

The Court also lacks jurisdiction to hear NewsGuard's challenge to the consent order because Congress limited the right of judicial review to the parties governed by the Commission's order. *See* 15 U.S.C. § 45(c) (specifying that judicial review is available to "[a]ny person,

partnership, or corporation required by an order of the Commission to cease and desist from using any … act or practice"). The "any person" provision "only allows judicial review for parties subject to an FTC cease and desist order." *Consumer Fed'n of Am. v. FTC*, 515 F.2d 367, 369 (D.C. Cir. 1975). Thus, by the plain terms of the FTC Act, third parties such as NewsGuard that are not named parties subject to an FTC order may not challenge it.

As the Supreme Court observed in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), Congress may—and sometimes does—limit access to judicial review to the class of plaintiffs who are actually bound by an agency order. In *Block*, the Court interpreted the relevant statute to provide for judicial review of certain Department of Agriculture orders when challenged by dairy handlers, who were subject to the orders, but not in cases by consumers who were not parties to the orders. *Id.* at 346–47. Because the statute conferred no explicit right to review on consumers, and because allowing them to sue "would severely disrupt this complex and delicate administrative scheme," the court declined to recognize an implied right of action. *Id.* at 347–48. The same reasoning applies to the FTC Act. Congress designed a comprehensive process that entrusted the Commission with the investigation and adjudication of putative violations of the antitrust laws, and provided for judicial review only when sought by a party to that process.

This was a sensible decision. FTC consent orders routinely affect third parties. For example, recent orders have prohibited the covered parties from entering into certain types of contracts with third parties, *see* Decision and Order, *Aaron's, Inc.*, 169 F.T.C. 380, 386 (May 11, 2020), from signing new leases with certain landlords, *see* Proposed Order, *In re Valvoline Inc.*, FTC Dkt. No. C-4824 (§ XI) (Nov. 14, 2025), https://tinyurl.com/2vmy8ekz, or from hiring certain specified employees, *see* Decision and Order, *Mars, Inc.*, 164 F.T.C. 821, 843 (Nov. 30, 2017). As in *Block*, allowing affected third parties to undermine litigation settlements would "severely disrupt" the FTC's adjudicatory process and hinder the agency's ability to enforce the law. 467

U.S. at 348. Allowing third-party challenges could also permit gamesmanship by enabling the parties to purport to agree to a settlement in the knowledge or expectation that portions of it will be attacked by like-minded third parties. *See Block*, 467 U.S. at 348 (noting that recognizing a third-party right of action would enable gamesmanship of this kind).

It is unsurprising, then, that when a group of third-party petitioners previously sought to challenge an FTC consent order, the D.C. Circuit dismissed the case for lack of jurisdiction. Order, *Consumers for Auto Reliability and Safety v. FTC*, No. 17-1038, 2017 U.S. App. LEXIS 12921, *1 (D.C. Cir. July 14, 2017) (per curiam) ("Petitioners are not subject to the requirements of the consent orders at issue and therefore may not challenge those orders in this court under 15 U.S.C. § 45(c)." (citing *Consumer Fed'n of Am.*, 515 F.2d 367 (D.C. Cir. 1975)). To our knowledge, no court has ever allowed such a challenge to proceed, and this Court should not be the first.

Third-party collateral attacks are also barred for the independent reason that consent orders reflect a decision by the Commission to settle enforcement litigation. An agency's decision to settle a case, and the terms of the settlement, amount to "an exercise of its 'complete discretion … to decide how and when to enforce'" its statute. *Schering Corp. v. Heckler*, 779 F.2d 683, 687 (D.C. Cir. 1985); *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 457 (D.C. Cir. 2001) (agency's "decision to settle [enforcement action] is committed to the agency's nonreviewable discretion"); *accord Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031–32 (D.C. Cir. 2007). Such decisions are committed to agency discretion, and therefore not subject to judicial review, because "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

### iii.    *NewsGuard failed to exhaust its claim.*

NewsGuard's attempt to challenge the consent order would also fail for lack of exhaustion. Even where a statute does not expressly impose an exhaustion requirement, courts often find an

implied requirement "based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Carr v. Saul*, 593 U.S. 83, 88 (2021) (cleaned up).

Here, NewsGuard did not submit a comment during the public comment period, even though by its own account "the proposed order was intended to target and debilitate if not eliminate new rating services" and "NewsGuard was at the top of the FTC's and Ferguson's hit list." Dkt.11-1 at 30. Accordingly, even if NewsGuard otherwise had a right to judicial review, failure to exhaust would defeat its case. *See, e.g., Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 509 (D.C. Cir. 2020) ("[W]e will not review arguments that have not first been presented to the Commission.").

