**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC., | |
| *Plaintiff*, | |
| v. | Case No.: 1:26-cv-00353-DLF |
| FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission, | Hon. Dabney L. Friedrich |
| *Defendants*. | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' NOTICE OF WITHDRAWAL OF CIVIL INVESTIGATIVE DEMAND AND NOTICE OF RELATED LITIGATION**

Plaintiff NewsGuard Technologies, Inc. ("NewsGuard") respectfully submits this Notice to address recent actions taken by the FTC and in response to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation ("Defendants' Notice"), ECF 33.

**A.     The FTC's Notice of Withdrawal of the CID to NewsGuard.**

On April 16, 2026, the FTC notified NewsGuard that it was withdrawing the CID it had issued on May 20, 2025, which had been the subject of eleven months of dealings and litigation, including this action. *See* Apr. 16, 2026, letter from Patricia Galvin (FTC) to NewsGuard, ECF 33-5. The only explanation given by the FTC was that the Commission had "entered, and a federal district court [had] approved, a settlement in *Federal Trade Commission, et al. v. Dentsu US, Inc., et al.*, No. 26-cv-469 (N.D. Tex)." *Id.* That settlement, the FTC asserted, "resolved the issues related to NewsGuard that gave rise to the CID." *Id.*

1

**B.     The FTC Obtained the *Dentsu* Consent Orders Without Notice or Opportunity to be Heard.**

On April 15, 2026, the FTC filed in the Northern District of Texas a Complaint and Proposed Final Orders and Stipulated Permanent Injunctions as to Dentsu US, Inc. ("Dentsu"), GroupM Worldwide LLC ("WPP"), and Publicis, Inc. ("Publicis"), three of the largest global ad agency holding companies. *See FTC v. Dentsu US, Inc.*, No. 26-cv-469 (N.D. Tex. 2026), Dkt. Nos. 3-1, 4-1, 5-1. As explained further below, the gist of the FTC's "settlement" was that the companies committed to not using third-party services that evaluate or rate "Media Publishers" (*e.g.*, websites or platforms) based on "veracity of news reporting" or "adherence to journalistic standards." *See, e.g.*, *FTC v. Dentsu*, Dkt. No. 3-1 at § II.C. This is the same restriction, stated in nearly verbatim terms, as the Omnicom Consent Order that NewsGuard has challenged in this case.

The FTC submitted its Complaint and stipulated Proposed Final Orders to the District Court in Texas the morning of April 15, 2026. The FTC gave no notice to NewsGuard of the filing (or of the FTC's purported view that entry of the requested consent orders would "resolve[] the issues related to NewsGuard)." *See* ECF 33-5. NewsGuard had no opportunity to be heard, to respond, or to intervene. The District Court accepted the FTC's assertions and proposed restrictions less than four hours after the FTC's filing. *See* ECF 33-2, 33-3, 33-4.

**C.     Through the *Dentsu* Consent Orders and the Prior Omnicom Order, the FTC Seeks to Bar Global Ad Agencies From Using NewsGuard's Services.**

Dentsu, WPP, and Publicis are three of the largest global ad agency holding companies, half of what was formerly called the "Big Six." Two of the other Big Six were Omnicom Media and the Interpublic Group of Companies (IPG) until those two companies merged in November

2025 with the FTC's blessing, contingent on their acceptance of the FTC's consent order prohibiting the merged entity from using NewsGuard's services.

The *Dentsu* Consent Orders impose conditions that are, as the FTC concedes, "materially identical to those in the Omnicom consent order." ECF 33 at 1. Under both, Omnicom—and now Dentsu, WPP, and Publicis—are prohibited from using third-party services that evaluate "viewpoints as to the veracity of news reporting" or "adherence to journalistic standards or ethics." *Compare* ECF 33-2, 33-3, 33-4 at §§ II.C, III.B, *with* ECF 11-25 at §§ I.D, II.A. NewsGuard is the FTC's primary target for these prohibitions. *See* Compl., ECF 1 ¶¶ 111–135; *see also* Mot. for Prelim. Inj., ECF 11-1 at 34–35.

By extending the blacklist of NewsGuard's services to three additional major industry participants, the FTC has substantially broadened the scope of its retaliation campaign. Together with the Omnicom Consent Order (ECF 11-25), the FTC-imposed prohibition on making use of third-party news rating services (such as NewsGuard) now apply to five of the six largest global advertising agencies.[1] *See* ECF 33-1 at ¶ 32.