### 2. NewsGuard Has Not Established Standing to Challenge the Consent Order.

In addition, NewsGuard lacks Article III standing. NewsGuard identifies only two purported injuries from the consent order, neither of which suffices to establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*First*, NewsGuard asserts that "it is questionable (or doubtful) that [IPG] will be able to continue with the [NewsGuard] contract now that it has been absorbed by Omnicom and is subject to the Consent Order." Dkt.11-1 at 34; Dkt.11-2 ¶ 67. As illustrated by the hedging words "questionable" and "doubtful," this suggestion is entirely speculative. This is presumably because—even though over four months have elapsed—NewsGuard cannot point to any actual harm it has suffered as a result of IPG's actions. In particular, NewsGuard pointedly does *not* claim that Omnicom will stop making payments on the IPG contract, or take any other action that will cause actual harm to NewsGuard. Nor does NewsGuard allege that, a result of the consent order, the contract will not be renewed in the future—presumably because the prospect of any such renewal would be speculative even in the absence of the order. This is particularly true in light of IPG's acquisition by Omnicom (which apparently was not a NewsGuard customer), as well as NewsGuard's self-acknowledged status as an extremely minor player in the advertiser brand safety

space. *See* Dkt.11-2 ¶ 20; *see also Lujan*, 504 U.S. at 560–61 (Plaintiff's injury must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." (cleaned up)).

*Second*, NewsGuard alleges that one other client indicated it would not renew its contract because of "[r]ecent developments that require [the client] to take a more cautious approach to this area of [its] business.'" Dkt.11-1 at 34; *see* Dkt.1 ¶ 134; Dkt.11-2 ¶ 66. But there is absolutely nothing in the record to suggest that the vague phrase "recent developments" refers to the consent order, which does not even mention NewsGuard (rather than, for example, the significant public criticism and multiple congressional investigations NewsGuard has faced).

Presumably it would have been quite easy for NewsGuard to clarify which developments its erstwhile client had in mind, but it pointedly chose not to do so. Thus, it would be wholly speculative to conclude that the loss of business was caused by the challenged portion of the consent order, let alone that the client will return if that portion of the order is enjoined. This purported injury therefore fails both the traceability and the redressability prongs of the standing analysis. *See Lujan*, 504 U.S. at 560–61 (Plaintiff's injury must be "fairly … traceable to the challenged action by the defendant, and not … the result of independent action of some third party not before the court," and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision.").[11]

---

[11] This asserted injury also lacks traceability because it is too remote from the challenged government action. NewsGuard identifies no case finding standing based on a representation by a third party to a fourth party that a government order involving two other parties requires the third party to be more cautious about its business relationships.

### 3. NewsGuard's Retaliation Challenge to the Consent Order Fails on the Merits.

#### i. There is no cognizable claim for "retaliatory settlement of litigation."

As discussed above, it is at best questionable whether a retaliatory *investigation* claim is cognizable. *See supra* Part I.A.2.ii. But NewsGuard's novel theory of a "retaliatory settlement of litigation" is even more far-fetched. The FTC knows of no example where a court has even *considered* such a claim by a third party—and NewsGuard has identified none. This is unsurprising because third parties are not bound by such settlements, and allowing them to challenge settlements on retaliation grounds would be highly disruptive of settled expectations. At any rate, NewsGuard certainly cannot show that it is *likely to prevail* on this novel claim, which wholly lacks doctrinal support. *See Skrmetti*, 83 F.4th at 471.

#### ii. NewsGuard fails to show that the consent order was retaliatory.

Even if a retaliatory settlement claim were valid, NewsGuard nevertheless fails to demonstrate First Amendment retaliation. As discussed above, to prevail on a retaliation claim NewsGuard must show (1) that it "engaged in conduct protected under the First Amendment," (2) that the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in [NewsGuard's] position from speaking again," and (3) that there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref*, 833 F.3d at 258 (cleaned up). As with its retaliatory investigation claim, NewsGuard's retaliatory settlement claim fails to establish either a causal link between its speech and the Commission's entry of the consent order, or that the consent order caused a sufficient deterrent effect.

##### a. NewsGuard cannot show that its speech prompted the consent order.

To support its retaliatory settlement claim, NewsGuard relies on the same factual allegations that it uses to support its retaliatory investigation claim. As discussed at length above,

*see supra* Part I.A.2.i., those allegations fail to establish that the Commission took any action

relating to NewsGuard because of the company's speech. Chairman Ferguson's statements about

his concerns involving collusive boycotts in the advertising industry, and NewsGuard's potential

role in them, demonstrate not retaliatory intent but rather his strong interest in enforcing the

antitrust laws. And NewsGuard fails to identify dates on which it engaged in expressive conduct

that could give rise to an inference of retaliation based on timing.