The FTC contends that its "latest action … demonstrates that the Omnicom consent order was part of a comprehensive investigation against unlawful collusion in the digital advertising market," contrary to NewsGuard's claims in this case about retaliation and viewpoint discrimination. ECF 33 at 3–4. Quite the opposite, the actions to obtain and impose the *Dentsu* Consent Orders—more than doubling the scope of the prohibition on use of news rating services— show the FTC's censorial retaliation is more serious and significant now than ever before.

---

[1] Of those firms, Havas appears to be the only one not subject to a consent decree with the FTC.

**D.      The FTC Obtained the *Dentsu* Consent Orders Based on Unsupported and Misleading Allegations.**

Under the terms of the Consent Orders, Dentsu, WPP, and Publicis admitted no wrongdoing and were absolved of liability by the settlement agreements they entered with the FTC. *See* ECF 33-2 at 3, ¶ 4. The FTC's *Dentsu* Complaint does not show or even allege that any of these companies ever conspired or entered into any agreement with one another or with any other ad agencies. Yet the FTC's theory to support the *Dentsu* Consent Orders is that "Dentsu, WPP, and Publicis colluded through trade associations to set brand-safety standards," and "these trade associations relied on information from entities such as NewsGuard to develop these shared brand-safety standards." ECF 33 at 2. The FTC's theory and its allegations are baseless.

Wading through the FTC's many characterizations and allusions, the one substantive claim stated in the *Dentsu* Complaint is that an effort of the Global Alliance for Responsible Media ("GARM") several years ago to develop a "Brand Safety Floor" constituted a collusive boycott among advertisers. *See FTC v. Dentsu* Compl., ECF 33-1 ¶¶ 98-105. GARM was an effort of advertising and ad agency trade associations to develop a framework of terminology to assess brand safety risks for digital advertising. The initiative began in 2019 after live-streamed videos of the Christchurch, New Zealand, mosque shootings appeared adjacent to advertising online.[2] This work resulted in promulgation of a suggested "Brand Safety Floor + Suitability Framework"[3] that defined and categorized various brand safety risks of websites and content (*e.g.*, regarding pornography, violent content, false or misleading content, misinformation) so that advertisers and

---

[2] *See Statement on the Global Alliance for Responsible Media (GARM)*, (Aug. 9, 2024), https://wfanet.org/leadership/garm.

[3]      *See GARM: Brand Safety Floor + Suitability Framework*, https://4962377.fs1.hubspotusercontent-na1.net/hubfs/4962377/resource-library/GARM%20Brand%20Safety%20Floor%20Suitability%20Framework%2023%20Sept%20(3).pdf.

ad agencies could speak a common language in addressing risks about online ad placements. The GARM guidelines were advisory, and their use was entirely voluntary. Advertisers and ad agencies could choose to use the GARM guidelines—or not use them—as they saw fit. Advertisers and ad agencies applied their own brand safety standards, competing with one another on the basis of their brand-safety protections for clients, and nothing in the *Dentsu* Complaint shows any contrary agreement or collusion.[4]

But the FTC goes further in an effort to connect NewsGuard to the GARM guidelines, and in this regard the Commission knowingly misstates the facts in an effort to mislead this Court. In its Notice to the Court, the FTC contends the trade associations (through which Dentsu, WPP, and Publicis supposedly colluded) "relied on information from entities such as NewsGuard to develop … shared brand-safety standards." ECF 33 at 2.

This assertion is untrue and the FTC knows it is untrue, which underscores that there can be no presumption of regularity in this proceeding. In one of its first responses during the CID process (in June 2025), NewsGuard explained to the FTC that it never had a commercial relationship with GARM, had never been a member of GARM, and did not provide data to GARM. *See* attached Ex. 1 at 6, 9 (June 27, 2025, letter from NewsGuard's counsel to FTC). NewsGuard's

---

[4] It also bears noting that GARM was dissolved two years ago, after the organization's work to promote understanding of brand safety risks was attacked in a staff report of the Republican majority of the House Judiciary Committee. *See* H. Judiciary Comm., 118th Cong., *GARM'S HARM: HOW THE WORLD'S BIGGEST BRANDS SEEK TO CONTROL ONLINE SPEECH* (Interim Staff Rep. 2024), http://efaidnbmnnnibpcajpcglclefindmkaj/ https://judiciary.house.gov/sites/evosubsites/republicans-judiciary.house.gov/files/evo-media-document/2024-07-10%20GARMs%20Harm%20-%20How%20the%20Worlds%20Biggest%20Brands%20Seek%20to%20Control%20Online%20Speech.pdf. Elon Musk and X then brought suit on the same theory of supposed advertiser boycotts the FTC has asserted now. GARM folded because, as it publicly stated, the organization did not have the resources to defend an assault from X. *See supra* note 2; *see also* Jonathan Vanian, *Advertising Group Suspends Brand Safety Unit After Elon Musk's Antitrust Lawsuit*, CNBC (Aug. 8, 2024), https://www.cnbc.com/2024/08/08/ad-group-suspends-garm-after-of-x-elon-musks-antitrust-lawsuit-.html.

disclosures thus make clear that GARM could not have "relied on information from entities such as NewsGuard to develop … shared brand-safety standards" because GARM did not receive *any* information from NewsGuard. Moreover, GARM's guidelines were significantly different from any data or misinformation criteria that NewsGuard has ever produced.