Far from showing retaliation against NewsGuard, the evidence reflects the Commission's

nonretaliatory reasons for adopting the final consent order. As the FTC's analysis of the proposed

order explained, Omnicom's acquisition of IPG would significantly increase market concentration

in the advertising industry, making it far easier for market participants to engage in anticompetitive,

collusive boycotts of disfavored media publishers, just as the Commission found they had done in

the recent past. *See* 90 Fed. Reg. 27304, 27305–06 (June 26, 2025). The proposed order sought to

remedy this problem by "eliminating Omnicom's ability to participate in [such] ongoing or future

coordination." *Id.* at 27304. During the public comment period, however, several commenters

expressed concern that the initial order as written might not achieve that goal. *See* Regulations.gov,

*Comment from CPAC & Independent Media Council* (July 29, 2025),

https://tinyurl.com/yf5nw8p2; *Comment from GB News Limited* (July 29, 2025),

https://tinyurl.com/4jcumwyp; *Comment from Newsmax Media Inc.* (July 28, 2025),

https://tinyurl.com/3ruxx5vp.[12] After considering the submitted comments, the Commission

---

[12] Contrary to NewsGuard's suggestion, *see* Dkt.11-1 at 31–32, 42–43, Newsmax's comment did not propose the final consent order's prohibition on the use of third-party services that evaluate "the veracity of news reporting" and "adherence to journalistic standards," *Omnicom* Decision at 2. Instead, Newsmax's comment suggested several significant changes to the proposed order that the Commission did *not* adopt, including blocking the Omnicom/IPG transaction outright, requiring Omnicom to develop its own in-house news vetting functions, requiring Omnicom and IPG to admit to various violations of the law, and imposing a monetary penalty of $250 million.

entered a final consent order with revised language designed to more effectively preclude Omnicom from engaging in the collusive conduct that the Commission had identified previously. NewsGuard is not named in the consent order, the challenged condition in the order applies to Omnicom's agreements with *any* brand safety organization (not just NewsGuard), and, by NewsGuard's own admission, it is only a tiny player in that space with "*de minimis*" market share. Dkt.1 ¶ 97; Dkt.11-2 ¶ 44 (same). This chain of events demonstrates that the Commission acted appropriately to address antitrust concerns.

Finally, NewsGuard completely ignores the fact that the Commission as a whole, not Chairman Ferguson, authorized the administrative complaint and entered the consent order. NewsGuard's complaint and affidavit make no mention at all of then-Commissioner Holyoak, who also voted in favor of the complaint and the final consent order. Dkt.11-25 at 2, 9. *See* 16 C.F.R. § 4.14 (Commission action "may be taken only with the affirmative concurrence of a majority of the participating Commissioners."). This is yet another reason to reject NewsGuard's claim.

### b. NewsGuard cannot show that the consent order chilled its speech.

As with its CID claim, NewsGuard fails to allege that the condition in the consent order was "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *Aref*, 833 F.3d at 258. Once again, NewsGuard does not claim to have tempered its speech in any way— or indeed, to have done anything differently at all—as a result of the consent order. And as explained above, its paltry allegations of injury are not even sufficient to make out standing, let alone a sufficiently grievous injury to deter a person of reasonable firmness.

### 4. NewsGuard's "Jawboning" Claim Likewise Fails.

Finally, NewsGuard asserts an "unconstitutional jawboning" claim, suggesting that the Commission coerced Omnicom and IPG into agreeing to a consent order that bars the merged entity from doing business with NewsGuard, thus punishing NewsGuard indirectly for its speech.

As the Supreme Court recently explained in *National Rifle Association of America v. Vullo*, a jawboning claim has two elements: "[a] government official [1] cannot coerce a private party to [2] punish or suppress disfavored speech on her behalf." 602 U.S. at 190. NewsGuard entirely fails to establish either element.

### i. NewsGuard has not come close to demonstrating that Omnicom and IPG were coerced.

A plaintiff advancing a jawboning claim must show that the third party's action against the plaintiff was *coerced* by the government. This means that "the coerced party 'reasonably understood' the [government] to threaten adverse action" if the directive were not followed, "and thus its 'compliance with the [government's] directives was not voluntary.'" *Vullo*, 602 U.S. at 176–77. Courts apply several "factors to determine whether a challenged communication is reasonably understood to be a coercive threat," such as "word choice and tone," "whether the speech was perceived as a threat; and, perhaps most importantly … whether the speech refers to adverse consequences." *Id.* at 189.

NewsGuard does not discuss any of these factors. And this is no surprise, because NewsGuard does not even allege the existence of *any threatening communication*. Specifically, it fails to allege any communication at all from the Commission to Omnicom or IPG inviting them to agree to the objected-to provision in the consent order, or making any threats in the event they did not agree. Remarkably, NewsGuard cannot even allege that the provision was added at the Commission's suggestion and not at the suggestion of Omnicom or IPG. NewsGuard can do no more than surmise that "it would be unusual ... for an ad agency and marketing company to seek restrictions on use of services designed to protect advertisers' reputations and brand safety." Dkt.1 ¶ 127. Whether or not one agrees that this is reasonable speculation, it is indisputably just speculation. In other words, NewsGuard cannot even establish that the FTC *asked* for this provision, let alone that it did so coercively.