**E.     The FTC's Latest Maneuver of Obtaining the *Dentsu* Consent Orders Underscores the Need for Injunctive Relief.**

The FTC asserts that "[f]ollowing the Commission's successful [*i.e.*, uncontested] lawsuit against Dentsu, WPP, and Publicis," it "no longer requires compliance with the CID" issued to NewsGuard. ECF 33 at 3. Indeed, the FTC goes further, representing that "[t]he relief obtained in *Dentsu* … marks the culmination of the Commission's investigation in this area" and so the FTC has withdrawn not only the NewsGuard CID but also the other 16 or so issued to other entities involved in digital advertising. *Id.* The FTC asserts: "The withdrawal of the CID at issue here moots NewsGuard's request for preliminary injunctive relief." *Id.* Quite the contrary, the FTC's withdrawal of the NewsGuard CID as part of the *Dentsu* Consent Orders gambit underscores the need for relief from this Court.

The FTC's imposition of the consent order condition as to Omnicom and IPG late last year, combined with its extraction of the same condition now from Dentsu, WPP, and Publicis is clearly designed to preclude NewsGuard from providing services to the vast majority of the world's largest ad agencies. While decrying supposed "potential advertiser boycotts" of media publishers, the FTC is itself imposing a government-mandated boycott of a journalistic organization because it does not like the ratings, opinions, and associated journalistic reports the organization provides.

The FTC's abandonment of the CIDs reveals the Commission's "investigation" was not about any legitimate concerns regarding advertiser boycotts or collusion of any sort but was instead aimed at targeting journalistic entities that provide reporting, opinions, ratings, and analyses of

6

news sources—NewsGuard chief among them. As discussed at length in prior briefing, this came about because conservative news outlets such as Newsmax chafed that they scored poorly on measures of accuracy and journalistic integrity and lobbied the FTC in the context of the Omnicom merger to prohibit use of NewsGuard services—and the FTC complied. *See* Mot. for Prelim. Inj., ECF 11-1 at 23–25, 35. This is impermissible viewpoint discrimination of protected speech. *See id.* at 34–37. That the FTC achieved its aim by pressuring Omnicom and IPG before—and Dentsu, WPP, and Publicis now—is jawboning and a prior restraint imposed through intermediaries contrary to black letter First Amendment law. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *see also* Mot. for Prelim. Inj., ECF 11-1 at 34–37. Thus, the FTC's withdrawal of the CIDs to NewsGuard and others in light of the *Dentsu* Consent Orders compounds NewsGuard's harm and its bases for relief in this Court, rather than mooting claims.[5]

\* \* \* \* \*

The FTC asserts the *Dentsu* Consent Orders are the "culminat[ion of] a landmark settlement" relating to "the Commission's investigation into potential advertising boycotts." ECF 33 at 1–2. While it may be fair to say the FTC's latest actions are a "landmark," it is an ignominious one. This Court should fully understand the FTC's latest maneuvering and that the need for injunctive relief in this action is even greater than before.

---

[5] In any event, the FTC's contention that its withdrawal of the CID moots NewsGuard's challenge is wrong because the Commission has certainly not made it "absolutely clear" its conduct "could not reasonably be expected to recur." *Fellowship of Christian Athletes v. District of Columbia*, No. 24-1332, 2026 WL 275995, at *7 (D.D.C. Feb. 3, 2026) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). Nothing prevents the FTC from reissuing similar demands, whether in connection with future investigations or through the monitoring and compliance processes established in the Dentsu Settlement. *See, e.g.*, ECF 33-2, 33-3, 33-4 §§ IV, V, VII.

Dated: April 21, 2026

Respectfully Submitted,

/s/ Samuel Rudovsky
   Samuel Rudovsky*
   (PA Bar No. 335724)
   Not Admitted to the D.C. Bar. D.C. Practice
   limited to U.S. federal courts and related
   matters under D.C. Ct. App. R. 49(c)(3).
Robert Corn-Revere
   (D.C. Bar No. 375415)
James C. Grant*
   (WA Bar No. 14358)
Sara E. Berinhout**
   (MA Bar No. 703217)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Admitted pro hac vice
**Pro hac vice forthcoming

*Counsel for Plaintiff*

8