By contrast, the cases on which NewsGuard relies—*Vullo*, *Bantam Books*, and *Backpage*—all involved explicit threats by government actors demanding that the target intermediaries cease dealing with a disfavored speaker or suffer significant legal consequences, as well as an immediate reaction by the intermediary to those threats. *See Vullo*, 602 U.S. at 183–85 (state financial services regulator offered to ignore legal violations by insurance companies "so long as [they] aided [the regulator's] campaign against gun groups," leading the companies to discontinue underwriting insurance policies for the National Rifle Association); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 60–63 (1963) (bookseller ceased selling certain disfavored books in response to notices from state "[m]orality" commission and visits by police); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (local sheriff threatened Visa and MasterCard with prosecution for processing payments for a disfavored website, which discontinued doing so as a direct result of the threats). In each of those cases the threatening nature of the government's communications, and their effect on the targeted intermediaries, made clear that the communications were coercive. NewsGuard points to nothing similar here, and it has therefore failed to demonstrate a *sine qua non* of a jawboning claim: coercion by the government.

### ii. *NewsGuard fails to show a nexus between the consent order and its speech.*

NewsGuard also must show that the Commission used the consent order to induce a third party to "punish or suppress disfavored speech on [its] behalf." *Vullo*, 602 U.S. at 190. In other words, coercion by itself does not make out a jawboning claim; instead, a jawboning claim arises only if the governmental coercion "indirectly worked a violation of [NewsGuard's] First Amendment rights." *Id.* at 201 (Jackson, J., concurring). NewsGuard is quite wrong, then, to suggest that the jawboning claim allows it to prevail regardless of whether the Commission's actions were retaliatory. *See* Dkt.11-1 at 43. To the contrary, NewsGuard must demonstrate that

the Commission acted *in order to suppress* its purportedly disfavored speech. As discussed above, *see supra* Part I.A.2.i., NewsGuard has entirely failed to make that showing.

**B.        The Equitable Factors Weigh Heavily Against a Preliminary Injunction.**

Here too the equitable prongs of the preliminary injunction analysis preclude relief. Once again, NewsGuard's own delay—over four months this time—is sufficient to demonstrate the lack of irreparable harm. *See Arrington*, 2025 WL 4083338, at *1. And even setting that aside, NewsGuard once again fails to identify any irreparable harm—indeed, as discussed in the standing section above, it has failed to demonstrate *any* non-speculative injury at all. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (D.C. Cir. 2006) ("speculative" injuries do not "warrant preliminary injunctive relief"). Moreover, the only concrete harms NewsGuard purports to identify involve possible loss of business, but "economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Once again, an overbroad injunction would harm the government (this time by invading the core executive function of settling enforcement actions) as well as the public's interest in effective antitrust enforcement (this time by disrupting a provision designed to alleviate the acute collusion risks of a large merger in an important industry). *See Baltimore Gas & Elec. Co.*, 252 F.3d at 457 (agency's "decision to settle [enforcement action] is committed to the agency's nonreviewable discretion"); *N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1214 (D.C. Cir. 1993) (same). And once again, the public's interest is only further harmed by the prospect that NewsGuard's expansive theories will open any number of other final orders by the FTC and other agencies to second-guessing, sowing chaos and upsetting well-settled expectations. The equitable calculus overwhelmingly favors Defendants.

## CONCLUSION

For the reasons set forth above, the motion for preliminary injunction should be denied.

Dated: February 23, 2026
       Washington, D.C.

                                   Respectfully submitted,

OF COUNSEL:                        LUCAS CROSLOW (D.C. Bar #1048342)
                                   *General Counsel*

DANIEL GUARNERA                    H. THOMAS BYRON III (D.C. Bar #442856)
*Director*                         *Deputy General Counsel*

KELSE MOEN                         ALEX POTAPOV (D.C. Bar #998355)
*Deputy Director*                  *Deputy General Counsel*

BUREAU OF COMPETITION              ROBERT E. ZUVER, JR. (D.C. Bar #987216)
                                   *Attorney*

                                   /s/ Ethan D. Beck
                                   ETHAN D. BECK (D.C. Bar #90024619)
                                   *Counsel to the General Counsel*

                                   FEDERAL TRADE COMMISSION
                                   600 Pennsylvania Ave., N.W.
                                   Washington, DC 20580
                                   (202) 326-2110
                                   ebeck@ftc.gov

                                   *Attorneys for the Defendants*